**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ALFREDO MOSQUERA-MURILLO,<br>JOAQUIN CHANG-RENDON, and<br>ANTONIO MORENO-MEMBACHE,<br><br>Defendants. |

Criminal Action No. 13-cr-134

Judge Beryl A. Howell

**MEMORANDUM OPINION**

Defendants Alfredo Mosquera-Murillo, Joaquin Chang-Rendon, and Antonio Moreno-Membache (collectively, the "defendants") are charged in a one-count indictment of conspiring to distribute, and possess with intent to distribute, at least five kilograms of cocaine and 100 kilograms of marijuana, on board a vessel subject to the jurisdiction of the United States, in violation of the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70503(a) and 70506(b), an offense that carries a mandatory minimum sentence of ten years of incarceration and a maximum penalty of life imprisonment.  *See* Indictment, ECF No. 1; *see* 46 U.S.C. § 70506(a); 21 U.S.C. § 960(b)(1)(B).[1]  The defendants, all Colombian nationals, were extradited to the United States in 2014 and are currently detained pending trial, Minute Entries, dated June

---

[1]      Two additional charged co-conspirators pled guilty to narcotics conspiracy charges in Colombia and were sentenced by a Colombian court to 149 months' imprisonment. *See* Gov't Mot. Dismiss Indictment at 2, ECF No. 26.  The Court dismissed these defendants, upon the government's motion, after the Colombian Supreme Court denied the government's extradition requests on the ground that the facts underlying the indictment were "the same in nature" as those for which the defendants were convicted and sentenced in Colombia. *Id.*; *see* Order Granting Gov't Mot. Dismiss Indictment, ECF No. 28 (dismissing indictment against William Obando-Gonzalez and Carlos Ivan Ortega-Tello).

19, 2014 and Oct. 29, 2014, which is scheduled to begin on January 19, 2016, *see* Minute Entry, dated Oct. 9, 2015.[2]

      With each of the defendants now detained in the United States for over a year, the parties have a substantial interest in proceeding expeditiously to trial. Indeed, federal law explicitly recognizes the important interests of both the defendants and the public in the prompt resolution of the government's charges at trial. 18 U.S.C. § 3161(h)(7)(A) (allowing for exclusion of time within which a criminal trial must commence only where the "ends of justice" served by a continuance outweigh both the "the best interest of the public and the defendant in a speedy trial"). Pending before the Court are ten pretrial motions, a number of which required supplemental briefing, addressing both the substance of the government's allegations and the means by which the government will attempt to prove its case. In connection with two of these motions, the Court heard testimony from three government witnesses at a day-long evidentiary hearing, but the defendants request no fewer than five *additional* pretrial hearings to test their various procedural and substantive challenges to this prosecution. *See infra* Part IV.C.2. & notes 14, 19, 35, 40. These requests for multiple, time-consuming rehearsals of the trial would, if granted, provide the defendants with a helpful preview of the government's case but, as discussed in more detail below, are neither required nor practical. Thus, in an effort to provide the parties with clear direction as they prepare for trial, the discussion that follows is grounded in the concrete realities of the present prosecution and the government's specific allegations against the defendants.

---

[2]    Chang-Rendon has remained in U.S. custody for nearly eighteen months, since June 13, 2014, and Mosquera-Murillo and Moreno-Membache have been detained in U.S. custody for more than a year, since October 23, 2014. *See* Executed Arrest Warrants, ECF Nos. 9, 30, 31.

As noted, pending before the Court are a total of ten motions: (1) Chang-Rendon's Motion for Bill of Particulars, ECF No. 69; (2) Moreno-Membache's and Chang-Rendon's separate motions to dismiss the indictment, ECF Nos. 78 and 119, respectively; (3) the United States' Motion *In Limine* to Introduce Other Crimes Evidence, ECF No. 71; (4) the United States' Motion *In Limine* to Admit or Allow out-of-court statements by alleged co-conspirators, ECF No. 72; (5) the United States' Motion *In Limine* to Preclude Cross-Examination or Argument by Defense Counsel as to a variety of topics, ECF No. 73; (6) Chang-Rendon's Amended Motion to Suppress Statements he gave to law enforcement on or about September 9, 2013, ECF No. 74; (7) Chang-Rendon's Amended Motion to Suppress Identifications made by three cooperating witnesses through the use of photo arrays, ECF No. 75; (8) Moreno-Membache's Motion to Disclose Identities of Confidential Informants Regardless of Whether They Will be Called at Trial, ECF No. 79; and (9) Chang-Rendon's Motion to Exclude Expert Testimony, ECF No. 115.[3]

Following a summary of the relevant factual and procedural background, these motions are discussed in the following sequence: Part II addresses Chang-Rendon's Motion for Bill of Particulars; Part III takes up the defendants' motions to dismiss the indictment in its entirety; and, lastly, Part IV addresses the parties' seven outstanding motions seeking the admission or exclusion of certain categories of evidence at trial.

---

[3]    While Mosquera-Murillo has adopted all co-defendant motions "that that can be conformed to [his] defense," *see* Minute Order, dated Aug. 10, 2015, Chang-Rendon has not adopted Moreno-Membache's motion to dismiss, *see* Minute Orders, dated Sept. 11, 2015, and Oct. 2, 2015, and Moreno-Membache likewise has not adopted Chang-Rendon's motion to dismiss and motion to exclude expert testimony, *see* Minute Order, dated Aug. 10, 2015.

## I.      BACKGROUND

On June 19, 2012, the U.S. Coast Guard ("USCG") intercepted a go-fast vessel called the "*Mistby*" on the high seas, approximately 70 nautical miles Southeast of Punta Mariato, Panama. Gov't Mot. Pretrial Detention ¶ 4, ECF No. 5. During the ensuing pursuit, the *Mistby* crew jettisoned overboard bales that were subsequently recovered and determined to contain approximately 125 kilograms of marijuana and approximately 229 kilograms of cocaine. *Id.*; Gov't Opp'n Def. Moreno-Membache's Mot. Dismiss Indictment ("Gov't Opp'n Moreno-Membache MTD") at 2–3, ECF No. 93.

Upon intercepting the vessel, U.S. law enforcement personnel conducted a right-of-visit board to determine the vessel's nationality. *Id.* After the vessel's master claimed Colombian nationality for both the *Mistby* and its crewmembers, the United States sought confirmation of the vessel's registry from Colombian authorities, as well as authorization to board and search the vessel pursuant to a formal Agreement Between the Government of the United States of America and the Government of the Republic of Colombia to Suppress Illicit Traffic by Sea. *Id.* at 2 & n.3 (citing the Narcotic Drugs Shiprider Agreement Between the United States of Am. & Colombia, State Dept., No. 97-57, 1997 WL 193931 (Feb. 20, 1997)). The Government of Colombia confirmed the nationality of the crew and the vessel, and, upon learning that the jettisoned bales contained narcotics, on June 26, 2012, granted the United States government's request to confirm that the exercise of United States jurisdiction over the *Mistby* was in accordance with this agreement. *Id.* at 2–3. In so doing, the Colombian government confirmed and concurred with the government's interpretation of the agreement, which served as its consent to allow the government to enforce American law over the vessel. *Id.* at 3 & n.4. Based on this consent, the United States government determined that the *Mistby* was subject to the jurisdiction

4

of the United States pursuant to the MDLEA. *Id.* at 4, Ex. A (Certification for the Maritime Drug Law Enforcement Act Case Involving Go-Fast Vessel *Mistby* (Colombia)) at 3, ECF No. 93-1.

Following the seizure of the *Mistby*, investigation by both Colombian law enforcement and the Drug Enforcement Agency ("DEA") indicated that the shipment was dispatched by a drug trafficking organization ("DTO") in Colombia. Mot. Pre-Trial Detention ¶ 5. While the charged defendants were not captured aboard the *Mistby*, but only arrested more than a year after its interdiction, they are now charged with assisting the DTO in its efforts to ship narcotics across the high seas on this vessel. *See* Executed Arrest Warrants, ECF Nos. 9, 30, 31. Specifically, the government alleges that Chang-Rendon, who was employed as a contractor by the Colombian Navy, obtained information regarding the location of Colombian and United States naval and law enforcement patrols and provided this information to the DTO. Gov't MIL Intro. Other Crimes Evidence at Trial ("Gov't 404(b) MIL") at 3, ECF No. 71. The government alleges that Mosquera-Murillo assisted in the preparation of the launch of the *Mistby* by working to recruit crew members for the maritime load; arranging planning meetings prior to the dispatch of the vessel; and serving as the primary link ("broker") between the organizers and co-defendant Chang-Rendon. *Id.* at 3–4. The government also alleges that Mosquera-Murillo owned the marijuana transported aboard the *Mistby*. *Id.* at 4. Finally, the government alleges that Moreno-Membache oversaw the launch of the *Mistby*, including traveling with the crew members to the launch point on the Colombian coast; guarding the seized load prior to the vessel's launch; and supervising a group of co-conspirators, who helped load the vessel. *Id.* Following their arrests, the defendants were extradited to the United States on June 16, 2014 (Chang-Rendon) and October 23, 2014 (Mosquera-Murillo and Moreno-Membache) on the single charge of conspiring from approximately January 2012 to February 2013, in Colombia and elsewhere, to distribute, and possess with intent to distribute, at least five kilograms of cocaine and at least 100 kilograms

of marijuana, on board a vessel subject to the jurisdiction of the United States, in violation of the MDLEA, 46 U.S.C. §§ 70503 and 70506(b), 21 U.S.C. §§ 960(b)(1)(B) and (b)(2)(G), and 18 U.S.C. § 2. Indictment at 1–2; *see* Gov't Mots. Pre-Trial Detention, ECF Nos. 5, 14, 15.

Following Chang-Rendon's extradition and arraignment, the government has produced discovery on a rolling basis since June 19, 2014. *See* Gov't Status Report on Discovery at 1, ECF No. 12. The government's initial productions comprised hundreds of pages of investigation reports and related materials obtained from both United States and Colombian law enforcement authorities, including a USCG drug seizure report, eighteen United States law enforcement reports of cooperator interviews and associated photo arrays, and more than 350 pages of investigation reports and court documents stemming from the Colombian investigation. *Id.* at 2–3. In light of the volume of documentary and other evidence, as well as the intercepted communications in Spanish at issue in the case, the Court designated this case as complex at the government's request in November 2014, thereby granting an extended period of discovery. *See* Minute Entry, dated Nov. 7, 2014 (indicating that the Court orally granted the government's Motion for a Complex Case Designation, ECF No. 23, due to the "volume of Spanish language documents requiring translation, the extensive wiretap evidence . . . , which will also require translation, [and] foreign witnesses that will require international travel arrangements").

The bulk of discovery is comprised of Spanish-language recordings of more than 59,000 intercepted telephone communications, which occurred over 48 cellular telephones subject to judicially-authorized wiretaps pursuant to Colombian orders. *See* Gov't Opp'n Defs.' Mot. Modify Court's Discovery Order at 1–3, ECF No. 46. This evidence includes pertinent calls intercepted over two phone lines used by Chang-Rendon, four phone lines used by Mosquera-Murillo, and four phone lines used by Moreno-Membache. Gov't Supp. Opp'n Defs.' Mot. Bill

of Particulars at 3, ECF No. 142. In addition to these audio recordings, the government has produced to the defendants, in compliance with this Court's orders, *see, e.g.*, Order, dated July 22, 2015, ECF No. 66, discs containing all of the intercepted communications, organized by telephone line, date and time; more than 1,600 pages of Colombian wiretap applications, along with an index of and summary information regarding all pertinent communications in which each defendant either participated or was mentioned; and English-language translations and transcripts of 111 intercepted communications that the government intends to introduce at trial, *see* July 24, 2015 Periodic Discovery Status Report ("DSR") at 2–3, ECF No. 68; Aug. 7, 2015 DSR at 1–2, ECF No. 84; Sept. 4, 2015 DSR at 2, ECF No. 117.

On September 11, 2015, the Court held an evidentiary hearing, at which the Court received testimony from three witnesses and heard oral argument on various pretrial motions submitted by the parties. *See* Minute Entry, dated Sept. 11, 2015. At the conclusion of this hearing, the Court reserved judgment as to all but four of the parties' individual requests and provided the parties with an opportunity to file supplemental briefing on a number of unresolved motions. *See* Minute Order, dated Sept. 11, 2015.[4] With this briefing now complete, the parties' outstanding motions are now ripe for consideration.

---

[4]       During the September 11 hearing, the Court granted: (1) the government's request, pursuant to Federal Rule of Evidence 615, to allow the lead agent assigned to this case to sit at counsel table at trial, Gov't MIL Admit or Allow at 11–12, ECF No. 72; *see* Tr. Mot. Hr'g. (Sept. 11, 2015 AM) at 37:11-22, ECF No. 134, with the government committing to alert the Court and the defendants should any extenuating circumstances require the agent to be replaced during trial, *id.* at 37:16-20; (2) the government's request to admit as substantive evidence English-language transcripts of any admissible Spanish-language recordings of intercepted communications, subject to the parties' stipulation that any such transcript is materially accurate, Gov't MIL Admit or Allow at 1–4; Tr. Mot. Hr'g. (Sept. 11, 2015 AM) at 36:10-25 (citing *United States v. Cano-Flores*, 796 F.3d 83 (D.C. Cir. 2015)); and (3) Chang-Rendon's Motion to Join and Adopt Motion of Co-Defendant Antonio Moreno-Membache, ECF No. 114, Minute Order, dated Sept. 11, 2015. Also at the September 11 hearing, the Court granted in part and denied in part the defendants' motion to reconsider the entry of a protective order requested by the government to govern discovery of sensitive investigatory materials, Mot. Recon. Entry Protective Order, ECF No. 108, and directed the parties to submit jointly a revised protective order reflecting modifications requested by the defendants, Tr. Mot. Hr'g. (Sept. 11, 2015 AM) at 22:9-13, which was subsequently accomplished, *see* Joint Mot. Protective Order, ECF No. 129. Chang-Rendon has indicated that he may yet file at least two, and perhaps more, additional out-of-time motions requiring resolution prior to trial. Notice Remaining Pretrial Mots. Filed Def. Chang-Rendon, ECF No. 77.

## II.      THE DEFENDANTS' MOTION FOR A BILL OF PARTICULARS

Arguing that the indictment "lacks factual information sufficient to permit [the defendants] to prepare a defense to the charges," the defendants request a bill of particulars providing additional information about the allegations against them, including their alleged respective roles in the charged conspiracy. Defs.' Mot. Bill of Particulars ("Defs.' BOP Mot.") at 3, ECF No. 69. As support, the defendants emphasize that the two-page indictment itself does little more than "parrot[] the statutory language" and sets out no factual allegations to support the government's charges. *Id.* Moreover, the defendants criticize the government's discovery production as of the filing of the motion for providing only "minimal guidance about [the] allegations" the government intends to prove at trial. Defs.' Reply Supp. Mot. Bill of Particulars at 5, ECF No. 101. Consequently, the defendants request a bill of particulars addressing seven categories of information related to the defendants' alleged illegal conduct. *Id.* at 3–4.[5]

In its initial response, the government relied on *United States v. Mejia*, 448 F.3d 436 (D.C. Cir. 2006), to contend that the indictment alone provides sufficient information as to the charged offenses to allow the defendants to prepare an adequate defense. Gov't Omnibus Opp'n Defs.' Mots. ("Gov't Omnibus Opp'n") at 6–7, ECF No. 82. Alternatively, the government suggested that the specific information requested by the defendants had been provided to the defendants through subsequent government filings and discovery, including prior motions, *id.* at 7–8 (citing ECF Nos. 5, 14, 15, 23, 71); reverse proffers with each defendant during which the government played intercepted phone calls involving that defendant, *id.* at 7; and "extensive discovery" including the production of "all of the judicially intercepted phone calls, an index of

---

[5]        Moreno-Membache and Mosquera-Murillo have each joined this motion, which was originally filed by Chang-Rendon. *See* Minute Orders, dated Aug. 10, 2015. Though the motion generally refers only to information requested as to Chang-Rendon, the government in supplemental briefing addresses the information produced to all defendants. Gov't Supp. Opp'n Defs.' BOP Mot. at 2 n.1.

the pertinent calls including each call's speakers and summary[] transcripts of calls that the Government intends to introduce at trial, lab reports, videos and photographs from associated seizures, Colombian judicially-authorized wiretap orders and reports, among other discovery," *id.* In light of the large volume of material already provided to the defendants, the government asserted that a bill a particulars is unnecessary and "would only serve to compel the Government to preview its case and particularize its theory of the Defendant[s'] guilt." *Id.* at 8.

Following the September 11 hearing, at the Court's invitation, *see* Minute Order, dated Sept. 11, 2015, the government filed supplemental briefing providing more detailed information as to the evidence produced to the defendants responsive to each of the seven categories identified in the defendants' motion, *see* Gov't Supp. Opp'n Defs.' BOP Mot. In light of this supplemental briefing, as well as the ample information provided to the defendants throughout more than eighteen months of discovery and, most recently, in compliance with this Court's discovery orders, and for the reasons outlined below, the defendants' request for a bill of particulars is denied.

## A.     Legal Standard

Federal Rule of Criminal Procedure 7(c) requires an indictment to "be a plain, concise and definite written statement of the essential facts constituting the offense charged." FED. R. CRIM. P. 7(c). Pursuant to Rule 7(f), if the Court so directs, these factual allegations may be supplemented by a bill of particulars. FED. R. CRIM. P. 7(f). This Rule permits a defendant to move for a bill of particulars "before or within 14 days after arraignment or at a later time if the court permits." *Id.* In considering the merits of such a motion, the D.C. Circuit has made clear that "'[a] bill of particulars can be used to ensure that the charges brought against a defendant are stated with enough precision to allow the defendant to understand the charges, to prepare a

defense, and perhaps also to be protected against retrial on the same charges.'"  *Mejia*, 448 F.3d at 445 (quoting *United States v. Butler*, 822 F.2d 1191, 1193 (D.C. Cir. 1987)).

If, however, "the indictment is sufficiently specific, or if the requested information is available in some other form, then a bill of particulars is not required."  *Butler*, 822 F.2d at 1193 (finding no abuse of discretion in denying request for bill of particulars for "the approximate times and the places at which [the defendant] entered and exited the alleged conspiracy," which information was not set out in indictment but provided in response to the motion); *see also Mejia*, 448 F.3d at 445 (finding no abuse of discretion in denying bill of particulars, where indictment charged a narcotics conspiracy that tracked the statute and provided a time period for the conspiracy, identified the statute that the object of the conspiracy violated, along with the proper *mens rea* and the location where the conspirators acted, despite the absence of particularized overt acts).

Defendants are not entitled to a bill of particulars as a matter of right, and the Court need only grant a defendant's request upon determining that a bill of particulars is necessary.  FED. R. CRIM. P. 7(f); 1 CHARLES ALAN WRIGHT & ANDREW LEIPOLD, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL § 130 (4th ed. 2008).  "The determination of whether a bill of particulars is necessary rests within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion."  *Mejia*, 448 F.3d at 445 (citations and internal quotation marks omitted).

## B.      Analysis

The defendants' request for a bill of particulars presents an unusual situation.  Typically, a defendant seeks a bill of particulars where the government has provided minimal discovery or other information as to the charged offense and the evidence to be offered against the defendant

at trial.  *See, e.g.*, *United States v. Sanford Ltd.*, 841 F. Supp. 2d 309, 312–13 (D.D.C. 2012) (describing the defendant's request for a bill of particulars, filed ten days after he was arraigned and prior to a superseding indictment, seeking additional information regarding the charges against him).  Here, by contrast, Cheng-Rendon filed the present motion more than a year after he was arraigned, *see* Minute Entry, dated June 16, 2014, and after the government produced extensive discovery to the defendants, *see supra* Part I.[6]  In light of the abundant information already provided through discovery and the government's various filings, the defendants rely on out-of-circuit authorities to turn the familiar reasoning underlying a request for a bill of particulars on its head.  Instead of arguing that they have received too little information from the government, the defendants contend that "the need for particulars is especially acute" here due to the deluge of information already provided.  Defs.' BOP Mot. at 2.

Thus, despite—and indeed because of—the large volume of material provided by the government apart from the indictment, the defendants suggest that a bill of particulars should be ordered "because the Indictment lacks factual information sufficient to permit [the defendants] to prepare a defense to the charges," by giving "no indication as to the basic facts regarding [their] allegedly unlawful conduct, including [their] alleged roles[s] in the conspiracy, the alleged scope of the conspiracy, and any actions [they] took in connection [with] this conspiracy."  *Id.* at 3 ("A bill of particulars is all the more important in a narcotics conspiracy case because the indictment itself provides so little detail." (quoting *United States v. Ramirez*, 54 F. Supp. 2d 25, 30 (D.D.C.

---

[6]   A motion for a bill of particulars is contemplated under the Federal Rules of Criminal Procedure to be filed promptly after the initiation of a criminal case.  *See* FED. R. CRIM. P. 7(f) (requiring a defendant to move for a bill of particulars within fourteen days after arraignment "or at a later time if the court permits"); *United States v. Homaune*, 898 F. Supp. 2d 153, 165 (D.D.C. 2012) (denying untimely motion for bill of particulars filed "fifty-two days after arraignment—far beyond Rule 7(f)'s fourteen-day default—with no explanation for why his request took so long to lodge.").  The present motion was filed many months after each of the defendants was arraigned.  Nonetheless, because the government raised no timeliness objection, the defendants' motion is considered on the merits.

1999))).  Further, contending that the government's production of discovery and other information "has been woefully deficient in numerous respects," the defendants argue that "forcing [the defendants] to proceed to trial . . . on the basis of the Government's barebones indictment and incomplete discovery would be unfair and would subject [them] to an intolerable risk of ambush at trial."  Defs.' Reply Supp. Mot. Bill of Particulars at 1–2.

The defendants therefore ask the Court to order the government to produce a bill of particulars providing additional information as to seven issues, which fall into three categories of subjects.  First, the defendants seek more detailed information regarding their alleged participation and respective roles in the DTO and the charged conspiracy, including:  (1) the period of the their alleged involvement in the charged conspiracy (Request #1); (2) the "scope, extent, and duration" of their alleged roles in the broader DTO (Request #2); (3) their alleged involvement in the planning of the narcotics shipment seized from the *Mistby* (Request #3); (4) the manner in which Defendant Chang-Rendon utilized his position within the Colombian Navy to provide information regarding the location of law enforcement assets to the DTO (Request #4); and (5) any locations outside of Colombia in which the defendants allegedly conspired or took actions in connection with the alleged conspiracy (Request #7).  Defs.' BOP Mot. at 3–4.  Second, they request the names of all members of the alleged conspiracy, including any unindicted members, as well the dates of these co-conspirators' participation (Request #5).  *Id*. at 4.  Finally, they request additional information regarding the government's proposed basis for the United States' exercise of jurisdiction over the *Mistby* (Request #6).  *Id*.

As an initial matter, the defendants are correct that the indictment in this case provides minimal background regarding the factual basis for the charges against the defendants.  Defs.' BOP Mot. at 3.  Of particular note, while the indictment charges a violation of the MDLEA

premised on the shipment of narcotics on the high seas, the indictment makes no mention of the *Mistby* or the basis for United States jurisdiction over the vessel. *See generally* Indictment. This relative sparsity alone, however, does not necessitate a bill of particulars. Indeed, the D.C. Circuit has rejected this exact argument. *See Mejia*, 448 F.3d at 445. In *Mejia*, the Circuit considered a district court's denial of a bill of particulars where the challenged indictment charged a narcotics conspiracy in a manner materially similar to the indictment at issue here. *Id.* (explaining that the indictment provided a time period for the charged conspiracy, identified the statute that the object of the conspiracy violated, stated the proper *mens rea*, and identified the location where the conspirators acted). There, as here, the challenged indictment did not identify any particular overt act undertaken by the defendants in furtherance of the charged conspiracy. *Id.* This brevity notwithstanding, the D.C. Circuit held that a bill of particulars is not required where the "requested information is available in some other form." *Id.* at 445–46 (citing *Butler*, 822 F.2d at 1193). In particular, because the government provided reports of cooperating witnesses' pretrial statements regarding alleged overt acts to the defendants well in advance of trial, the Circuit rejected the defendants' contention that they were unprepared to rebut these witnesses' testimony before the jury. *Id.* ("We can only conclude that if the defendants felt ambushed, it was not because the government was lying in wait, but because the defendants were not looking.").

Thus, the indictment's failure to detail the government's case against the defendants alone does not trigger a requirement for the government to produce a bill of particulars so long as the information requested by the defendants has been made available in another form, including in the government's responses to this and other defense motions. *Butler*, 822 F.2d at 1193–94. Here, the government's voluminous discovery to the defendants, as well as the additional

information provided through the government's filings providing additional clarity as to government's specific allegations against each defendant, provides sufficient information to isolate each category of information sought in the requested bill of particulars. This information as to each of the three categories of specific requests by the defendants is summarized below.

### 1.    The Defendants' Alleged Participation in the DTO and the Charged Conspiracy (Requests #1–#4, #7)

Taken together, five of the defendants' requests seek additional information regarding the government's allegations as to the scope, location and duration of the charged conspiracy, as well as the defendants' alleged involvement in that conspiracy and the DTO more broadly. The indictment itself does not detail this information, but multiple subsequent filings by the government do describe the allegations and evidence underlying the charge against each defendant with sufficient specificity to obviate any need for a bill of particulars.

With regard to the scope, location, and purpose of the alleged conspiracy, the government has repeatedly represented that the charged conspiracy is limited to efforts to prepare and launch the *Mistby* prior to its interdiction in June 2012. The government's motion in support of the admission of other crimes evidence indicates that proof at trial will include "that during the course and in furtherance of the charged conspiracy, from around January 2012 through February 2013, the Defendants were members of an international drug trafficking organization . . . , the object of which was to transport large quantities of cocaine from Colombia to Panama on board a vessel subject to the jurisdiction of the United States." *See* Gov't 404(b) MIL at 2. While the indictment does not name the *Mistby*, the *only* vessel the government alleges is subject to United States jurisdiction is the *Mistby*. *See* Gov't Opp'n Moreno-Membache MTD, Ex. A. Moreover, the government's most recent filings further confirm that the defendants are presently charged only with conspiring to ship narcotics aboard the *Mistby* in June 2012. *See, e.g.*, Gov't Supp.

14

MIL Admit or Allow at 3–5, ECF No. 159 (under the heading "The Charged Conspiracy" describing the alleged planning and preparation of the launch of the *Mistby*, as well as "discussions during the course of and immediately following the United States Coast Guard's interdiction of [vessel]").[7]

The government also has provided specific information as to the alleged role of each defendant in achieving this conspiratorial aim. Most notably, the government's allegations as to each defendant's participation and role in a coordinated effort to obtain cocaine from mountainous regions in Colombia and ship cocaine and other drugs aboard the *Mistby* are described in both its motion in support of its other crimes evidence describes, Gov't 404(b) MIL at 2–4, and in its supplemental opposition to the present motion, Gov't Supp. Opp'n Defs.' BOP Mot. at 5–6, 12–13. The government likewise has produced to the defendants ample evidence underlying the government's allegation regarding the approximate period of each defendant's alleged involvement in the charged conspiracy during the spring of 2012. *See id.* at 3. According to the government, this evidence includes calls and text messages intercepted over phone lines used by each defendant until the spring of 2012, as well as investigative reports describing planning meetings attended by the defendants in approximately March 2012. *Id.*

In light of this supplemental information clarifying the offense charged in the indictment, the defendants have received sufficient notice of the charge against them. Indeed, in this Circuit, the "general rule . . . states that an indictment need only to provide a general time period of the conspiracy and a list of the countries where the conspiracy transpired." *United States v. Lorenzana-Cordon*, No. 03-cr-331-13-14 (CKK), 2015 WL 5441035, at *4 (D.D.C. Sept. 15,

---

[7]     As described below, *infra* Part IV.B.2.a., the government's evidence of *other* alleged narcotics shipments involving the defendants is not properly understood as intrinsic to the charged conspiracy, but may be admitted, if at all, only as "other crimes" evidence under Rule 404(b).

2015) (citing authorities). Under this general rule, the D.C. Circuit has expressly rejected efforts to obtain much of the information the defendants now request. For example, in *United States v. Butler*, the defendant sought "a bill to require the government to state the approximate times and the places at which [he] entered and exited the alleged conspiracy." 822 F.2d at 1193. As here, though the government's response described only the approximate dates of the defendant's involvement in the alleged scheme, the D.C. Circuit concluded that "[m]ore specific information about the times and places that Butler participated in the alleged conspiracy was not required by law." *Id.* (citing *United States v. Pollack*, 534 F.2d 964, 970 (D.C. Cir. 1976) *cert. denied*, 429 U.S. 924 (1976)); *see also Lorenzana-Cordon*, 2015 WL 5441035, at *4 (denying a bill of particulars where the defendants sought specific information regarding the defendants' entry and withdrawal from the charged conspiracy after the government alleged only an approximate date of the defendants' entry into the conspiracy and contended that the conspiracy continued until the date of the filing of the indictment); *see also United States v. Bazezew*, 783 F. Supp. 2d 160, 168 (D.D.C. 2011) (holding that the defendants were "not entitled to know exactly how government law enforcement officials determined that each defendant was involved in the conspiracy; the exact date, time, and place when the conspiracy began; the conduct of all co-conspirators in furtherance of the conspiracy that was known to each individual defendant; the names, addresses, and telephone numbers of all persons having information or knowledge of each defendant's involvement in the conspiracy; the identity of all persons known by the government to have participated in each alleged overt act; or a description of the nature of all acts or statements that each defendant allegedly engaged in or uttered in support of or in furtherance of the conspiracy").

While the government has provided sufficient clarity as to the nature and purpose of the charged conspiracy, as well as the defendants' respective roles therein, however, the defendants are correct that the indictment and the government's subsequent filings raise some confusion as to its duration. In the indictment and its subsequent filings, the government alleges that the charged conspiracy continued through February 2013. *See* Indictment at 1. Both in seeking a bill of particulars and in opposing the government's evidentiary motions, however, the defendants contend that the charged conspiracy necessarily concluded eight months earlier, upon the interdiction of the *Mistby* in June 2012. *See* Defs.' Resp. Gov't Supp. Opp'n Defs.' BOP Mot. at 3–4, ECF No. 151 (arguing that the interdiction of the *Mistby* "irremediably defeated the conspiracy's allege end"); Defs.' Opp'n Gov't Supp. MIL Admit or Allow at 3, ECF No. 164. Thus, the defendants argue that any acts undertaken after the interdiction of the *Mistby* cannot be in furtherance of the charged conspiracy. *See id.*

The government's asserted basis for alleging that the charged conspiracy concluded in February 2013, almost eight months after the *Mistby*'s interdiction, is decidedly unclear. Neither the indictment, nor the government's numerous filings to date, appear to include any specific allegation regarding over acts undertaken by the defendants or any uncharged co-conspirators following the immediate aftermath of the *Mistby*'s interdiction. *See, e.g.*, Gov't Supp. MIL Admit or Allow at 3–5 (summarizing wiretap evidence of the charged conspiracy and describing no conspiratorial acts undertaken after the interdiction of the *Mistby* to further the alleged conspiracy). Likewise, the D.C. Circuit generally has held that "conspirators' acts of concealment after the central object of the conspiracy [has] been accomplished [or defeated do] not extend the life of the conspiracy." *United States v. Turner*, 548 F.3d 1094, 1097 (D.C. Cir.

2008) (citing authorities); *see also Krulewitch v. United States*, 336 U.S. 440, 443 (1949)).[8]

Thus, "[t]o show that an act of concealment was in furtherance even though it occurred after the

conspiracy ended, the government must prove the existence of an express original agreement to

conceal the conspiracy." *United States v. Hong Vo*, 978 F. Supp. 2d 49, 53 (D.D.C. 2013) (citing

*Grunewald v. United States*, 353 U.S. 391, 405 (1957)). As yet, the government has made no

such showing. Nonetheless, because the government has provided ample information regarding

the defendants' alleged participation and roles in the charged conspiracy, a bill of particulars

providing further detail regarding the government's specific allegations on this score is

unnecessary and the request for particulars is therefore denied.

### 2.    Identifying Alleged Co-Conspirators (Request #5)

In addition to information regarding their own alleged participation in the charged

conspiracy, the defendants seek additional information regarding the identities of their alleged

co-conspirators. *See* Defs.' Reply Supp. Defs.' BOP Mot. at 2–3 & n.1 (citing authorities in

support of a bill of particulars identifying "by name all members of the alleged conspiracy,

including unindicted members, and the dates of their participation in the conspiracy").

The government counters that sufficient information regarding the members of the

charged conspiracy has been produced to allow the defendants to prepare an adequate defense.

Gov't Supp. Opp'n Defs.' BOP Mot. at 9–11. In support, the government points to its extensive

production of wiretap recordings and intercepted text messages, along with summaries of all

pertinent calls and an accompanying index identifying by name (where known) the individuals

who participated in each of these calls. *Id.* at 9–10. The government likewise contends that

---

[8]     Writing in dissent, Judge Tatel has noted that the Supreme Court recognizes that certain acts of concealment may serve to extend a charged conspiracy, namely where the conspiratorial objective is predicated on the continued concealment of the defendants' activities after an initial illegal act (*e.g.*, kidnappers concealing their location in order to obtain a ransom). *See Turner*, 548 F.3d at 1100–01 (Tatel, J., dissenting).

additional Colombian judicial and investigative documents produced to the defendants describe some of the same co-conspirators identified in these calls. *Id.* at 10. These documents include plea and sentencing documents related to individuals prosecuted by the Government of Colombia as a result of a wide-ranging investigation that included the interdicted shipment aboard the *Mistby*, as well as nine land-based seizures and other maritime seizures. *Id.* Finally, the government argues that no further information regarding the identities of alleged co-conspirators needs to be provided because the government has no burden at trial to prove all participants in the charged conspiracy. *Id.* (citing *Rogers v. United States*, 340 U.S. 367, 375 (1951)).

Even if authority in this Circuit exists for disclosure of known co-conspirators, whether or not these co-conspirators will testify at trial, at least for non-violent conspiracies, *see*, *e.g.*, *Bazewew,* 783 F. Supp. 2d at 168; *United States v. Palfrey*, 499 F. Supp. 2d 34, 52 (D.D.C. 2007), this does not require any further disclosure in this case, where the government *has* disclosed the identities of alleged co-conspirators who participated in or were discussed on intercepted communications. Thus, to the extent that alleged co-conspirators remain unidentified, the defendants have failed to demonstrate that this alone will prevent them from preparing an adequate defense to the charged conspiracy, and the defendants' request for particulars identifying these individuals is denied.

### 3. United States Jurisdiction Over the Mistby (Request #6)

Finally, the government has provided sufficient information as to its asserted basis for the exercise by the United States of jurisdiction over the *Mistby* to allow the defendants to understand the charges against them. In particular, the government has asserted in multiple filings that the *Mistby* is subject to United States jurisdiction pursuant to the MDLEA, which defines "vessels subject to the jurisdiction of the United States" to include "a vessel registered in

a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States." *See, e.g.*, Gov't Opp'n Moreno-Membache MTD at 3 (quoting 18 U.S.C. § 70502(c)(1)(C)). According to the government, such consent or waiver is "proved conclusively by certification of the Secretary of State or the Secretary's designee." *Id.* (quoting 18 U.S.C. § 70502(c)(2)(B)), and the government has produced a State Department certification demonstrating that the Government of Colombia waived objection to the enforcement of United States law by the United State over the *Mistby*, *see id.*, Ex. A. The government likewise has provided investigative materials produced by the USGC documenting the "specific location of the *Mistby* go-fast vessel at the time of interdiction, the observations of law enforcement officers, and photographs and videos of the interdiction." Gov't Supp. Opp'n Defs.' BOP Mot. at 11. These productions, coupled with the information relayed in the government's opposition to the defendants' motions to dismiss which, in part, challenge United States jurisdiction over the *Mistby*, provide ample notice of the government's asserted basis for exercising jurisdiction over the vessel pursuant to the MDLEA.

*       *       *

Despite the volume of discovery materials and the government's supplemental proffer in response to the current motion, the defendants complain that the government "continues to withhold fundamental and critical components of its allegations." Defs.' Resp. Gov't Supp. Opp'n Defs.' BOP Mot. at 1. Specifically, the defendants continue to suggest that the government "refuses to state when it believes [the defendants] joined the conspiracy;" "has yet to reveal who it believes was part of the alleged conspiracy;" "has never provided evidence of how Mr. Chang-Rendon supposedly got the confidential information he conveyed [regarding the position of law enforcement assets];" and "has neither explained nor provided any evidence of what [the defendants] (or the conspiracy at large) allegedly did after the *Mistby* was seized." *Id.*

20

at 1–3.  These continued complaints fall far short of warranting a bill of particulars for at least three reasons.

First, to the degree that the defendants' request for a bill of particulars stemmed from deficiencies in the government's initial discovery productions, *see, e.g.*, Defs.' Reply Supp. Mot. Bill of Particulars at 2 (describing the government's discovery as of August 14, 2014, as "woefully deficient," in light of the government's failure to translate key materials into English), the government has recently cured these prior deficiencies in compliance with the Court's most recent discovery orders, *see, e.g.*, Sept. 4, 2015 DRS at 2 (reporting the completed translation and production of summaries of all pertinent intercepted communications).   Moreover, though the defendants suggest that "substantial discovery remains outstanding," raising the specter that additional evidence may be provided "on the eve of trial," Defs.' Reply Supp. Mot. Bill of Particulars at 3–4, the defendants' request to postpone the trial date was granted, *see* Minute Entries, dated July 21, 2015 and Oct. 9, 2015, and the government's most recent interim status report indicates no outstanding discovery requests that have not been addressed.  *See* Nov. 27, 2015 DSR, ECF No. 174.   Indeed, as already noted, discovery has been ample, including production to each defendant of an index and summaries of all pertinent intercepted communications, including the names of any known participants, as well as filter disks of calls on which each defendant participated or was mentioned.  Aug. 7, 2015 DSR at 1–2; Gov't Supp. Opp'n Defs.' BOP Mot. at 9–10.

Second, given the substantial clarification already provided by the government through discovery and in response to this and other motions, any complaints regarding remaining uncertainty as to the factual basis for the charge against the defendants amounts to little more than a request to preview the government's case and evidence in advance of trial.  "'A bill of

particulars is not a discovery tool or a devi[c]e for allowing the defense to preview the government's theories or evidence.'" *Sanford Ltd.*, 841 F. Supp. 2d at 316 (quoting *United States v. Ramirez*, 54 F. Supp. 2d 25, 29 (D.D.C. 1999)); *see also United States v. Mack*, 53 F. Supp. 3d 179, 190 (D.D.C. 2014) ("It is not the function of a bill of particulars . . . to provide detailed disclosure of the government's evidence in advance of trial." (quoting *United States v. Edelin*, 128 F. Supp. 2d 23, 37 (D.D.C. 2001))).  Instead, in considering a request for a bill of particulars, "the court must balance the defendant's need to know evidentiary-type facts in order to adequately prepare a defense with the government's need to avoid prematurely disclosing evidentiary matters to the extent that it will be unduly confined in presenting its evidence at trial." *Sanford Ltd.*, 841 F. Supp. 2d at 316 (internal quotations omitted) (quoting *United States v. Baker*, No. 8–00075, 2010 WL 936537, at *2 (M.D. Pa. Mar. 15, 2010)).  The information provided by the government more than sufficiently enables the defendants to assess the government's view about each defendant's role and the scope of the evidence against him.  This evidence, as supplemented by the government's numerous filings describing its specific allegations against each defendant, is also more than sufficient to allow the defendants adequately to understand the conspiracy charge they face and to prepare their defense. *See Butler*, 822 F.2d at 1193–94; *see also United States v. Homaune*, 898 F. Supp. 2d 153, 165 (D.D.C. 2012) (noting that government "provided less complete answers than [the defendant] wanted" but denying particulars since "the information he requested is now largely 'available in some other form'" (quoting *Butler*, 822 F.2d at 1193))).  Thus, for example, the defendants are not entitled to a bill of particulars about the government's theory of precisely how, or from whom, Cheng-Rendon obtained the sensitive law enforcement location information that he allegedly shared with the DTOs.

Finally, to the extent that the defendants demand an explanation from the government for the end date of the charged conspiracy as extending for eight months beyond the interdiction of the *Mistby*, this is not a matter necessary to address in a bill of particulars. Specific information about the times, places and duration of a defendant's participation in a conspiracy are not required to be set out in an indictment, nor warrant a bill of particulars. *See Butler*, 822 F.2d at 1194; *Sanford Ltd.*, 841 F. Supp. 2d at 316–19 (recognizing that "[d]efendants in a conspiracy case may not obtain the 'whens,' 'wheres,' and 'with whoms' . . . in a bill of particulars" (quoting *United States v. Diaz*, 303 F. Supp. 2d 84, 89 (D. Conn. 2004))).

Accordingly, the defendants' motion for a bill of particulars is denied.

## III.     THE DEFENDANTS' MOTIONS TO DISMISS THE INDICTMENT

In addition to requesting a bill of particulars providing additional information regarding the charges against them, Moreno-Membache and Chang-Rendon each assert that the indictment must be dismissed in its entirety. Mots. Dismiss, ECF Nos. 78 ("Moreno-Membache MTD"), 119 ("Chang-Rendon MTD").[9] Raising a myriad of constitutional and statutory challenges, the defendants broadly contend that their prosecution under the MDLEA for alleged conduct on the Colombian mainland cannot proceed. For the reasons outlined below, the defendants' motions are denied.

### A.     Legal Standard

Pursuant to Federal Rule of Criminal Procedure 12(b), a defendant "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(1). Following an amendment in 2014, Rule 12(b) now

---

[9]     Each of these motions have been adopted by at least one co-defendant, *see* Minute Orders, dated Aug. 10, 2015, and Oct. 2, 2015. In each instance, however, the adopting defendant has declined to provide supplemental support for the adopted motion.

delineates between certain motions that may be made at any time and those required to be made before trial if certain conditions are met. FED. R. CRIM. P. 12(b)(2), (3). On one hand, a "motion that the court lacks jurisdiction may be made at any time while the case is pending." FED. R. CRIM. P. 12(b)(2). On the other hand, where the basis for the objection is "reasonably available" before trial, a defendant must raise by pretrial motion any objection asserting a "defect in the indictment," including, *inter alia*, a "failure to state an offense." FED. R. CRIM. P. 12(b)(3)(B). Interpreting this latter phrase, "courts have determined that constitutional objections . . . challenging the validity of the charge are objections that the charge failed to state an offense." *Al Bahlul v. United States*, 767 F.3d 1, 79 (D.C. Cir. 2014) (en banc) (Kavanaugh, J., concurring in part and dissenting in part) (citing authorities).

"[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) *cert. denied*, 135 S. Ct. 2911 (2015) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)). "Rather, to be sufficient, an indictment need only inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense." *Id.* (citing authorities); *see also* 24 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 612.02 (3d ed. 2015). As such, a pretrial motion to dismiss an indictment "allows a district court to review the sufficiency of the government's pleadings, but it is not a permissible vehicle for addressing the sufficiency of the government's evidence." MOORE ET AL. § 612.02 (a "Rule 12 motion to dismiss is not the proper way to raise a factual defense."). Thus, "[w]hen considering a motion to dismiss an indictment, a court assumes the truth of [the government's] factual allegations." *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015) (citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952)); *see also*

24

*United States v. Hitt*, 249 F.3d 1010, 1016 (D.C. Cir. 2001) (same) (citing authorities); *United States v. Bowdin*, 770 F. Supp. 2d. 142, 146 (D.D.C. 2011) ("The question, then, is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed."); *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009) ("The district court must presume the allegations of the indictment to be true, . . . and may not dismiss an indictment on a determination of facts that should have been developed at trial" (internal citations, quotations, and alterations omitted)).

### B.        Analysis

The defendants have filed two separate motions that together assert the following six grounds for dismissing the indictment against them: (1) the Court lacks subject matter jurisdiction over prosecution of individuals who were not arrested on board the *Mistby*; (2) enactment of the conspiracy provision of the MDLEA exceeded Congress's authority under Article I, Section 8, of the Constitution; (3) the present prosecution violates the *Ex Post Facto* Clause of Article I, Section 9, of the Constitution; (4) the government's "unfair and arbitrary" prosecution of the defendants under United States law violates the Due Process Clause; (5) the substantive and conspiracy provisions of the MDLEA are unconstitutionally vague; and (6) the indictment fails to charge the alleged basis for United States jurisdiction over the *Mistby*.[10] Following a summary of the relevant provisions of the MDLEA, as well as the D.C. Circuit's resolution of recent challenges to these provisions, the discussion that follows addresses each of these proposed objections to the present indictment *seriatim*.

---

[10]        In view of their purported constitutional concerns, the defendants further argue that the conspiracy provision of the MDLEA should be interpreted to preclude extraterritorial application. Chang-Rendon MTD at 18–19. Acknowledging that this argument is foreclosed in this Court by the D.C. Circuit's opinion in *United States v. Ballestas*, 795 F.3d 138 (D.C. Cir. 2015), however, the defendants merely preserve this argument for later review by the D.C. Circuit and U.S. Supreme Court. *Id.* at 19.

### 1.    The Statutory Framework

Endeavoring to address "concerns about difficulties encountered in prosecuting persons involved with shipments of drugs to the United States on vessels, both with respect to the crew on board and others associated with the enterprise," Congress enacted the MDLEA to facilitate the prosecution of individuals involved in narcotics smuggling via the high seas "in absence of often elusive evidence that the drugs were destined for the United States." *Ballestas*, 795 F.3d at 145 (citing S. Rep. No. 96-855, at 2 (1980)).   To that end, the MDLEA provides:

> An individual may not knowingly or intentionally manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance on board—
>> (1) a vessel of the United States or a vessel subject to the jurisdiction of the United States . . . .

46 U.S.C. § 70503(a).  In addition to proscribing this substantive offense, the MDLEA's conspiracy prohibits "attempting or conspiring to violate" the statute. *Id.* § 70506(b).

Indicative of Congress's desire to disrupt international narcotics trafficking, the MDLEA broadly defines a "vessel subject to the jurisdiction of the United States" to include, *inter alia*, "a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States." *Id.* § 70502(c)(1)(C).  Further, the statute explicitly provides for its extraterritorial enforcement, stating that its substantive provisions apply "even though the act [giving rise to the offense] is committed outside the territorial jurisdiction of the United States." *Id.* § 70503(b).  Given Congress's express effort to criminalize international narcotics trafficking, even absent evidence of an immediate effort to transport narcotics to the United States, foreign defendants seeking to avoid prosecution under the MDLEA have raised a number of constitutional and statutory challenges.  In fact, the D.C. Circuit has addressed challenges to the MDLEA's extraterritoriality twice in the last ten months.

*See United States v. Miranda*, 780 F.3d 1185 (D.C. Cir. 2015); *Ballestas*, 795 F.3d at 138.  In each instance, however, the Circuit rejected such challenges and upheld the prosecution under the MDLEA of foreign nationals who engaged purely in land-based extraterritorial conduct as participants in alleged international narcotics conspiracies.

First, in *United States v. Miranda*, two Colombian nationals were charged with participating in an international drug conspiracy using go-fast vessels to move narcotics from Colombia northward to various Central American countries.  780 F.3d at 1186–87.  Like the defendants here, neither defendant in *Miranda* planned to, or did, leave Colombia in furtherance of the alleged conspiracy.  *Id.* at 1187 (explaining that one defendant served as an "organizer of the smuggling operations" and the other defendant "provided logistical support").  Advancing both statutory and constitutional challenges, the defendants moved to dismiss the indictment on at least four grounds, three of which are raised by the defendants here.  *Id.*  After the district court denied their motions, the defendants each entered guilty pleas through which they stipulated to their participation in the alleged scheme.  *Id.*  On appeal, the D.C. Circuit held that the defendants' unconditional guilty pleas barred their attempts to renew all but one of their challenges to the underlying indictment, namely the defendants' subject-matter jurisdiction challenge.  *Id.* at 1189–91.  With respect to this remaining issue, the *Miranda* Court considered whether the vessels the defendants used to transport narcotics qualified as vessels "subject to the jurisdiction of the United States."  *Id.* at 1191.  In so doing, the Court held that this question raised an issue of subject-matter jurisdiction that must be resolved before trial by the court; *id.* at 1193 ("[S]ubject-matter jurisdiction presents a question of law for resolution by the court, and courts have an 'obligation to determine whether subject-matter jurisdiction exists' as a preliminary matter." (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006))), before

ultimately concluding that "stateless" vessels qualify as vessels subject to United States jurisdiction for purposes of the MDLEA, *id.* at 1197.

While the *Miranda* Court thus largely avoided the constitutional and statutory questions raised in the present motions, the D.C. Circuit reaffirmed the broad extraterritorial reach of the MDLEA in *United States v. Ballestas*. As in *Miranda*, the facts presented in *Ballestas* closely parallel the charged conspiracy at issue here. Again, a long-term investigation involving intercepted electronic communications uncovered an effort to traffic narcotics from Colombia northward on go-fast vessels and culminated with the interdiction of a narcotics-laden vessel on the high seas. *Id.* at 141–42. Like Chang-Rendon, the defendant, who allegedly provided information purporting to reveal the location of air and maritime law enforcement assets situated along the proposed routes used to traffic narcotics, was charged along with six co-conspirators with conspiring to violate the MDLEA. *Id.* at 142. As in *Miranda*, the defendant pleaded guilty, based upon stipulated facts. *Id.* at 143. Unlike the defendants in *Miranda*, however, the defendant in *Ballestas* reserved his right to pursue various challenges to his prosecution under the MDLEA on appeal, *id.* at 141, and advanced many of the same arguments before the D.C. Circuit that the defendants put forward in support of the instant motions. *Id.* Specifically, the defendant contended that the MDLEA's conspiracy provisions either did not reach his purely extraterritorial conduct or, alternatively, that any effort to proscribe such conduct was beyond Congress's authority to criminalize under Article I of the Constitution. *Id.* at 143–148. The defendant further asserted that the application of the MDLEA against him violated the Due Process Clause because the government failed to establish a sufficient nexus between his conduct in Colombia and the United States. *Id.* at 148–149.

Rejecting each of these arguments, the D.C. Circuit held, first, that Congress intended the MDLEA to reach the purely extraterritorial conduct of individuals who conspire to traffic narcotics aboard a vessel subject to United States jurisdiction.  *Id.* at 145.  As the Court explained, cabining the MDLEA's extraterritorial reach to exclude liability for individuals who do not themselves embark upon the high seas would leave "[d]rug kingpins and other conspirators who facilitate and assist in carrying out trafficking schemes . . . beyond the reach of the statute, compromising the overriding intent of Congress in enacting it."  *Id.*  Second, the *Ballestas* Court held that Congress did not exceed its authority under the Define and Punish Clause in proscribing the defendant's role in the charged conspiracy.  *Id.* at 147.  Citing familiar principles of criminal conspiracy law, the Circuit observed that reasonably foreseeable overt acts undertaken by one co-conspirator in furtherance of a conspiracy are attributable to all co-conspirators.  *Id.* (citing *Pinkerton v. United States*, 328 U.S. 640, 641 (1946)).  Thus, because the acts of the defendant's co-conspirators on the high seas were attributable to him, Congress maintained authority to punish him for his role in agreeing to violate the MDLEA.  *Id.*  Finally, while declining to determine definitively whether the Due Process Clause constrains the extraterritorial application of federal criminal laws, the *Ballestas* Court relied on the defendant's stipulated facts to conclude that the application of the MDLEA to him was neither arbitrary nor fundamentally unfair.  *Id.* at 148.

Set against these recent precedents, the defendants' various arguments in support of their pending motions to dismiss face significant legal obstacles.  As the discussion below explains, the defendants' efforts to overcome these obstacles are unsuccessful.

### 2.    Subject-Matter Jurisdiction

The defendants first contend that this Court lacks jurisdiction over their prosecution. Specifically, as they interpret the materials relied upon by the government to assert jurisdiction over the *Mistby*, the defendants assert that the Colombian government did not consent or waive objection to application of American law to individuals who did not engage in conduct aboard the vessel. While the defendants advance this argument only after challenging the constitutional basis for their prosecution, courts have an "'obligation to determine whether subject-matter jurisdiction exists' as a *preliminary matter*." *Miranda*, 780 F.3d at 1193 (emphasis added) (quoting *Arbaugh*, 546 U.S. at 514). Accordingly, the Court will address this issue before turning to the defendants' remaining arguments.

As an initial matter, the defendants' multiple arguments in support of the instant motion present at least some confusion as to their view of the proper resolution of the jurisdictional question they have raised. *Compare* Chang-Rendon MTD at 16–18 (asking the Court to conclude that the *Mistby* does not qualify as a "vessel subject to United States jurisdiction") *with id.* at 29–32 (asking the Court to hold that whether a vessel is "subject to the jurisdiction of the United States" is a question for the jury). This apparent confusion notwithstanding, the D.C. Circuit has spoken clearly and definitively on the subject.

As previously noted, in *Miranda*, the D.C. Circuit held that the determination of whether a vessel qualifies as "subject to the jurisdiction of the United States" for purposes of a prosecution under the MDLEA is a question of subject-matter jurisdiction that must be resolved before trial by the court. 780 F.3d at 1193. In so holding, the D.C. Circuit emphasized the potential affront to the interests of foreign nations, as well as international comity generally, an alternative rule would raise, noting that "[i]f a defendant could waive or forfeit the requirement

30

regardless of the interests of a foreign nation whose prerogatives may be directly at stake, application of the MDLEA could engender considerable tensions in foreign relations." *Id.* at 1194. Moreover, even before *Miranda*, this Court held that the question of United States jurisdiction over a vessel used to traffic narcotics is, under the MDLEA, a "jurisdictional issue [that] is a question of law 'to be determined solely by the trial judge . . . because 'it does not raise factual questions that traditionally would have been treated as elements of an offense under common law.'" *United States v. Varon Castro*, No. 12-cr-78, Tr. Evidentiary Hr'g, (Aug. 8, 2014) at 52 (quoting *United States v. Tinoco*, 304 F.3d 1088, 1108 (11th Cir. 2002) and citing *United States v. Larrahondo*, 885 F. Supp. 2d 209 (D.D.C. 2012)), ECF No. 82. Thus, while this "allocation of the issue to the court rather than the jury gives rise to a possible Sixth Amendment claim (regardless of whether the issue goes to subject-matter jurisdiction)," *Miranda*, 780 F.3d at 1195–96 (citing *United States v. Gonzalez*, 311 F.3d 440, 444 (1st Cir. 2002)), the Court is bound under *Miranda* to resolve the issue of United States jurisdiction over the *Mistby* as a threshold matter.

The defendants' suggestion that the Colombian government's waiver of jurisdiction over the *Mistby* extends only to the vessel and its crew does not withstand close scrutiny. At the outset, as this Court has previously held, the MDLEA provides that a certification by the U.S. Department of State constitutes conclusive proof of a foreign nation's consent or waiver of jurisdiction over a particular vessel. *Varon Castro*, No. 12-cr-78, Tr. Evidentiary Hr'g, (Aug. 8, 2014) at 71.[11] Here, the government has provided such a certification indicating that, upon the

---

[11]     This holding was based the statutory language, legislative history and established case law. First, the statute plainly provides that a "response of a foreign nation to a claim of registry . . . is proved conclusively by certification of the Secretary of State or the Secretary's designee." 46 U.S.C. § 70502(d)(2). Second, the legislative history confirms the definitiveness of this language. Specifically, when first enacted the MDLEA provided that "[t]he denial of [a] claim of registry by the claimed flag nation may be proved by certification of the Secretary of State or the Secretary's designee," Coast Guard Authorization Act of 1986, Pub. L. No. 99-640, 100 Stat 3545, but the 1996 amendments struck the words "may be" and replaced them with "is conclusively," ensuring that the

request of United States authorities, "Colombian authorities confirmed and concurred with the United States' interpretation of Article 16 of the Agreement, thereby waiving objection to the enforcement of United States law by the United States over the go-fast vessel MISTBY, all associated contraband, and persons on board." Gov't Opp'n Moreno-Membache MTD, Ex. A. at 3.

The defendants point to the text of the certification to contend that the scope of the waiver does *not* provide for United States jurisdiction over individuals, like the defendants, who were not apprehended on board the *Mistby*. Chang-Rendon MTD at 17–18. Consequently, the defendants suggest that the *Mistby* "is *not* a vessel 'subject to the jurisdiction of the United States' for *purposes of [their] prosecution*." *Id.* at 18 (emphasis original). They muster no authority, however, for the proposition that conclusive evidence of a foreign government's waiver of jurisdiction over a particular vessel is insufficient to establish the court's subject-matter jurisdiction over a subsequent prosecution of any land-based co-conspirators. *See generally id.* at 16–18. Absent binding authority to the contrary, however, the Court declines the defendants' invitation to indulge in this novel interpretative exercise.

By its plain terms, the MDLEA provides this Court with subject-matter jurisdiction over the prosecution of individuals who engage in, or conspire to engage in, narcotics trafficking aboard a vessel "subject to the jurisdiction of the United States." 46 U.S.C. §§ 70503(a), 70506.

---

Secretary of State or the Secretary's designee's certification is, as stated, conclusive proof of jurisdiction, *see* Coast Guard Authorization Act of 1996, Pub. L. No. 104-324, 110 Stat 3901. Then, the 2008 amendment to the MDLEA expanded the scope of the Secretary's certification in order to "make it easier to prosecute illegal drug smugglers." 152 Cong. Rec. 4,526 (daily ed. June 26, 2006) (statement of bill sponsor, Rep. Young). Finally, those courts to have considered the issue have held that the 1996 Amendments foreclosed any challenge to the accuracy or factual basis underlying the Secretary's certification because the certification "conclusively" establishes jurisdiction. *See, e.g.*, *United States v. Cardales-Luna*, 632 F.3d 731, 737 (1st Cir. 2011); *United States v. Gil-Martinez*, 980 F. Supp. 2d 165, 169–70 (D.P.R. 2013); *United States v. Antonio Munoz Brant-Epigmelio*, No. 8:09-CR-404-T-23TGW, 2010 WL 557283, at *1, *5 (M.D. Fla. Feb. 11, 2010) *aff'd sub nom. United States v. Brant-Epigmelio*, 429 F. App'x 860 (11th Cir. 2011).

Included among such vessels are vessels, like the *Mistby*, that are "registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States." *Id.* § 70502(c)(1)(C). The *Mistby*'s status as a "vessel subject to the jurisdiction of the United States" is proven conclusively by the State Department certification provided by the government. Moreover, to the degree that any uncertainty remains as to the Colombian government's consent to allow the defendants to be prosecuted under United States law, the defendants offer no explanation for how any purported desire to withhold consent with regard to land-based conspirators can be squared with the Colombian government's subsequent extradition of the defendants to the United States to stand trial under the MDLEA. In the end, then, the government has made a sufficient showing that the *Mistby* is subject to United States jurisdiction within the meaning outlined in the MLDEA and the Court therefore maintains subject-matter jurisdiction over the prosecution of individuals alleged to have trafficked, or conspired to traffic, narcotics aboard that vessel.

### 3.     The Define and Punish Clause

Having confirmed subject matter jurisdiction over the present prosecution, the Court turns next to the defendants' various bases for challenging the constitutionality of the MDLEA generally, as well as any application of the statute to their alleged land-based conspiratorial conduct in particular. In considering these challenges, the Court is mindful that invalidating an Act of Congress is "'the gravest and most delicate duty that courts are called on to perform,'" even when significant constitutional rights are at stake, *Hodge v. Talkin*, 799 F.3d 1145, 1157 (D.C. Cir. 2015) (quoting *Blodgett v. Holden*, 275 U.S. 142, 147–48 (1927) (Holmes, J., concurring)), and that federal statutes are presumed to be constitutional, with "'the burden . . . on the one attacking the legislative arrangement to negative every conceivable basis which might

support it,'" *Heller v. Doe*, 509 U.S. 312, 320 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

Congress's legislative power is both "defined and limited," such that "[e]very law enacted by Congress must be based on one or more of its powers enumerated in the Constitution." *United States v. Morrison*, 529 U.S. 598, 607 (2000). Among these enumerated powers, the Define and Punish Clause of Article I, Section 8, of the Constitution authorizes Congress to "define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. CONST. art. I, § 8, cl. 10. This "clause encompasses three distinct powers: (i) to define and punish piracy; (ii) to define and punish felonies committed on the high seas; and (iii) to define and punish offenses against the Law of Nations." *Ballestas*, 795 F.3d at 146–47 (citing *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 158–59 (1820)). In addition to this express authority, Congress is broadly empowered under the Necessary and Proper Clause to "make all Laws which shall be necessary and proper for carrying into Execution" Congress's other enumerated powers. U.S. CONST. art. I, § 8, cl. 18.

Here, the defendants contend that the conspiracy provision of the MDLEA exceeds both the explicit and implicit limitations on Congress's constitutional authority to "define and punish" felonies committed on the high seas. Chang-Rendon MTD at 3–11. In challenging the constitutionality of the MDLEA's conspiracy provision, the defendants cite the text of the Define and Punish Clause as permitting Congress to criminalize only those felonies that are "committed on the high seas." Chang-Rendon MTD at 4. Insofar as either the substantive or conspiracy provisions of the MDLEA purport to criminalize conduct that "need not occur on the high seas," the defendants argue that these provisions are unconstitutional. *Id.* at 4–8; Defs.' Reply Supp. Mot. Dismiss at 1–5, ECF No. 145. Alternatively, the defendants argue that the Define and

Punish Clause implicitly limits Congress's authority to define and punish felonies committed on the high seas that "have some relation to the United States." Chang-Rendon MTD at 8–11; Defs.' Reply Supp. Mot. Dismiss at 6–7.[12]

At the outset, given the obvious similarities between the instant prosecution and *Ballestas*, the defendants' present constitutional challenge must overcome a significant precedential hurdle. Indeed, the government correctly notes that the D.C. Circuit, when presented with essentially the same factual scenario in *Ballestas*, flatly rejected the defendant's challenge to the constitutionality of the MDLEA's conspiracy provision, Gov't Opp'n Chang-Rendon Mot. Dismiss at 12, ECF No. 137. Attempting to distinguish the case at hand, the defendants argue that the D.C. Circuit in *Ballestas* considered only an as-applied challenge to the MDLEA's conspiracy provision. Chang-Rendon MTD at 7 (suggesting that the defendant in *Ballestas* "apparently assumed the precise point disputed here: that the MDLEA's conspiracy provision is an appropriate exercise of congressional authority in general"). According to the defendants, then, the *Ballestas* Court merely "assumed the premise" that the MDLEA was constitutional, and concluded, under familiar conspiracy law principles, that the statute therefore could be applied against the defendant. *Id.* at 7–8. The defendants reason that, because the defendant in *Ballestas* argued only that the conspiracy provision was unconstitutional *as applied to him*, the *Ballestas* court was neither presented with, nor required to decide, whether the statute is unconstitutional *on its face*. *Id.*

The defendants' argument on this score presents some logical difficulty. The Supreme Court has emphasized that a plaintiff generally "can only succeed in a facial challenge by 'establishing that no set of circumstances exists under which the [challenged statute] would be

---

[12] The defendants' argument that the government has failed to establish a sufficient nexus between their land-based conduct and the United States is addressed more fully, *infra* in Part III.B.5.

valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v.*

*Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481

U.S. 739, 745 (1987) (internal alterations omitted)). This general "no-set-of-circumstances" rule

is subject to some criticism, but "all agree that a facial challenge must fail where a statute has a

'plainly legitimate sweep.'" *See id.* (citing *Washington v. Glucksberg*, 521 U.S. 702, 739–740,

& n.7 (1997) (Stevens, J., concurring)). In *Ballestas*, the D.C. Circuit rejected the defendant's

as-applied challenge, thereby identifying at least one class of cases—indeed the very class of

case presented in the present prosecution—in which the conspiracy provision of the MDLEA

may be constitutionally applied. Under either the "no-set-of-circumstances" test or the "plainly

legitimate sweep" standard, this alone would seem to preclude any subsequent effort to attack the

provision on its face.

 Notwithstanding this traditional notion of facial challenges, however, the Supreme Court

has held facially unconstitutional certain criminal statutes that *may* be applied constitutionally

but lack a necessary jurisdictional element *ensuring* that they are so applied. Thus, as explained

by the D.C. Circuit, the Supreme Court has sustained facial challenges to laws that "omit

constitutionally-required jurisdictional elements, even though all such laws necessarily have a

'plainly legitimate sweep.'" *Gordon v. Holder*, 721 F.3d 638, 654–55 (D.C. Cir. 2013). Under

such circumstances, "any legitimate application [of the otherwise unconstitutional statute] is pure

happenstance." *Id.* As an example, the D.C. Circuit has cited the Supreme Court's rejection of

the Gun-Free School Zones Act in *United States v. Lopez*, 514 U.S. 549 (1995), where the

Supreme Court struck down a statute prohibiting the knowing possession of a firearm within a

school zone on the ground that the statute exceeded Congress's authority under the Commerce

Clause, *id.* at 551. Despite the fact that some, or even most, prosecutions under the statute would

involve possession of a gun that moved in interstate commerce, the Supreme Court held the statute unconstitutional because it "contain[ed] no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affect[ed] interstate commerce." *Id.* at 561.

Relying on this latter line of cases, the defendants contend that the conspiracy provision of the MDLEA "lacks a jurisdictional element to ensure, on a case-by-case basis, that the [conspiracy] is committed *on* the high seas." Chang-Rendon MTD at 6 (emphasis in original). While this argument has some superficial appeal, the defendants' characterization of their current challenge as a facial attack on the MDLEA's conspiracy provision does not render the D.C. Circuit's recent decisions addressing this provision irrelevant. Indeed, the D.C. Circuit recently emphasized that "'distinction between facial and as-applied challenges is not so well defined that it has some automatic effect.'" *Hodge*, 799 F.3d 1145, 1156 (D.C. Cir. 2015) (quoting *Citizens United v. FEC*, 558 U.S. 310, 331 (2010)); *see also City of Los Angeles, Calif. v. Patel*, 135 S.Ct. 2443, 2457–58 (Scalia, J., dissenting) (explaining that the precedential "effect of a given case is a function not of the plaintiff's characterization of his challenge, but the narrowness or breadth of the ground that the Court relies upon in disposing of it"). To be sure, the D.C. Circuit's treatment of the constitutionality of the MDLEA's conspiracy provision in *Ballestas* leaves some uncertainty as to the degree to which the Court directly considered its facial constitutionality. Nevertheless, the Court's reasoning strongly suggests that the D.C. Circuit would find this provision facially constitutional for at least two reasons.

First, although the *Ballestas* Court did not expressly hold that the MDLEA's conspiracy provision is constitutional on its face, the reasoning for its holding was not explicitly confined to the facts of that case. *See generally Ballestas*, 795 F.3d at 146–47. Indeed, contrary to the

defendants' contention that the defendant in *Ballestas* "apparently assumed . . . that the MDLEA's conspiracy provision is an appropriate exercise of congressional authority in general," Chang-Rendon MTD at 7, the defendant in *Ballestas* argued broadly before the D.C. Circuit that the Define and Punish Clause is "textually limited to conduct on the high seas," Appellant's Reply Brief, *Ballestas v. United States*, No. 13-3107, 2014 WL 4243800, at *12. Though the defendant generally focused his challenge on the application of the MDLEA to his land-based conduct, in framing the issue, he cited the dissenting opinion in *United States v. Cardales-Luna*, 632 F.3d 731 (1st Cir. 2011). Appellant's Reply Brief, 2014 WL 4243800, at *4. That dissent expressed disagreement with upholding the constitutionality of the MDLEA to permit prosecution of foreign nationals absent any demonstrable nexus with the United States, and, relying in part on *Lopez*, concluded that "[a]ny prosecution based on such legislation constitutes an invalid exercise of jurisdiction by the United States, and is void *ab initio*." *Cardales-Luna*, 632 F.3d at 739 (Torruella, J., dissenting) (citing authorities). Thus, irrespective of the *Ballestas* defendant's characterization of his constitutional challenge, the D.C. Circuit ultimately considered essentially the same argument pressed by defendants here. There, as here, the defendant contended that the Define and Punish Clause permits Congress to define only those felonies that are committed on the high seas and that the MLDEA is unconstitutional because it permits the prosecution of defendants who engaged only in land-based conduct. The D.C. Circuit flatly rejected this argument, and this Court is therefore bound to reach the same conclusion.

Second, in declining to adopt a construction of the MDLEA that would limit its extraterritorial effect to those who actually engage in conduct on the high seas, the *Ballestas* Court noted that such a reading would largely neuter the statute's conspiracy and attempt

provisions. *Ballestas*, 795 F.3d at 145–46 ("[U]nder the interpretation [the defendant] urges us

to adopt, the conspiracy and attempt prohibition . . . would seemingly do little practical work.").

Thus, when presented with the precise constitutional concerns raised by the defendants here, the

D.C. Circuit not only identified no fundamental flaw in the MDLEA's conspiracy provision, the

Court expressed a reluctance to disrupt application of the provision to alleged co-conspirators

who engaged only in land-based conduct. Consequently, to the degree that a facial constitutional

challenge was not considered in *Ballestas*, this Court is not persuaded that the D.C. Circuit

would revisit its holding if presented with the arguments now advanced by the defendants.

Finally, even assuming that the MDLEA's conspiracy provision itself may not be enacted

under the Define and Punish Clause, this provision falls within Congress's ancillary power under

the Necessary and Proper Clause. As previously noted, "[r]ecognizing that 'trafficking in

controlled substances aboard vessels is a serious international problem, is universally

condemned, and presents a specific threat to the security and societal well-being of the United

States,' Congress enacted the MDLEA to enhance the government's ability to prosecute

members of drug trafficking organization." *Id.* at 145 (quoting 46 U.S.C. § 70501). To do so,

Congress sought to subject to criminal liability those who sail aboard vessels carrying narcotics,

as well as the "[d]rug kingpins and other conspirators who facilitate and assist in carrying out

trafficking schemes." *Id.* An integral and necessary element of this effort is the criminalization

under United States law of conspiratorial efforts to launch shipments in violation of the MDLEA.

*See United States v. Carvajal*, 924 F. Supp. 2d 219, 20 (D.D.C. 2013) *aff'd sub nom. United*

*States v. Miranda*, 780 F.3d 1185 (D.C. Cir. 2015); *see also United States v. Price*, 265 F.3d

1097, 1107 n.2 (10th Cir. 2001) ("[I]f the underlying substantive provision is constitutional, a

provision which criminalizes conspiracy to commit the underlying crime is also constitutional"

(citing *United States v. Wacker*, 72 F.3d 1453, 1475 n.18 (10th Cir. 1996))).  Accordingly, the defendants' challenge to the constitutionality of the MDLEA's conspiracy provision under Article I, Section 8, of the Constitution is rejected.

### 4.    The *Ex Post Facto* Clause

The defendants next suggest that their prosecution under the MDLEA's conspiracy provision violates the Constitution's *Ex Post Facto* Clause, which prohibits Congress from enacting any "ex post facto Law." U.S. CONST. art. I, § 9, cl. 3.  "'The phrase *ex post facto* law was a term of art with an established meaning at the time of the framing.'"  *Al Bahlul*, 767 F.3d at 17 (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2081 (2013)).  Under this established meaning, the *Ex Post Facto* Clause prohibits:

> 1st. Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment, and inflicts a greater punishment than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

*Id*. at 17–18 (quoting *Calder v. Bull*, 3 U.S. 386, 390 (1798)).

The defendants contend that courts have routinely struck down as *ex post facto* laws statutes that "change the jurisdiction requirements of an offense *after* its commission."  Chang-Rendon MTD at 19 (emphasis in original).  Relying on these precedents, the defendants argue that the *Mistby* became a "vessel subject to the jurisdiction of the United States," if at all, only upon the government of Colombia waiving jurisdiction over the vessel, which occurred after it was interdicted on the high seas. *Id*. at 21.  According to the defendants, any alleged overt acts in furtherance of the charged conspiracy therefore pre-dated the moment at which the defendants became subject to potential prosecution under the MDLEA.  *Id*.  Since they were not *certainly*

subject to prosecution in the United States at the time they allegedly entered into the charged conspiracy, the defendants argue that their present prosecution violates the *Ex Post Facto* Clause.

Again, while the defendants' argument has superficial appeal, the out-of-circuit authorities on which they rely are each readily distinguishable. For example, in *Means v. North Cheyenne Tribal*, the Ninth Circuit considered an *ex post facto* challenge to the 1990 Amendments to the Indian Civil Rights Act. 154 F.3d 941, 943 (9th Cir. 1998), *overruled on other grounds by United States v. Enas*, 255 F.3d 662 (9th Cir. 2001). Under these amendments, Congress granted to Indian tribal courts jurisdiction over all Native Americans in criminal matters, regardless of whether the defendant was a member of the tribe whose laws were allegedly violated. *Id.* at 945–46. The defendant, who was charged in 1997 for his alleged conduct in 1978 and 1988, *id.* at 942, challenged his prosecution under tribal law on the ground that retroactive application of the 1990 amendments was prohibited under the *Ex Post Facto* clause, *id.* at 943. The Ninth Circuit agreed. Emphasizing that retroactive application would subject the defendant to new liability under tribal law that would have been impossible when he last engaged in illegal conduct, the court held that "given the ex post facto problems that would arise were we to apply the 1990 amendments retroactively, . . . the 1990 amendments . . . should not apply retroactively to grant criminal jurisdiction to tribal courts over acts committed . . . prior to 1990." *Id.* at 948. *Means* therefore stands for the unremarkable proposition that legislation, which authorizes for the first time the possible prosecution of a defendant only *after* the conduct giving rise to that potential prosecution is completed, runs afoul of the *Ex Post Facto* Clause. *See also United States v. Juvenile Male*, 819 F.2d 468, 469 (4th Cir. 1987) (application of 1984 amendment to the Juvenile Delinquency Act to defendant's 1981 conduct violated *Ex Post Facto* Clause).

The case at hand, however, presents an entirely different situation. Here, by contrast, Congress enacted the present version of the conspiracy provision of the MDLEA in 1986. Anti-Drug Abuse Act of 1986, Pub. L. 99–570, 100 Stat 3207. The defendants' alleged participation in the charged conspiracy began over two decades later, in early 2012 and endured at least through the interdiction of the *Mistby* in June 2012. *See supra* Part I. In contrast to *Means*, then, the possibility that the defendants would face criminal liability under the MDLEA was well established long before the defendants allegedly entered into the conspiracy to violate the statute. Thus, while the *likelihood* of their prosecution under United States law was uncertain, the *risk* of prosecution in this jurisdiction was clear.[13]

Properly framed, then, the defendants' *ex post facto* challenge is without support. Indeed, the D.C. Circuit has held that "[t]he right to be tried in a particular forum is not the sort of right the *Ex Post Facto* Clause protects." *Al Bahlul*, 767 F.3d at 19. Such a "procedural" change may violate the *Ex Post Facto* Clause only where the change ""affects matters of substance' by 'depriving a defendant of substantial protections with which the existing law surrounds the person accused of crime or arbitrarily infringing upon substantial personal rights.'" *Id.* (quoting *Collins v. Youngblood*, 497 U.S. 37 (1990). As discussed in the next section, *infra* Part III.B.4., the defendants have failed to demonstrate that prosecution in an American forum works so substantial a deprivation.

Instead, their broad arguments regarding the remaining uncertainty regarding their inability to predict with certainty the forum of their prosecution would appear to prove too much.

---

[13]       Similarly, though the defendants rely on a Third Circuit opinion addressing the retroactive application of an *unforeseeable* judicial construction of a criminal statute to a defendants' illegal conduct, *see* Chang-Rendon MTD at 20 (citing *Helton v. Fauver*, 930 F.2d 1040, 1045–46 (3d Cir. 1991)), the defendants concede that the D.C. Circuit has declined to embrace a similar interpretation of the *Ex Post Facto* Clause, *see id.* at 20–21 (citing *Al Bahlul*, 767 F.3d at 20).

Individuals who engage in illegal narcotics trafficking on an international scale subject themselves to potential criminal liability under the laws of any number of jurisdictions. In so doing, they assume the risk that any of these jurisdictions may choose to pursue charges against them. While the defendants did not know *with certainty* that the Colombian government would consent to United States jurisdiction over the *Mistby*, thereby allowing for their prosecution under American law, they have provided no support for the proposition that such uncertainty is sufficient to invalidate the indictment under the *Ex Post Facto* Clause. *Cf. United States v. Robinson*, 843 F.2d 1, 6 (1st Cir. 1988) (noting that the predicament of defendants facing prosecution under a predecessor statute "is more like that of a defendant potentially subject to prosecution by several jurisdictions or uncertain of just what sentence a judge will impose than that of persons unaware that what they do at the time is unlawful or subject to particular penalties"). On the contrary, circuit courts confronted with the identical question have uniformly held that prosecution under the MDLEA does not violate the *Ex Post Facto* Clause. *See United States v. Khan*, 35 F.3d 426, 430 (9th Cir. 1994) ("'The statute is not applied to the defendants ex post facto; although Panaman gave its consent after they had set to sea, they took the risk of such consent being given.'" (quoting *United States v. Aikins*, 946 F.2d 608, 613 (9th Cir. 1990), *as amended on reh'g* (Oct. 2, 1991) and citing *United States v. Mena*, 863 F.2d 1522, 1528 (11th Cir. 1989) ("[While] defendants were subject to arrest only after Honduras gave its consent to the enforcement of United States law[, t]he conduct prohibited by the statute . . . was clearly defined before the defendants embarked on their voyage. Defendants accepted the risk that Honduras would consent." (citing *Gonzalez*, 776 F.2d 931, 938–41 (11th Cir. 1985))); *United States v. Alomia-Riascos*, 825 F.2d 769, 772 (4th Cir. 1987) ("The fact that Barbados consented to enforcement of [a predecessor maritime drug trafficking statute] against Defendants after the

[subject vessel] had been boarded and searched simply does not constitute a violation of the prohibition against *ex post facto* laws."); *Robinson*, 843 F.2d at 7–8 (same, addressing the MDLEA's predecessor statute).

For these reasons, the defendants' suggestion that the application of the MDLEA in the present prosecution violates the *Ex Post Facto* Clause is unpersuasive and their motions to dismiss the indictment on this ground are denied.

### 5.    The Due Process Clause

Next, the defendants argue that their prosecution under the MDLEA is inconsistent with traditional notions of due process and fair notice embodied by the Fifth Amendment. Arguing that the government has failed to demonstrate a sufficient "nexus" between the defendants' conduct and the United States, the defendants suggest that that they could not have reasonably anticipated being haled before an American court in connection with their alleged conduct in Colombia, and consequently, their indictment violates the Due Process Clause.

The D.C. Circuit has yet to decide whether, and to what degree, "the Constitution limits the extraterritorial exercise of federal criminal jurisdiction." *Ballestas*, 795 F.3d at 148 (internal quotations omitted) (quoting *United States v. Ali*, 718 F.3d 929, 943–44 (D.C. Cir. 2013)). Without deciding the issue directly, however, the Circuit has noted that several other circuits have recognized such a limitation, and "generally require a showing of 'sufficient nexus between the defendant and the United States, so that . . . application [of the law] would not be arbitrary or fundamentally unfair." *Id.* (alterations in original) (quoting *United States v. Davis*, 905 F.2d 245, 248–49 (9th Cir. 1990)). Largely eschewing this emphasis on a requisite "nexus," however, the D.C. Circuit has indicated that the "ultimate question under the Due Process Clause is not nexus,

but is whether application of the statute to the defendant would be arbitrary or fundamentally unfair." *Id.* (internal quotations and alterations omitted) (quoting *Ali*, 718 F.3d at 944).

As before, the defendants' present contention that their prosecution violates the Due Process Clause would appear to ignore the D.C. Circuit's recent holding in *Ballestas*. Indeed, confronted with a due process challenge brought by a nearly identically situated defendant, the D.C. Circuit in *Ballestas* concluded that the defendant's acknowledged efforts to evade United States law enforcement in order to traffic narcotics ultimately destined for the United States placed the defendant on notice that he may be prosecuted for his actions under American law. *Id.* at 148. Thus, the *Ballestas* Court held that the application of the MDLEA to the defendant was neither arbitrary nor fundamentally unfair under the Due Process Clause. *Id.*

The defendants argue that the instant case is distinguishable because, absent the factual stipulations that proved determinative in *Ballestas*, the government here has failed to demonstrate either that the defendants had legal notice that their conduct subjected them to prosecution in the United States or that a sufficient factual connection exists between their conduct in Colombia and the United States to alert them to such potential prosecution. Chang-Rendon MTD at 13. As to legal notice, the parties dispute the degree of notice afforded to defendants under relevant international agreements between the United States and Colombia. *See id.* at 13–15 (arguing that these agreements do not provide notice of potential prosecution in the United States for land-based conduct) *with* Gov't Opp'n Chang-Rendon MTD at 22–25 (disagreeing). Nonetheless, because the Court is persuaded that the defendants' conduct demonstrated sufficient awareness of their potential criminal liability under American law, a detailed review of these documents is unnecessary.

Indeed, under *Ballestas*, the government has presented sufficient evidence to demonstrate at this stage of the proceedings that the defendants could reasonably anticipate the risk of prosecution in the United States as a result of their alleged participation in the charged conspiracy. In *Ballestas*, the D.C. Circuit found probative that the defendant's factual stipulations established: (1) "that he was part of an international drug smuggling organization that used stateless vessels to transport drugs across the high seas, bound ultimately for the United States"; (2) that the defendant obtained and sold "reports and maps indicat[ing] where *U.S.*, Colombian and other countries' . . . maritime assets were operating in the Caribbean Sea;" and; (3) that he knew that his "coconspirators used the maps to plan the best route to be taken by the cocaine-laden vessels so as to avoid detection by maritime and law enforcement authorities, including, specifically, United States authorities." 795 F.3d at 148 (all alterations and emphasis in original) (internal quotations omitted). In light of these admissions, the Court concluded that the "application of a United States drug trafficking law (the MDLEA) . . . was neither arbitrary nor fundamentally unfair." *Id.*

The present prosecution presents all but one of the critical facts underlying D.C. Circuit's holding in *Ballestas*. In this case, the government alleges that the defendants each agreed to enter into a conspiracy to ship narcotics aboard the *Mistby* on the high seas from Colombia northward to Panama. In so doing, the defendants undertook efforts to avoid detection by United States law enforcement, including through the transmission of stolen coordinates of maritime law enforcement assets, and the preparation and use of maps incorporating this information to evade interdiction by United States authorities. Gov't Opp'n Chang-Rendon MTD at 20–21. Assuming that the government proves its allegations at trial, *see Bowdin*, 770 F. Supp. 2d. at 146; *Sunia*, 643 F. Supp. 2d at 60, the only missing factor in the present case is an allegation that

the narcotics aboard the *Mistby* was destined for the United States. This distinction, however, is insufficient to distinguish the instant case from *Ballestas*. As previously noted, the MDLEA was enacted specifically to criminalize international narcotics trafficking, even where the government does not allege an immediate effort to transport narcotics to the United States. *See supra* Part III.B.1. The statute thereby reflects the policy judgment that stopping international narcotics trafficking would ultimately inure to the benefit of the United States. *See* 46 U.S.C. § 70501 (finding and declaring that "trafficking in controlled substances aboard vessels is a serious international problem, is universally condemned, and presents a specific threat to the security and societal well-being of the United States" and that such trafficking "facilitates transnational crime, including drug trafficking, and terrorism, and presents a specific threat to the safety of maritime navigation and the security of the United States"); *see also United States v. Cardales*, 168 F.3d 548, 553 (1st Cir. 1999) (explaining that "application of the MDLEA . . . is consistent with the protective principle of international law because Congress has determined that all drug trafficking aboard vessels threatens our nation's security"). Moreover, the defendants' active efforts to evade detection and interdiction by United States law enforcement significantly undercuts their present contention that they could not have reasonably anticipated that they may be subject to prosecution in the United States. This risk of interdiction by United States law enforcement was real, since the government is prepared to present evidence that the defendants engaged in prior shipments, two of which were seized by the USGC. *See infra* Part IV.B.2. Taken together, these facts clearly suggest that the defendants had adequate notice of their targeting and risk of interdiction by United States law enforcement, as well as the concomitant risk of potential criminal liability under United States law. Thus, their present prosecution under the MDLEA is neither arbitrary nor fundamentally unfair under the Due Process Clause.

Without doubt, the defendants intend to contest some or all of these allegations. The proper forum in which to resolve these objections, however, is at trial before a jury, not through a pretrial motion to dismiss the indictment.[14] For this reason, and in keeping with the D.C. Circuit's holding in *Ballestas*, the defendants' request to dismiss the indictment on this ground is denied.

### 6.    Unconstitutionally Vague

The defendants next suggest that the indictment must be dismissed because the substantive provisions of the MDLEA fail to provide adequate notice of the likelihood of prosecution under American law for trafficking in narcotics on the high seas. Chang-Rendon MTD at 22–23. Under the Fifth Amendment, "[a]ny law or judicial order which requires people of common intelligence to necessarily guess at its meaning and differ as to its application violates due process." *In re Holloway*, 995 F.2d 1080, 1100 (D.C. Cir. 1993) (internal quotations and alterations omitted) (quoting *Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926)); *see also Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015) ("Our cases establish that the Government violates [the Fifth Amendment by enacting] a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." (citing *Kolender v. Lawson*, 461 U.S. 352, 357–358 (1983))).

Arguing that the MDLEA is unconstitutionally vague, the defendants suggest that the MDLEA provides no "objective standard" to guide the decision-making of either the United States government, which must request consent from foreign governments to obtain jurisdiction

---

[14]    The defendants request yet another pretrial hearing at which the government would be required to "*prove* that there is a connection between [them] and the United States" by demonstrating, under a preponderance of the evidence standard, that the drugs transported aboard the *Mistby* were bound for the United States and that the defendants intended to enter into and assist the charged conspiracy. Chang-Rendon MTD at 16 (emphasis added). Given the Court's conclusion that the government is not required to make any such showing before trial, the defendants' request for a rehearsal of the trial outside of the presence of the jury for this purpose is denied.

over certain vessels used to traffic narcotics, or any foreign government from which such consent is sought.  Chang-Rendon MTD at 22–23.  According to the defendants, this lack of objective standards "gives ordinary people no way to predict *ex ante* whether they will be subject to [the MDLEA's] reach," fails to provide adequate notice, and invites arbitrary enforcement, in violation of the Fifth Amendment to the Constitution.  *Id*. at 23.

While the D.C. Circuit has not had occasion to consider whether the MDLEA's conspiracy provision is unconstitutionally vague, other circuits have unanimously rejected this argument.  Most directly, in *United States v. Mena*, the Eleventh Circuit rejected the notion that the MDLEA's criminalization of narcotics trafficking aboard a "vessel subject to the jurisdiction of the United States" fails to notify defendants engaged in such conduct of the risk of prosecution under American law.  863 F.2d at 1527–28.  There, the court emphasized that "[t]hose embarking on voyages with holds laden with illicit narcotics, conduct which is contrary to laws of all reasonably developed legal systems, do so with the awareness of the risk that their government may consent to enforcement of the United States' laws against the vessel." *Id*. (quoting *Gonzalez*, 776 F.2d at 940–41); *see also United States v. Suerte*, 291 F.3d 366, 371–72 (5th Cir. 2002) (same, regarding those charged with conspiring to violate the MDLEA); *Robinson*, 843 F.2d at 6 (concluding, in rejecting the defendants' claims under the *Ex Post Facto* Clause, that the method of determining which jurisdiction will prosecute a defendant who violated the MDLEA "does not affect 'fair notice'").  Instead of attempting to distinguish or otherwise explain why the Court should reject the reasoning of these cases, the defendants baldly assert that these decisions "are incorrect" before reminding the Court that they not binding in this Circuit.  Chang-Rendon MTD at 23 n.11.

Thus, the defendants have done little to demonstrate that departure from the general consensus is warranted. Again, while the defendants may have been unable *ex ante* to predict *with certainty* whether their alleged participation in the charged conspiracy would subject them to criminal liability under the MDLEA, this uncertainty alone is insufficient to demonstrate that the MDLEA fails to "give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *Johnson*, 135 S. Ct. at 2556. For nearly three decades, the MDLEA has served as a means for American law enforcement to work with other nations to combat narcotics trafficking on the high seas. The statute has itself been supported by a bilateral international agreement between the United States and the defendants' home nation for nearly twenty years. Any remaining uncertainty regarding the enforcement decisions of American and Colombian law enforcement notwithstanding, the defendants have not demonstrated that the MDLEA failed to apprise them of their potential liability under American law upon allegedly entering into the charged conspiracy.

### 7.    Sufficiency of the Indictment

Lastly, the defendants argue that the indictment does not allege each element of the charged offense and thereby fails to provide sufficient notice to the defendants of the charges against them. Chang-Rendon MTD at 23–32. Specifically, the defendants assert that the indictment fails to describe "in what manner" the government will prove that the *Mistby* is subject to United States jurisdiction and that this flaw requires dismissal of the indictment as constitutionally deficient. *Id*. at 24–29. Alternatively, the defendants ask that the question of United States jurisdiction over the vessel be decided by the jury at trial. *Id*. at 29–32.

In large measure, this challenge resurrects the defendants' request for a bill of particulars providing more detailed information regarding the basis for United States jurisdiction over the

*Mistby*. As discussed above, *supra* Part II.B.3., while the precise jurisdictional basis may not be alleged in the indictment, the government has provided the Colombian government's waiver of objection to the enforcement of United States law over the vessel and certification of this wavier by the Secretary of State, along with extensive discovery of the alleged activity leading up to the interdiction of the *Mistby*. This ample disclosure through both discovery and related motions practice precludes any further necessity to provide the defendants with a bill of particulars to supplement the indictment itself. *Id.*

Beyond any renewed request for additional clarity regarding the charges against them, however, the defendants further suggest that the basis for United States jurisdiction over them is, in fact, an element of the charged violation of the MDLEA. Chang-Rendon MTD at 27. Arguing that the indictment must include each element of the charged offense, the defendants assert that the government's failure to specify the basis for exercising jurisdiction over the *Mistby* in the indictment itself renders the indictment constitutionally invalid. *Id.* In so doing, the defendants readily concede that Congress amended the MDLEA in 1996 to declare that the question of United States jurisdiction over a subject vessel is "not an element of an offense" under the statute and is, instead, a question to be decided by the Court. *Id.*; *see* 46 U.S.C. § 70504 ("Jurisdiction of the United States with respect to a vessel subject to this chapter is not an element of an offense. Jurisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge.").[15] As previously noted, *supra* Part III.B.2., the D.C. Circuit has interpreted this provision to mean that the basis for United States jurisdiction is a "threshold question determined by the court." *Miranda*, 780 F.3d at 1193. The

---

[15]     Prior to this amendment, "there was a consensus among the circuits that 'the jurisdictional requirement in section 1903(a) is an element of the crime charged and therefore must be decided by the jury.'" *United States v. Moreno-Morillo*, 334 F.3d 819, 828 (9th Cir. 2003) (quoting *United States v. Medjuck*, 48 F.3d 1107, 1110 (9th Cir.1995) (collecting cases)).

defendants do not appear to contend otherwise, but instead suggest that the question of United States jurisdiction must be determined independently by both the court (to establish subject-matter jurisdiction) and the jury (to find the defendant guilty).

In this light, this aspect of the defendants' present challenge is not an attack on the sufficiency of the indictment *per se*, but is instead a challenge to Congress's authority to permit the government to secure their conviction under the MDLEA without submitting the question of United States jurisdiction to the jury. The defendants acknowledge that their preferred interpretation of the MDLEA conflicts with Congress's express intent in amending the MDLEA, Chang-Rendon MTD at 27, and is likewise in tension with the D.C. Circuit's holding in *Miranda*, *id.* at 27–28. Undeterred, however, the defendants posit that the D.C. Circuit has not considered whether the jurisdictional issue may be *both* a question of subject-matter jurisdiction, to be decided by the Court, *and* an element of the charged offense, to be decided by the jury. *Id.* at 28. Thus, the defendants suppose that the *Miranda* Court's holding "has no logical bearing on . . . the entirely different inquiry into whether a fact is an *element* of the crime." *Id.* (emphasis original). According to the defendants, removing the jurisdictional question entirely from the province of the jury, particularly where jurisdiction may be proven conclusively through certification by the State Department, raises significant concerns for both the defendants' Sixth Amendment right to trial by jury and parallel rights under the Due Process Clause. *Id.* at 28–29. To remedy any potential constitutional concerns, the defendants ask the Court to submit this question to the jury along with an instruction informing the jury that the State Department certification presented by the government is *not* conclusive proof of United States jurisdiction over the *Mistby* and the defendants. *Id.* at 32. Again, however, the Court declines to follow the defendants' suggested course.

The Sixth Amendment guarantees that criminal defendants "shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. CONST. amend. VI. "This right, in conjunction with the Due Process Clause, requires that each *element* of a crime be proved to the jury beyond a reasonable doubt." *Alleyne v. United States*, 133 S. Ct. 2151, 2156 (2013) (emphasis added) (citing authorities).  To determine whether a particular fact must be submitted to the jury to preserve a defendant's trial rights, the "touchstone . . . is whether the fact constitutes an 'element' or 'ingredient' of the charged offense." *Id.* at 2158 (citing authorities). In making this determination, the Court looks first to the terms of the relevant statute, *U.S. ex rel. New v. Rumsfeld*, 448 F.3d 403, 408 (D.C. Cir. 2006), with the "legislature's definition of the elements of the offense . . . usually dispositive," *McMillan v. Pennsylvania*, 477 U.S. 79, 85; *see also Staples v. United States*, 511 U.S. 600, 604 (1994) (noting that "'[t]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute'" (alteration in original) (quoting *Liparota v. United States*, 471 U.S. 419, 424 (1985))).

While Congress therefore enjoys broad authority to delineate the elements of a criminal offense, this authority is not unlimited.  Indeed, the Supreme Court has recognized that "in certain limited circumstances . . . facts not formally identified as elements of the offense charged" nonetheless must be submitted to the jury and proven beyond a reasonable doubt. *McMillan*, 477 U.S. at 86. The Court has been reluctant "to lay down any 'bright line' test" for determining when a particular fact is so essential to a prosecution as to require submission to the jury, but has identified certain factors that bear on this determination. *Id.* at 91. Among these factors are the degree to which the relevant statute creates any presumption against the defendant's innocence, increases the penalty to which a defendant is subject upon conviction, or

appears to be an effort by the legislature to evade the constitutional requirement of proof beyond a reasonable doubt. *Id.* at 86–90. Disputes regarding legislative efforts to allocate factual determinations to the trial judge arise most frequently in the sentencing context. For example, the Supreme Court has held unconstitutional statutes that broadly remove from the jury the determination of facts that increase the mandatory maximum or minimum penalties to which a criminal defendant is exposed. *Apprendi v. New Jersey*, 530 U.S. 466, 490–97 (2000); *Alleyne*, 133 S. Ct. at 2155 ("Any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." (citing *Apprendi*, 530 U.S. at 483 n.10, 490)). By analogy, here, the defendants suggest that the question of United States jurisdiction over the *Mistby* must be submitted to the jury because this jurisdictional fact stands as an essential element of the charges brought against them under the MDLEA, and this question must therefore be submitted to the jury. Chang-Rendon MTD at 30–32.

While the D.C. Circuit has noted the hypothetical constitutional concerns identified by the defendants, *see Miranda*, 780 F.3d at 1195–96 (citing *Gonzalez*, 311 F.3d at 444), the Court has not had occasion to consider the issue directly. Moreover, the Court's consideration of similar challenges in other contexts provides limited guidance. *See United States v. Nwoye*, 663 F.3d 460, 466 (D.C. Cir. 2011) (declining to decide whether venue is an element of a charged offense that must be submitted to the jury); *U.S. ex rel. New*, 448 F.3d at 408 (finding "no fundamental defect" in Court of Appeals of the Armed Forces conclusion that the "lawfulness" of an order is not a "separate and distinct element of the offense [of insubordination], but rather is an issue for the military judge"); *cf. United States v. Edmonds*, 240 F.3d 55, 63 (D.C. Cir. 2001) (holding that, to establish a violation of a federal statute criminalizing drug transactions within the vicinity feet of certain enumerated categories of schools, the government must

establish beyond a reasonable doubt that the school near which the defendant committed a drug crime falls within these categories). Nonetheless, the persuasive reasoning adopted by a majority of circuits, as supported by analogous Supreme Court precedent, suggest that the jurisdictional provision of the MDLEA, as amended, does not violate the defendants' rights under the Fifth and Sixth Amendments.

Following the 1996 amendments, three circuits have considered Congress's authority to allocate the question of United States jurisdiction under the MDLEA to the Court, with two of these circuits concluding that Congress permissibly allocated the question of United States jurisdiction to the court. First, the Eleventh Circuit has held repeatedly that the jurisdictional question at issue here need not be determined by the jury. *See United States v. Persaud*, 605 F. App'x 791, 795 (11th Cir. 2015) *cert. denied sub nom. Wilson v. United States*, No. 14-10377, 2015 WL 3867699 (U.S. Nov. 30, 2015) *and cert. denied*, No. 14-10407, 2015 WL 3902878 (U.S. Nov. 30, 2015); *United States v. Campbell*, 743 F.3d 802, 809 (11th Cir.) *cert. denied*, 135 S. Ct. 704 (2014); *United States v. Rendon*, 354 F.3d 1320, 1326–27 (11th Cir. 2003); *Tinoco*, 304 F.3d at 1106–1112. In so doing, the court has emphasized that this question bears little similarity to the common law understanding of the "elements" of a criminal offense. *See Tinoco*, 304 F.3d at 1108 (noting that, at common law, the elements of an offense included "each component of the actus reus, causation, and the mens rea that must be proved in order to establish that a given offense has occurred" (quoting Black's Law Dictionary 520 (6th ed. 1990)). Thus, because the question of United States jurisdiction over a vessel "has nothing to do with the 'concurrence of an evil-meaning mind with an evil-doing hand' as reflected in the common law," *Tinoco*, 304 F.3d at 1109 (quoting *Morissette v. United States*, 342 U.S. 246, 251 (1952)), and does not otherwise affect "the defendant's blameworthiness or culpability," *id.* at

1109 (citing authorities), the issue is not properly considered a required element of the charged MDLEA offense and need not be submitted to the jury, *id.*

By contrast, though noting the Eleventh Circuit's contrary holding, the Ninth Circuit has held that Congress exceeded its authority in "over[iding] by statute the consensus prevailing at that time that juries, not judges, would decide whether [the MDLEA's] jurisdictional requirement was satisfied." *United States v. Perlaza*, 439 F.3d 1149, 1163–67 (9th Cir. 2006). In so holding, the Ninth Circuit emphasized the Supreme Court's admonishment that "'Congress may not manipulate the definition of a crime in a way that relieves the Government of its constitutional obligations to charge each element in the indictment, submit each element to the jury, and prove each element beyond a reasonable doubt.'" *Id.* at 1166 (quoting *Harris v. United States*, 536 U.S. 545, 556 (2002) *overruled on other grounds by Alleyne*, 133 S. Ct. at 2151). Thus, concluding that the question of United States jurisdiction "turns on 'factual issues,'" the Ninth Circuit held that the "the jurisdictional inquiry *must* be resolved by a jury." *Id.* (quoting *United States v. Smith*, 282 F.3d 758, 767 (9th Cir. 2002) (indicating that "whether [the relevant vessel] was stateless" qualifies as such a factual issue)); *cf. Tinoco*, 304 F.3d at 1111 ("[E]ven if questions under the [MDLEA] jurisdictional requirement may have a factual component, that component does not have to be resolved by the jury, given that . . . the jurisdictional requirement goes only to the court's subject matter jurisdiction and does not have to be treated as an element of a MDLEA substantive offense.").

Finally, confronted with these conflicting decisions, the First Circuit joined the Eleventh Circuit in holding that the "explicit allocation . . . of the question of whether a vessel is 'subject to the jurisdiction of the United States' to the court rather than the jury . . . was well within the power of Congress." *United States v. Vilches–Navarrete*, 523 F.3d 1, 19 (1st Cir. 2008), *cert.*

*denied*, 555 U.S. 897 (2008) (separate opinion of Lynch & Howard, JJ.). First, considering the factors identified by the Supreme Court, the court observed that under the MDLEA's jurisdictional provision, "the presumption of a defendant's innocence is not affected; the underlying determination does not subject the defendant to an increased penalty; and there is no evidence that Congress was attempting to evade defendants' constitutional rights." *Id.* at 20. Likewise, largely adopting the reasoning of the Eleventh Circuit, the court concluded that United States jurisdiction over a vessel "does not relate to whether a defendant committed the proscribed *actus reus* or possessed the necessary *mens rea*[, and therefore] does not meet the common law definition of an element." *Id.* Lastly, consistent with the *Miranda* Court's concern that, absent a threshold determination of jurisdiction by the Court, the "MDLEA's application might . . . cause friction with foreign nations," *Miranda*, 780 F.3d at 1193, the First Circuit has noted that "Congress inserted the requirement that a vessel be subject to the jurisdiction of the United States into the statute as a matter of diplomatic comity," *Vilches-Navarrete*, 523 F.3d at 22 (citing *Tinoco*, 304 F.3d at 1108). Thus, the provision is not intended to subvert the defendants' trial rights, but is instead concerned principally "with the rights of governments, determined by a judge prior to trial." *United States v. Mitchell-Hunter*, 663 F.3d 45, 51 (1st Cir. 2011); *see also Tinoco*, 304 F.3d at 1108 (same, relying on the court's interpretation of a predecessor statute in *Gonzalez*, 776 F.2d at 931).

This prevailing view is bolstered by the Supreme Court's consideration of a substantially similar provision in *Ford v. United States*, 273 U.S. 593 (1927). In *Ford*, the Court considered a prosecution under a Prohibition-era statute that involved a ship seized at sea while carrying contraband liquor. *Id.* at 600. Under the relevant statute, the British defendants could be prosecuted for conspiracy to smuggle liquor only if the ship had been seized within a designated

area identified by treaty between the United States and Great Britain. *Id.* at 600–01. There, as here, the defendants contended that the failure to submit this jurisdictional question, which the trial judge decided in the government's favor in denying a defense evidentiary objection, to the jury violated their rights under the Fifth and Sixth Amendments. *Id.* at 604–06. The Supreme Court disagreed. Explaining that the issue of subject-matter jurisdiction "was necessarily preliminary to th[e] trial," the Court held that "[t]he issue whether the ship was seized within the prescribed [area] did not affect the question of the defendants' guilt or innocence. It only affected the right of the court to hold their persons for trial." *Id.* at 606. Thus, "the proper way of raising the issue of fact of the place of seizure was by a plea to the jurisdiction," which need not be resolved by a jury. *Id.* While both the First and Eleventh Circuits cite *Ford* in concluding that the question of United States jurisdiction over a vessel need not be submitted to the jury, *Vilches-Navarrete*, 523 F.3d at 21; *Tinoco*, 304 F.3d 1109–10, the Ninth Circuit does not appear to have considered the import of *Ford* on the jurisdictional provision of the MDLEA at issue here, *see generally Perlaza*, 439 F.3d 1149. Indeed, as the *Ford* Court suggested, the defendants' proposed course raises a number of secondary procedural concerns to which the defendant offers little response. Most notably, assuming the proposed jury determination coincides with the jury's ultimate verdict following trial, the redundant procedure proposed by the defendants raises the specter of inconsistent determinations between the Court and the jury such that a jury's ultimate failure to convict the defendants potentially undermines the judicial determination of jurisdiction over the defendants' prosecution in the first instance.

Additionally, in arguing that the Court must submit the jurisdictional question to the jury, the defendants suggest that the State Department certification relied upon by the government in asserting jurisdiction should be excluded from the jury's consideration under the Sixth

Amendment. Chang-Rendon MTD at 32 (arguing that, because the certification includes out-of-court statements to be offered for their truth, admission of the certification violates the defendants' rights under the Confrontation Clause). The defendants' contention that this issue must be submitted to the jury at trial having failed, the defendants' reliance on their confrontation rights at trial is similarly misplaced. *Mitchell-Hunter*, 663 F.3d at 51–53 (holding that the Confrontation Clause does not necessitate a pretrial hearing to consider whether a vessel is subject to United States jurisdiction within the meaning of the MDLEA).

For these reasons, consistent with the plain language of the MDLEA, the D.C. Circuit's holding in *Miranda*, and the persuasive reasoning of the majority of circuits, the Court finds that the question of United States jurisdiction is a question of subject-matter jurisdiction that must be resolved by the Court and is not *also* an element of the offense that must be proven by the government at trial. *Accord Larrahondo*, 885 F. Supp. 2d at 223–24 ("'[T]he MDLEA jurisdictional requirement does not raise factual questions that traditionally would have been treated as elements of an offense under the common law'—that is, 'the actus reus, causation, or the mens rea of the defendant,'" and the question therefore "may be appropriately decided by the trial judge, rather than a jury." (quoting *Tinoco*, 304 F.3d at 1107–08)). As discussed above, the government has presented conclusive evidence that the Court maintains subject-matter jurisdiction over the present prosecution. *Supra* Part III.B.2. Any further dispute as to the defendants' guilt or innocence must turn on the substantive elements of the charged offense.

Accordingly, the defendants' request to dismiss the indictment or, alternatively, to submit the jurisdictional question to the jury, is denied.

## IV.    THE PARTIES' EVIDENTIARY MOTIONS

Having considered the defendants' motions addressing the content and sufficiency of the indictment, the Court now turns to the parties' motions seeking to admit or exclude various categories of evidence and argument. Following an overview of the legal principles applicable to such pretrial evidentiary motions, the Court considers first the government's motions and then the defendants' motions.

### A.    General Legal Principles Applicable to Pretrial Evidentiary Motions

The Supreme Court has recognized that "[a]lthough the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984); *see id.* at 40 n.2 (defining motion *in limine* "in a broad sense to refer to any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered"). Indeed, Rule 103(d) of the Federal Rules of Evidence mandates that the court must conduct a jury trial to the extent practicable so that inadmissible evidence is not suggested to the jury by any means. FED. R. EVID. 103(d). Pretrial motions *in limine* are an important mechanism to effectuate this goal of insulating the jury from inadmissible evidence and further the purpose of the rules, generally, to administer the proceedings "fairly . . . to the end of ascertaining the truth and securing a just determination." FED. R. EVID. 102; *see Banks v. Vilsack*, 958 F. Supp. 2d 78, 82 (D.D.C. 2013) (citing FED. R. EVID. 103(d)). Moreover, "[a] pretrial ruling, if possible, may generally be the better practice, for it permits counsel to make the necessary strategic determinations." *United States v. Jackson*, 627 F.2d 1198, 1209 (D.C. Cir. 1980).

60

In evaluating the admissibility of proffered evidence on a pretrial motion *in limine* the court must assess whether the evidence is relevant and, if so, whether it is admissible, pursuant to Federal Rules of Evidence 401 and 402. "[T]he burden is on the introducing party to establish relevancy," *Dowling v. United States*, 493 U.S. 342, 351 n.3 (1990), as well as admissibility. Even relevant evidence may be deemed inadmissible and subject to exclusion on multiple grounds, including that "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. "Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008) (alteration in original) (quoting *United States v. Abel*, 469 U.S. 45, 54 (1984)).

Under Rule 403, the court must "engage in on-the-spot balancing of probative value and prejudice and . . . exclude even factually relevant evidence when it fails the balancing test." *United States v. Moore*, 651 F.3d 30, 63 (D.C. Cir. 2011) (internal quotation marks omitted) (quoting *Sprint/United Mgmt. Co.*, 552 U.S. at 384). This balancing test is "requires a fact-intensive, context-specific inquiry." *Sprint/United Mgmt. Co.*, 552 U.S. at 388. Importantly, "'[u]nfair prejudice' within [the Rule 403] context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Ring*, 706 F.3d 460, 472 (D.C. Cir. 2013) (quoting FED. R. EVID. 403 advisory committee's notes).

Depending upon the nature of the evidentiary issue presented in a pretrial motion *in limine*, the court must also assess whether a ruling is appropriate in advance of trial or, instead,

should be deferred until trial "'[when] decisions can be better informed by the context, foundation, and relevance of the contested evidence within the framework of the trial as a whole.'" *Herbert v. Architect of the Capitol*, 920 F. Supp. 2d 33, 38 (D.D.C. 2013) (alteration in original) (quoting *Casares v. Bernal*, 790 F. Supp. 2d 769, 775 (N.D. Ill. 2011)). The timing of a decision on the admissibility of contested evidence is a matter within a trial judge's discretion. *Banks*, 958 F. Supp. 2d at 81–82 (citing authorities); *Barnes v. District of Columbia*, 924 F. Supp. 2d 74, 78–79 (D.D.C. 2013) (citing authorities).

## B.   The Government's Motion to Admit Other Crimes Evidence

To support its allegations regarding the defendants' participation in the charged conspiracy, the government seeks to introduce evidence of certain other crimes allegedly committed by the defendants in connection with other narcotics shipments prior to and after the interdiction of the *Mistby*. The government contends that evidence of these other alleged crimes is admissible either as direct evidence of the defendants' participation in the charged conspiracy, Gov't 404(b) MIL at 11–13, or, alternatively, as evidence tending to demonstrate a "common scheme or plan, intent, knowledge, identity, and absence of mistake" under Federal Rule of Evidence 404(b), *id.* at 17–23. This proposed evidence falls into three general categories: (1) other shipments of narcotics involving the defendants, which shipments were variously seized, stolen, or successfully completed; (2) efforts by Chang-Rendon to conceal his identity; and (3) testimony from a single witness regarding Chang-Rendon's alleged participation in five additional narcotics shipments. *See id.* at 4–11. These three categories are summarized as follows.

*Category #1 (Other Shipments)*: The government proposes to introduce evidence of nine shipments of narcotics allegedly involving one or more of the defendants between June 2008 and

October 2012, including eight shipments prior to, and one shipment after, the *Mistby*'s interdiction. These alleged shipments include: (1) three USCG seizures of large quantities of narcotics aboard go-fast vessels between Colombia and Panama, with alleged co-conspirators prepared to testify that Chang-Rendon assisted each of these shipments by providing the location of law enforcement assets and that Mosquera-Murillo served as the broker between Chang-Rendon and the DTO for two of these shipments; *id.* at 5–6; (2) two seizures from go-fast vessels of large quantities of narcotics by Panamanian authorities, with alleged co-conspirators prepared to testify that Mosquera-Murillo successfully fled from authorities upon the first of these seizures and that all of the defendants were involved in planning the second shipment, *id.* at 7, 8–9; (3) two narcotics shipments stolen in Panama, with the government representing that wiretap evidence and witness testimony will prove that Moreno-Membache discussed these thefts and his involvement in attempting to transport these shipments via go-fast vessel, *id.* at 7–8; and (4) two successful shipments of cocaine from Colombia to Panama via go-fast vessels, with alleged-conspirators prepared to testify that Chang-Rendon and Mosquera-Murillo played the same roles they are alleged to have played in the charged conspiracy, *id.* at 9. In addition to alleged co-conspirator testimony, for the shipments seized by the USCG, the government intends to introduce documentary materials, including videos of the interdiction of go-fast vessels, photographs, and lab reports evidencing these seizures. *Id.* at 5–6.

 *Category #2 (Chang-Rendon's Efforts to Conceal His Identity)*: The government seeks to introduce evidence through alleged co-conspirator witnesses that Chang-Rendon worked to insulate himself from DTOs and hide his identity by using aliases and brokers, including Defendants Mosquera-Murillo and Moreno-Membache, to interact with DTOs. *Id.* at 10.

*Category #3 (Chang-Rendon's Prior Trafficking Activities)*: Finally, the government proposes to introduce evidence through the testimony of an alleged co-conspirator that the defendants each "have a long history in narcotics trafficking," and "regularly worked together to transport cocaine on the high seas using vessels." *Id.* at 10–11. As clarified in supplemental briefing, in addition to the evidence already described, this includes testimony from a single witness who will describe Chang-Rendon's alleged participation in five other shipments of narcotics between 2011 and 2013. Gov't Supp. Gov't 404(b) MIL ("Gov't 404(b) Supp.") at 3–4, ECF No. 158. The government indicates that this witness will testify to Chang-Rendon's involvement in one of the nine shipments included in Category #1, but the five additional shipments to which this witness will testify are different from the nine shipments identified in Category #1. *Id.* The government argues that evidence of this alleged criminal history is "necessary to provide context and establish [the witnesses'] familiarity with the Defendants." Gov't 404(b) MIL at 11.

As discussed below, in light of the government's proffer as to the nature of the other crimes evidence and the purposes for which this evidence will be admitted, the defendants' participation in these additional uncharged conspiracies will be admitted under Rules 403 and 404(b).

### 1.    Legal Standard

Federal Rule of Evidence 404(b) bars the admission of a defendant's other "crime, wrong, or other act" where this evidence is offered to "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b). Such evidence may be admitted for "another purpose" as long as the government provides notice of its intent to offer the evidence and, when requested, guidance is provided to

the jury in the form of limiting instructions. *Id.* Examples of other purposes for which such evidence may be admitted are enumerated in the Rule, including: "proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.*

The D.C Circuit has noted that "Rule 404(b) is a rule of inclusion rather than exclusion." *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000). Thus, "[u]nder Rule 404(b), '*any* purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered *solely* to prove character.'" *United States v. Cassell*, 292 F.3d 788, 792 (D.C. Cir. 2002) (emphasis in original) (quoting *United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990)); *see also United States v. Long*, 328 F.3d 655, 660–61 (D.C. Cir. 2003) ("Under the law of this circuit, Rule 404(b) is . . . quite permissive, excluding evidence only if it is offered for the sole purpose of proving that a person's actions conformed to his or her character." (internal quotations and citations omitted) (quoting *Bowie*, 232 F.3d at 929–30)).

Nonetheless, "[c]ompliance with Rule 404(b) does not itself assure admission of the other crimes evidence. If the defendant moves under Rule 403, the court may exclude the evidence on the basis that it is 'unfairly prejudicial, cumulative or the like, its relevance notwithstanding.'" *Bowie,* 232 F.3d at 930 (quoting *Old Chief v. United States*, 519 U.S. 172, 179 (1997)). "This two-step analysis—certification of a proper and relevant purpose under Rule 404(b), followed by the weighing of probity and prejudice under Rule 403—is firmly rooted in the law of this circuit." *Miller*, 895 F.2d at 1435; *see also United States v. Sitzmann*, 856 F. Supp. 2d 55, 61–62 (D.D.C. 2012) (applying the two-step analysis described in *Miller*).

Rule 403 "does not bar powerful, or even prejudicial evidence. Instead, the Rule focuses on the danger of *unfair* prejudice, and gives the court discretion to exclude evidence only if that danger *substantially* outweighs[s] the evidence's probative value." *United States v. Pettiford*,

517 F.3d 584, 590 (D.C. Cir. 2008) (internal quotation marks and citations omitted) (emphasis and brackets in original) (quoting *United States v. Gartman*, 146 F.3d 1015, 1021 (D.C. Cir. 1998)). "[I]n cases where a defendant is charged with unlawful possession of something, evidence that he possessed the same or similar things at other times is often quite relevant to his knowledge and intent with regard to the crime charged." *United States v. King*, 254 F.3d 1098, 1100 (D.C. Cir. 2001) (citing *Huddleston v. United States,* 485 U.S. 681, 689 (1988)); *see also United States v. Douglas*, 482 F.3d 591, 597 (D.C. Cir. 2007) (same, in a narcotics possession case).

### 2.    Analysis

The government's other crimes evidence is comprised largely of co-conspirator testimony, as well as documentary evidence where available, regarding the defendants' alleged participation in other efforts to ship narcotics aboard go-fast vessels from Colombia to Panama. The following chart summarizes the key information as to each alleged shipment, including the alleged date, in reverse chronological order, of the shipment; the amount of illegal narcotics involved; the "Result" or what allegedly happened to the shipment; the particular defendant against whom the evidence is sought to be admitted; and the source of the evidence.

**Alleged Shipments Summary Chart**

|  | Date | Amount | Result | Introduced Against | Source |
|---|---|---|---|---|---|
| 1 | Oct. 25, 2012 | 740 kg (cocaine) | Seized (USCG) | Chang-Rendon | Co-Conspirator/ Investigator Testimony; Investigation Materials |
| *Mistby* | June 19, 2012 | 125 kg (marijuana) 229 kg (cocaine) | Seized (USCG) | - | - |
| 2 | March 16, 2012 | 790 kg (cocaine) | Seized (USCG) | Chang-Rendon; Mosquera-Morillo | Co-Conspirator/ Investigator Testimony; Investigation Materials |
| 3 | Feb. 3, 2012 | 451 kg (cocaine) | Seized (USCG) | Chang-Rendon; Mosquera-Morillo | Co-Conspirator/ Investigator Testimony; Investigation Materials |
| 4 | Jan. 2012 | Unknown | Successful | Chang-Rendon; Mosquera-Morillo | Co-Conspirator Testimony |
| 5 | Nov. 2011 | 115 kg (cocaine) | Seized (Panama) | Chang-Rendon; Mosquera-Morillo; Moreno-Membache | Co-Conspirator Testimony |
| 6 | Nov. 2011 | Unknown | Successful | Chang-Rendon; Mosquera-Morillo | Co-Conspirator Testimony |
| 7 | Aug. 2011 | Unknown | Stolen (Panama) | Moreno-Membache | Investigator Testimony; Intercepted Communications |
| 8 | July 2011 | Unknown | Stolen (Panama) | Moreno-Membache | Co-Conspirator Testimony; Intercepted Communications |
| 9 | June 2008 | 5000 kg (cocaine) | Seized (Panama) | Mosquera-Morillo | Co-Conspirator Testimony |
| 10-14 | 2011-2013 | Unknown | Unknown | Chang-Rendon | Co-Conspirator Testimony (Witness Testifying to October 2012 Shipment) |

The government seeks admission of the defendants' alleged participation in these shipments, as well as Chang-Rendon's associated efforts to conceal his identity while assisting shipments numbered 1–6 and 10–14, under two theories. First, the government argues that this evidence is "intrinsic" to the charged conspiracy, such that the Court need not consider its

admissibility under Rule 404(b). Gov't 404(b) MIL at 11–13. Alternatively, to the extent that the evidence is extrinsic to the charged conspiracy, the government argues that evidence of other efforts to ship narcotics from Colombia to Panama is admissible under Rule 404(b) to prove "a common scheme or plan, intent, knowledge, identity, and absence of mistake." *Id*. at 17. In response, the defendants object to admission of this "other crimes" evidence essentially on three grounds: (1) the evidence is not intrinsic, and must therefore be analyzed under Rule 404(b), Defs.' Opp'n Gov't 404(b) MIL at 2–6, ECF No. 107; (2) the evidence is irrelevant to any non-character purpose allowed under Rule 404(b), *id*. at 6–10; and (3) this "avalanche of other crimes evidence," *id*. at 13, amounts to "[p]iling on," *id*. at 12, and, consequently, has minimal additional probative value and is prejudicial and confusing, requiring exclusion under Rule 403, *id*. at 10–16.

In light of the government's alternative bases for admission and the defendants' objection, the Court will consider first whether some or all of the proffered other crimes evidence may be considered intrinsic to the charged conspiracy. The Court will then consider whether any extrinsic evidence may be admitted for a non-character purpose under Rule 404(b).[16]

### a.    Admission as Intrinsic Evidence

The indictment charges a conspiracy over the period of January 2012 through February 2013 and the shipment of 220 kilograms of cocaine and 125 kilograms of marijuana on the *Mistby*, which was interdicted on June 19, 2012. *See* Gov't 404(b) MIL at 1–4. The government's proffered "other" evidence consists, in part, of a total of fourteen separate shipments of narcotics that occurred between June 2008 and October 2012, with all but one of

---

[16]    Neither Mosquera-Murillo nor Moreno-Membache have expressly joined Chang-Rendon in opposition to the government's motion, but the Court will deem them to have done so based upon the defendants' joint motion requesting additional time to respond to the motion. *See* Unopposed Mot. Ext. Time File Defs.' Opp'n Gov't 404(b) MIL, ECF No. 85

the shipments preceding the interdiction of the *Mistby*. *See supra* Alleged Shipments Summary Chart. In addition, the government's proffered "other" evidence includes certain actions Chang-Rendon allegedly took to conceal his identity and assist co-conspirators with respect to the charged conspiracy, as well as other alleged drug shipments from Colombia. Arguing that this evidence is "intrinsically intertwined with the charged conspiracy," the government broadly contends that the evidence "is not subject to analysis under Federal Rule of Evidence 404(b)." Gov't 404(b) MIL at 12.

At the outset, the government's broad suggestion that all of its proffered "other" crimes evidence is intrinsic to the charged conspiracy, without distinguishing between its various categories of evidence, complicates the Court's review of the government's motion, particularly since the D.C. Circuit has questioned both the usefulness and the practicality of drawing a distinction between extrinsic and intrinsic evidence under Rule 404(b). *See Bowie*, 232 F.3d at 927 (suggesting that "the only consequences of labeling evidence 'intrinsic' are to relieve the prosecution of Rule 404(b)'s notice requirement and the court of its obligation to give an appropriate limiting instruction" and explaining that "[b]ifurcating the universe into intrinsic and extrinsic evidence has proven difficult in practice").

According to the government, evidence falling into each of the three categories described above is intrinsic to the charged conspiracy because it is "necessary to complete the story of the crime at trial." Gov't 404(b) MIL at 12. The D.C. Circuit, however, has explicitly rejected this basis for admitting evidence as intrinsic and forgoing an analysis under Rule 404(b). *See United States v. Bell,* 795 F.3d 88, 100 (D.C. Cir. 2015). While noting that prior opinions have characterized certain other crime evidence as "inextricably intertwined with the charged crime," *Bowie*, 232 F.3d at 928 (citing cases), the Circuit has held that "evidence is not generally

rendered intrinsic simply because it completes the story or explains the circumstances behind a charged offense," *Bell*, 795 F.3d at 100. Instead, intrinsic evidence is generally limited to "'act[s] that [are] part of the charged offense' or 'some uncharged acts performed contemporaneously with the charged crime . . . if they facilitate the commission of the charged crime.'" *Bell*, 795 F.3d at 100 (alterations in original) (quoting *Bowie*, 232 F.3d at 929).

The cases relied upon by the government are not to the contrary. Each of these cases addressed the admission of *extrinsic* evidence under Rule 404(b) and make no mention of *intrinsic* evidence admitted without consideration for its non-character relevance. *See United States v. Pindell*, 336 F.3d 1049, 1057 (D.C. Cir. 2003) (upholding admission of other crimes evidence to prove the defendant's identity); *United States v. Clarke*, 24 F.3d 257, 266 (D.C. Cir. 1994) (same, with evidence used to demonstrate intent).[17]

Applying these principles here, the Court is skeptical that much of the evidence offered by the government is properly understood as intrinsic to the *charged* conspiracy. Specifically, evidence falling into the first and third categories described above explicitly relates to *other* shipments of narcotics allegedly involving one or more of the defendants. At best, this evidence demonstrates the defendants' involvement in separate criminal undertakings to ship narcotics and is therefore best understood as extrinsic to their alleged effort to prepare and launch the *Mistby*. As to the second category, the government apparently intends to present co-conspirator testimony regarding Chang-Rendon's use of aliases both in connection with these other shipments and in his participation in the charged conspiracy. As the forgoing discussion

---

[17] The government contends in supplemental briefing that the D.C. Circuit's recent holding in *United States v. Straker*, 800 F.3d 570, 588 (D.C. Cir. 2015), supports its contention that the proffered evidence is admissible as intrinsic to the charged conspiracy. *Straker*, however, dealt with the admission of *extrinsic* evidence under Rule 404(b), *see id.* at 589 (explaining the district court's use of a limiting instruction consistent with admission under Rule 404(b)); *see also* Gov't 404(b) Supp. at 6 ("On appeal, the D.C. Circuit affirmed the admission of the evidence under Rule 404(b).").

suggests, only this latter evidence in connection with the *Mistby* is properly understood as intrinsic to the present prosecution.

By contrast, the government's representations in its supplemental briefs regarding alleged overt acts undertaken in connection with the conspirators' efforts to secure narcotics and prepare for the launch of the *Mistby*, *see* Gov't 404(b) Supp. at 10–12, are more easily characterized as intrinsic to the conspiracy charged in the indictment. Specifically, the government indicates that it intends to introduce evidence of intercepted electronic communications to "demonstrate that planning of the launch of the *Mistby* began in January or February 2012 and that there were numerous attempts to launch the *Mistby*." *Id.* at 11. This evidence includes conversations regarding the March 2012 seizure of narcotics from a stash house in Buenaventura, Colombia, which narcotics were intended for shipment on the *Mistby*, the arrest of an alleged co-conspirator, and subsequent efforts to obtain additional narcotics to replace those that were seized. Gov't Supp. MIL Admit or Allow at 3–4. Unlike the evidence of *other* successful and unsuccessful shipments, evidence of alleged over acts undertaken to prepare for the final launch the *Mistby* prior to its interdiction in June 2012 are either "part of the charged offense" or were "performed contemporaneously with the charged crime [to] facilitate [its] commission. . . ." *Bell*, 795 F.3d at 100. As such, this evidence need not be subjected to analysis under Rule 404(b).

In sum, much of the government's other crimes evidence is not intrinsic to the charged conspiracy involving the *Mistby*. Nevertheless, since this other crimes evidence is otherwise admissible under Rule 404(b), the Court need not further delineate between the evidence that is only admissible as intrinsic to the alleged conspiracy and extrinsic evidence that is admissible for a permitted purpose under Rule 404(b).

### b.    Admission under Rule 404(b)

Other crimes evidence is broadly admissible to explain and demonstrate the contours of a charged conspiracy.  As the D.C. Circuit recently reiterated, "'[i]n a conspiracy prosecution, the government is allowed considerable leeway in offering extrinsic, 'other crimes' evidence under Rule 404(b)(2) to inform the jury of the background of the conspiracy charged and to help explain to the jury how the illegal relationship between the participants in the crime developed." *Bell*, 795 F.3d at 100 (internal alterations removed) (quoting *United States v. Mathis*, 216 F.3d 18, 26 (D.C. Cir. 2000)).

Here, the government asserts that its proffered evidence may be admitted for a variety of discrete non-character purposes, including the defendants': (1) "involvement in a common scheme or plan to traffic cocaine on go-fast vessels from Colombia to Panama," Gov't 404(b) MIL at 17–18; (2) "knowledge and specific intent to transport narcotics using a go-fast vessel," *id*. at 18–19; (3) "conspiratorial intent . . . to purposefully agree to act in partnership," *id*. at 19; (4) "identity as the individuals involved in this conspiracy," *id*. at 20–21; and (5) "absence of mistake," *id*. at 21–22.  In general, the government intends to use co-conspirator testimony to explain the history and purpose of the charged conspiracy and to demonstrate the relationships between the defendants and their alleged co-conspirators.

Under long-standing D.C. Circuit precedent, the government's proffered evidence generally may be used to prove the defendants' participation in the charged conspiracy.  Indeed, the Circuit has long held that evidence of prior drug transactions is "probative of intent, knowledge and plan on the part of [the defendant]." *United States v. Washington*, 969 F.2d 1073, 1081 (D.C. Cir. 1992) (citing *United States v. Moore*, 732 F.2d 983, 989 (D.C. Cir. 1984)).  Further, the D.C. Circuit has emphasized that such evidence is particularly important when, as

here, a defendant intends to argue that he lacked the requisite *mens rea* to commit the charged offense. The Court explained in *United States v. Clarke* that the "relevance of this kind of evidence has little to do with the defendant's character *per se*. Its relevance is based rather on a straightforward recognition that 'the intent with which a person commits an act on a given occasion can many times be best proven by testimony or evidence of his acts over a period of time thereto, particularly when the activity involves a continuous course of dealing.'" 24 F.3d at 265 (quoting *Moore*, 732 F.2d at 991)).

The D.C. Circuit's recent holding in *United States v. Straker*, 800 F.3d 570 (D.C. Cir. 2015) (per curiam), is particularly instructive. In *Straker*, the D.C. Circuit considered the convictions of seven foreign nationals for conspiring to abduct an American citizen in violation of the Hostage Taking Act, 18 U.S.C. § 1203. *Id.* at 581–82. On appeal, the defendants challenged the admission, under Rule 404(b), of three uncharged hostage takings that occurred within four months of the charged conspiracy. *Id.* at 588. There, as here, the government sought to introduce evidence of these uncharged crimes to demonstrate "the background of the conspiracy and how the relationships between the participants developed, as well as defendants' motive, intent, knowledge, preparation, and plan." *Id.* The district court instructed the jury periodically during trial that the evidence was admissible "only against the specific defendants the jury found were involved in them and explain[ed] the purposes for which the evidence could, and could not, be considered." *Id.* at 589 (citing *Clarke*, 767 F. Supp. 2d at 27–28).[18] Upholding the admission of this other crimes evidence, the D.C. Circuit concluded that the evidence was

---

[18]     Though noting that this evidence presented a "fairly low" danger of unfair prejudice, the district court nonetheless restricted the government's presentation of this evidence by precluding the government from presenting evidence of a fourth alleged abduction, which resulted in the victim's murder, and limiting testimony as to the remaining abductions to three hours each. *Straker*, 800 F.3d at 588–589.

"relevant to both how [the] defendants started to work together as kidnappers, and their motive and intent to kidnap wealthy citizens to extort ransom money." *Id*. at 590.

In light of this recent precedent, each category of extrinsic evidence proffered by the government may be admitted for a non-character purpose under Rule 404(b). The first and third categories will be presented through co-conspirator testimony, as well as certain documentary evidence, regarding the defendants' participation—both together and separately—in numerous narcotics shipments under strikingly similar circumstances as the charged conspiracy. *See supra* Alleged Shipments Summary Chart. As the D.C. Circuit has emphasized, *see Straker*, 800 F.3d at 590, this evidence is admissible under Rule 404(b) to demonstrate how the defendants began working together and with their testifying co-conspirators as narcotics traffickers, as well as their "intent, knowledge, preparation, and plan," *id*. at 588, to conspire to traffic narcotics aboard the *Mistby*. Given that Chang-Rendon has suggested that he intends to argue at trial that he provided only fabricated coordinates to the DTO, *see* Defs.' Opp'n Gov't 404(b) Supp. at 3, ECF No. 166, evidence of his prior involvement in narcotics trafficking, particularly where traffickers successfully evaded authorities, is certainly probative of his intent to enter the charged conspiracy. Likewise, the second category of evidence, relating to Chang-Rendon's past use of aliases and intermediaries to convey information regarding the location of law enforcement assets, relates directly to his planning and efforts to conceal his identity during preparations for the *Mistby*'s launch, as well as his knowledge and intent to provide coordinates to assist the DTO's trafficking efforts.

Thus, the government's other crimes evidence is not proffered purely to demonstrate the defendants' propensity to engage in narcotics trafficking, but is instead probative of their specific pattern of partnering with each other and a common group of co-conspirators to engage in

conduct on virtually a monthly basis that was substantially similar to the scheme for which the defendants will be tried. *See Straker*, 800 F.3d at 590–91. As the D. C. Circuit explained, "[p]otential juror doubt about whether any of these . . . defendants [were] somehow mistakenly swept up into activities [they] did not know were part of a criminal conspiracy is powerfully undermined by the evidence of similar criminal teamwork with some of the same people." *Id.* Similarly, "[a]ny questions about motive also tended to be put to rest by evidence that the conspirators successfully obtained [their desired criminal objective] in the other, uncharged [crimes]." *Id.*

Finally, the defendants' suggestion that the government's proffered evidence is irrelevant because the government cannot establish that the defendants intended to participate in the uncharged conspiracies, Defs.' Opp'n Gov't 404(b) Supp. at 3, fundamentally misunderstands the government's burden in bringing the present motion. Other crimes evidence is admissible under Rule 404(b) so long as the Court finds, by the preponderance of the evidence, that the defendants intended to join the uncharged conspiracies. *Gewin*, 471 F.3d at 201. Therefore, the government need not demonstrate *conclusively* now or at trial that the defendants intentionally participated in these uncharged conspiracies. Instead, so long as the government presents sufficient evidence to meet this lower preponderance standard, the proffered other crimes evidence is admissible for non-character purposes to prove that the defendants knowingly and intentionally agreed to participate in the charged conspiracy. [19]

Having determined that this evidence may be admitted for at least one permitted purpose identified in Rule 404(b), the Court must further consider whether the government's proffered

---

[19]    The defendants have requested a pretrial evidentiary hearing in order to preview the government's other crimes evidence, Defs.' Opp'n Gov't 404(b) MIL at 2, which presumably would consist primarily of the testimony of alleged co-conspirators the government intends to call at trial. This request is denied.

evidence should nevertheless be excluded under Rule 403, because "its probative value is substantially outweighed by the danger of unfair prejudice." *Douglas*, 482 F.3d at 600 (citing FED. R. EVID. 403). The defendants argue that the government's "avalanche of other crimes evidence," holds little probative value and presents a significant risk of undue prejudice, confusion, and delay. Defs.' Opp'n Gov't 404(b) MIL at 13. In particular, attempting to distinguish this case from *Straker*, the defendants note that the district court in *Straker* admitted evidence of only three uncharged kidnappings—in contrast to the fourteen separate shipments identified by the government here—and strictly limited the trial time allowed for the presentation of evidence as to each uncharged crime. Defs.' Opp'n Gov't 404(b) Supp. at 4. Again, the defendants' efforts both to distinguish recent D.C. Circuit precedent, and to raise blanket objections to the probity of the government's proffered other crimes evidence, are unpersuasive.

As a preliminary matter, the defendants contend that evidence of their alleged participation in prior narcotics conspiracies is irrelevant to any *disputed* issue and therefore offers only minimal probative value. Defs.' Opp'n Gov't 404(b) MIL at 11 (suggesting that points not explicitly disputed by the defendants in pretrial briefing should be presumed undisputed "unless and until [the defendants] indicate[] otherwise"). To the contrary, the D.C. Circuit has emphasized that, where the government is required to demonstrate as an element of a charged offense a defendant's intent and knowledge, admission of other crimes evidence is permissible even where the defendant has not affirmatively challenged these elements. *Douglas*, 482 F.3d at 596–97 ("Even if a defendant concedes an element of an offense, the government still has the burden of proving that element to the jury beyond a reasonable doubt." (citing *Cassell*, 292 F.3d at 794)). Indeed, even a defendant's offer to stipulate to an element of a charged offense "does not deprive the government's evidence of relevance." *United States v.*

76

*Crowder*, 141 F.3d 1202, 1206 (citing *Old Chief*, 519 U.S. at 179). As such, the exclusion of such evidence "must rest not on the ground that the other evidence has rendered it 'irrelevant,' but on its character as unfairly prejudicial, cumulative or the like, its relevance notwithstanding." *Id*. at 1206 (quoting *Old Chief*, 519 U.S. at 179). Consequently, because the government intends to introduce other crimes evidence to prove necessary elements of the charged offense (*e.g.*, the defendants' knowledge and intent), the defendants' failure to affirmatively contest these elements does not alone require exclusion under either Rule 404(b) or Rule 403.

Instead, the Court must weigh the relative probative value of each category of evidence against the risk that such evidence will be unfairly prejudicial to determine whether this evidence will be admissible at trial. Regarding Category #1, the government's proffered evidence of nine seized, stolen, or successful shipments involving at least one of the defendants, is probative of their intent, knowledge, preparation, and plan to agree to traffic narcotics aboard the *Mistby*. In particular, evidence of prior seized shipments is greatly probative of each defendant's intention to traffic narcotics via go-fast vessels even after some shipments had been interdicted. This persistent effort, even with significant risk of interdiction and apprehension, is highly probative of the cohesiveness of the conspiracy and the strength of the defendants' mutual desire and motivation to enter into the charged conspiracy. Similarly, as previously noted, evidence of successful shipments, which would be introduced against Mosquera-Morillo and Chang-Rendon are probative of the felonious relationship with one another, as well as their intent to traffic narcotics to Panama and Chang-Rendon's intent to provide accurate coordinates to the DTO. Finally, the stolen shipments, which would be introduced against only Moreno-Membache, hold particular probative value in light of the fact that these are two of only three other crimes the government proposes to introduce against the defendant. In addition to demonstrating Moreno-

Membache's intent to traffic narcotics to Panama, where the shipments were stolen, this evidence is probative of his prior felonious relationship with at least one of the testifying co-conspirators. The fact that all but one of these alleged shipments occurred between July 2011 and October 2012, within a year of the charged conspiracy, further increases their probative value. *Bell*, 795 F.3d at 100 (noting the "unique probative value" of alleged conduct that "'occurred relatively close in time to the conduct charged in the indictment'" (quoting *United States v. West*, 22 F.3d 586, 597 (5th Cir. 1994))).

Moreover, while the probative value of the prior shipment involving all three defendants is clear, the admission of other crimes evidence involving fewer than all of the defendants, accompanied by appropriate limiting instructions, is entirely consistent with *Straker*. 800 F.3d at 592 (noting with approval that the district court "repeatedly and carefully instructed the jury as to which defendants were involved in which of the other crimes, and cautioned the jurors to consider evidence only against those specific defendants, thereby protecting all of the defendants against any potential confusion stemming from the other-crimes evidence"). Here, this evidence is highly probative of both the witnesses' ability to identify the defendants, as well as the felonious relationships developed between the witnesses and each defendant.

At the same time, the Court is not persuaded that presentation of this evidence, with appropriate limiting instructions, presents a serious risk of undue prejudice, confusion, or delay. Although the D.C. Circuit has cautioned that "manifest prejudice can result when the jury is informed of a prior conviction that is similar to the charged offense," *see United States v. Coleman*, 552 F.3d 853, 859–860 (D.C. Cir. 2009), the unindicted conduct at issue here did not result in prosecution or conviction and generally involves criminal activity that is no more serious than that charged in the indictment, *see Bell*, 795 F.3d at 99–100 (upholding admission of

other crimes evidence under Rule 404(b) where the contested evidence "'did not involve conduct any more sensational or disturbing than the other conduct attributed to the [defendant]'" (internal alterations omitted) (quoting *United States v. Roldan–Zapata*, 916 F.2d 795, 804 (2d Cir. 1990))); *Straker*, 800 F.3d at 591 (holding uncharged kidnappings admissible, noting that "danger of unfair prejudice was minimal because the other-crimes evidence added no emotional or other pejorative emphasis not already introduced by the evidence of the crime charged in this case" (internal citation and quotation omitted)). Similarly, because the government proposes to introduce this evidence largely through the testimony of witnesses, who will also testify to the defendants' participation in the charged conspiracy, there is little risk that additional questioning directed at these witnesses' prior dealings with the defendants will significant delay proceedings or confuse the jury.

As compared to evidence of prior uncharged narcotics shipments, Category #2 of the government's proffered 404(b) evidence—Chang-Rendon's prior efforts to conceal his identity to insulate himself from the DTO—presents an even clearer case for admission. This evidence is highly probative of Chang-Rendon's identity, particularly because many alleged co-conspirators are apparently able to identify Change-Rendon only through the aliases he used in connection with prior narcotics shipments and the charged conspiracy. *See infra* Part VI.F.2. This evidence is also relevant to Chang-Rendon's knowledge and intent to provide information regarding the location of law enforcement assets to DTOs. Compared with its significant probative value, this evidence raises even less risk of unfair prejudice, confusion, or delay. Again, the government seeks to elicit this evidence through the testimony of the same cooperating witnesses, who will also testify to the defendants' participation in the charged conspiracy.

Lastly, as to Category #3, the probative value of Chang-Rendon's alleged participation in five additional shipments holds substantially the same probative value as the evidence included in Category #1.  As before, evidence of the witness's prior criminal relationship with Chang-Rendon is probative of both his ability to identify Chang-Rendon, as well as Chang-Rendon's intent to enter into the charged conspiracy.  Further, because this evidence will be elicited from a single witness, there is little risk of undue delay or juror confusion.

Thus, because each category of other crimes evidence is admissible under both Rule 404(b) and Rule 403, the government's motion to admit this evidence is granted.  Nonetheless, in keeping with *Straker* and the general practice in this Circuit, the defendants are free to request an appropriate limiting during trial to ensure that the jury considers this evidence "only for its proper purpose" and only against the defendant or defendants against whom it may be properly admitted.  *See Pindell*, 336 F.3d at 1057 n.9 (internal quotations omitted) (quoting *United States v. Mitchell*, 49 F.3d 769, 777 (D.C. Cir. 1995)).[20]

## C.    The Government's Motion to Admit Alleged Co-Conspirator Statements

In addition to its other crimes evidence, the government has identified 10 text messages and more than 100 audio recordings obtained through Colombian wiretaps that it may introduce at trial as direct evidence of the defendants' involvement in the charged conspiracy.  Gov't MIL Admit or Allow at 1–2, ECF No. 72.  Among these intercepted communications, the government

---

[20]      In a final attempt to exclude the proffered evidence, the defendants argue that admission of this evidence would violate the conditions of their extradition.  Defs.' Opp'n Gov't 404(b) MIL at 16–18.  The defendants acknowledge their lack of precedential support, *id.* at 17 n.3, and, indeed, this argument is foreclosed by the D.C. Circuit's holding in *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 206 (D.C. Cir. 2013), that the admission of evidence, under Rule 404(b), about a criminal defendant's involvement in an uncharged conspiracy "for the limited purpose of showing knowledge or intent" does not violate "the so-called doctrine of specialty, which provides that 'once extradited, a person can be prosecuted only for those charges on which he was extradited'" (quoting *United States v. Sensi*, 879 F.2d 888, 892 (D.C. Cir. 1989)).  As the D.C. Circuit explained, "the doctrine of specialty governs prosecutions, not evidence."  *Id.*  Consequently, the defendants' objection to admission of other crimes evidence on this ground is denied.

seeks to introduce evidence of statements from purported co-conspirators in this or other alleged narcotics trafficking schemes who will not testify at trial. *Id.* at 4–11. Arguing that such statements were made in furtherance of conspiracies to which one or more defendant was a party, the government contends that these statements are admissible for their truth at trial as non-hearsay under Federal Rule of Evidence 801(d)(2)(E). *Id.*

In response, the defendants contend that the Court may not rule on the admissibility of these statements without first convening a hearing to determine whether the government has demonstrated that the statements conform to the requirements of Rule 801(d)(2)(E). Defs.' Opp'n Gov't Mot. Admit or Allow at 5, ECF No. 88 (citing *United States v. James*, 590 F.2d 575 (5th Cir. 1979)). Such a hearing would, in the defendants' view, allow the Court to make a "statement-by-statement analysis" of the proffered evidence to ensure that each offered statement is admissible under Rule 801(d)(2)(E). *Id.* at 7. As discussed below, in light of the government's representations both in initial filings in support of this motion and in its supplemental proffer following the September 11 hearing, these statements will be provisionally admitted, contingent upon the government's showing at trial that the statements conform to the requirements of Rule 801(d)(2)(E).

### 1. Legal Standard

Under Rule 801(d)(2)(E), an out-of-court statement is not hearsay if it is "offered against an opposing party and . . . was made the party's coconspirator during and in furtherance of the conspiracy." FED. R. EVID. 801(d)(2)(E). In order to admit such a statement, the Court must find by the preponderance of the evidence that: (1) a conspiracy existed; (2) the defendant and the out-of-court declarant were involved in the conspiracy; and (3) the statement to be introduced was made in furtherance of that conspiracy. *United States v. Gewin*, 471 F.3d 197, 201 (D.C.

Cir. 2006).  The D.C. Circuit has clarified, however, that an out-of-court statement cannot *alone* support the necessary finding that the defendant and declarant were together involved in a conspiracy.  *Id.* (citing *United States v. Gatling*, 96 F.3d 1511, 1520–21 (D.C. Cir. 1996).  Thus, while the Court may consider the statements itself in making its admissibility determination, *id.* (citing *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987)), the Court's ultimate determination must rest at least partially on some independent evidence of the conspiracy, *id.* (citing *Gatling*, 96 F.3d at 1520–21).

Although the D.C. Circuit has suggested that the "better practice" is for the Court to make a final admissibility determination prior to admitting any purported co-conspirator statements, the Circuit has acknowledged that "it is just impractical in many cases for a court to comply strictly with the preferred order of a proof." *Jackson*, 627 F.2d at 1218.  As such, "the court is vested with considerable discretion to admit particular items of evidence 'subject to connection.'"  *Id.* (quoting *United States v. Vaught*, 485 F.2d 320, 323 (4th Cir. 1973)).  In particular, "a decision on a motion should be deferred, if disposing of the motion involves deciding issues of fact that are inevitably bound up with evidence about the alleged offense itself." *United States v. Wilson*, 26 F.3d 142, 159 (D.C. Cir. 1994).  Doing so conserves judicial resources by avoiding "what would otherwise become a separate trial on the issue of admissibility." *United States v. Gannt*, 617 F.2d 831, 845 (D.C. Cir. 1980), *abrogated on other grounds by In Re Sealed Case*, 99 F.3d 1175, 1178 (D.C. Cir. 1996).

If, however, "at the close of the government's case, or at any other critical point," the government has failed to meet its burden, the court "must upon motion, and may *sua sponte*, strike the testimony that has not been sufficiently connected and direct the jury to disregard it." *Jackson*, 627 F.2d at 1218 (citing authorities).  Where such an instruction "cannot cure the

prejudice threatened by the inadmissible hearsay[,] a mistrial required." *Id.* (citing *United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969)).

### 2.      Analysis

The government has identified 10 text messages and 111 calls intercepted by means of Colombian judicially-authorized wiretaps that it intends to introduce at trial. *See* Gov't Reply Supp. MIL Admit or Allow at 6 n.8, ECF No. 99. Contending that these intercepted communications are admissible as non-hearsay co-conspirator statements, the government initially proffered that these recordings include: (1) conversations between two of the defendants; (2) conversations between a defendant and an alleged co-conspirator; and (3) conversations between two alleged co-conspirators. Gov't MIL Admit or Allow at 4. To demonstrate the admissibility of these statements, the government provided summaries of twenty-three categories of statements made by non-testifying co-conspirators that the government intends to introduce at trial. *Id.* at 7–9.

With a number of these exemplary statements demonstrating no obvious connection to the defendants or the charged conspiracy, the defendants initially contended that the government failed to demonstrate that these statements are admissible under Federal Rule of Evidence 801(d)(2)(E) and demanded a pre-trial hearing to consider the admissibility of each proffered out-of-court statement. Defs.' Opp'n Gov't Mot. Admit or Allow at 5. Following the September 11 hearing, the government filed a supplemental proffer describing in greater detail each of the twenty-three categories previously identified and the relationship between these statements and the charged conspiracy. Gov't Supp. MIL Admit or Allow at 2–6. This proffer indicates that all of the calls to be introduced fall within one of the twenty-three categories, and that all but one of the categories relate directly to the charged conspiracy. *Id.* at 3.

For example, two categories of statements include communications regarding the production of cocaine to be shipped aboard the *Mistby* and subsequent efforts to arrange for the transportation of this cocaine to a stash house in Buevaventura, Colombia. *Id.* Three categories include communications in March 2012 discussing preparations to move the drugs from the stash house to the *Mistby*. *Id.* After this stash house was raided, and the cocaine was seized by law enforcement authorities, seven categories of statements include communications regarding the seizure and conversations discussing efforts to obtain and transport replacement drugs to the *Mistby*. *Id.* at 4. The remaining categories that relate directly to the charged conspiracy include co-conspirator statements discussing the logistics of the preparation and launch of the *Mistby*, including efforts to time the launch to avoid detection by law enforcement. *Id.* In particular, these conversations describe Chang-Rendon's provision of coordinates of law enforcement assets, as well as payments made to Chang-Rendon for this information. *Id.* The final category, consisting of twelve intercepted calls, relates to two shipments that the government seeks to admit as other crimes evidence under Rule 404(b) against Defendant Moreno-Membache, namely, Shipments 7 and 8 on the Alleged Shipments Summary Chart, *supra* Part IV.B. *Id.* at 3 n.2, 5–6; *see also* Gov't Reply Supp. MIL Admit or Allow at 5 n.6 (explaining that some of the statements the government seeks to admit "are in furtherance of a separate conspiracy relating to certain events the Government has sought to admit pursuant to [Rule 404(b)].").

As to the existence of a conspiracy, the government contends that this conspiracy will be proven at trial through testimony from cooperating co-conspirators, through audio recordings of intercepted calls between the defendants themselves, and through evidence of seized narcotics on an unidentified vessel allegedly used to transport narcotics. Gov't Supp. MIL Admit or Allow at 7. Regarding the declarants' involvement in this alleged conspiracy, the government proffers

that co-conspirators will testify to their personal dealings with the declarants, including the declarants' role in the conspiracy, as well as their prior dealings with the declarants in other, similar schemes. *Id.* As to the defendants' involvement in the alleged conspiracy, the government proffers that recordings of intercepted phone conversations involving the defendants will demonstrate that the defendants and declarants were coordinating in order to prepare for the launch of the vessel carrying narcotics. *Id.* Beyond these out-of-court statements, the government asserts that testimony from co-conspirators and evidence of the seized narcotics support a determination that the defendants and declarants participated as co-conspirators in the same narcotics trafficking scheme. *Id.*

In response, the defendants do not contest that out-of-court statements made in furtherance of the charged conspiracy may be admitted at trial, and instead argue simply that the Court must determine before trial which of the government's proffered statements meet the requirements for admission under Rule 801(d)(2)(E). Defs.' Opp'n Gov't Supp. MIL Admit or Allow at 2 ("The question is *when* the Court should make these determinations."). While acknowledging the Court's "significant discretion in deciding when to make admissibility determinations in this context," the defendants suggest that the "better practice" is to determine conclusively the admissibility of each proffered statement prior to its admission. *Id.* (citing *Jackson*, 627 F.2d at 1218).

In support, the defendants suggest that, given the sheer number of out-of-court statements the government seeks to admit, the wrongful admission of these statements may result in a mistrial, counseling against provisional admission of these statements prior to trial. *Id.* at 2–3. The defendants point out that the possibility of mistaken admission is particularly pronounced in this case due to perceived weaknesses in the government's proffered evidence supporting

admission of the contested out-of-court statements. Defs.' Opp'n Gov't Supp. MIL Admit or Allow at 3–4. For example, the defendants suggest that these statements may not be admitted because the government has failed to demonstrate conclusively that the defendants intended to participate in the charged conspiracy. *Id.* As noted, however, to support admission of these statements against the defendants, the government need only advance sufficient evidence to demonstrate by a preponderance of the evidence that any defendant against whom these statements are introduced intended to participate in the charged conspiracy. *Gewin*, 471 F.3d at 201. Here, given the substantial evidence offered by the government beyond the contested out-of-court statements, *see supra* Part VI.B., the Court does not share the defendants' concern regarding the government's ability to meet this burden at trial. As previously noted, however, the Court's discretion to provisionally admit such statements subject to a later showing of admissibility is designed to balance this exact concern with the equally compelling interest in avoiding unnecessary delay in criminal proceedings. *See Gannt*, 617 F.2d at 845 (explaining that provisional admission concerns allows for the conservation of judicial resources by avoiding "what would otherwise become a separate trial on the issue of admissibility.").

Finally, because the last category of statements relates to two separate, uncharged conspiracies, the parties dispute whether this evidence may properly be admitted against the defendants under Rule 801(d)(2)(E). Relying primarily on out-of-circuit precedent, the government contends that the "conspiracy that forms the basis for admitting the co-conspirator's statements need not be the same conspiracy for which the defendant is indicted." Gov't Supp. MIL Admit or Allow at 7 (citing authorities from the Fifth, First, Eleventh, and Third Circuits). In response, the defendants reiterate their contention that the "proffered statements must be made

'in furtherance of' the charged conspiracy." Defs.' Opp'n Gov't Supp. MIL Admit or Allow at 3

(citing FED. R. EVID. 801(d)(2)(E) and *Bourjaily*, 483 U.S. at 175).[21]

As the Court noted at the September 11 hearing, the D.C. Circuit does not appear to have

addressed directly the question whether co-conspirator statements are admissible as non-hearsay

where the conspiracy serving as the predicate for admissibility differs from the charged

conspiracy. Tr. Mot. Hr'g (Sept. 11, 2015 AM) at 28:21–23, ECF No. 134. The government is

correct, however, that other circuits have uniformly held that such statements may be admitted so

long as they were made in furtherance of an uncharged conspiracy in which the defendant

participated. *See*, *e.g.*, *United States v. Senegal*, 371 Fed. App'x 494, 502 (5th Cir. 2010) ("The

conspiracy that forms the basis for admitting the coconspirators' statements need not be the same

conspiracy for which the defendant is indicted." (citing *United States v. Elashyi*, 554 F.3d 480,

503 (5th Cir. 2008))); *United States v. Marino*, 277 F.3d 11, 26 (1st Cir. 2002); *United States v.

Russo*, 302 F.3d 37, 45–46 (2d Cir. 2002). In a different context, the D.C. Circuit has likewise

emphasized the agency-law principles underlying Rule 801(d)(2)(E) to conclude that out-of-

court statements are admissible so long as they advance a joint endeavor in which the defendant

was involved. *See Gewin*, 471 F.3d at 201 (upholding admission of statements made in

furtherance of a *legal* conspiracy, observing that Rule 801(d)(2)(E), "based on concepts of

agency and partnership law and applicable in both civil and criminal trials, embodies the long-

standing doctrine that when two or more individuals are acting in concert toward a common goal,

the out-of-court statements of one are admissible against the others, if made in furtherance of the

---

[21]    Following supplemental briefing by the government, the Court granted Defendant Moreno-Membache's
request for additional time to respond to the government's contention that these out-of-court statements are
admissible against him at trial. *See* Minute Order, dated Oct. 16, 2015. Nonetheless, Defendant Moreno-Membache
filed no additional opposition to the government's motion.

common goal." (internal quotation and alteration omitted) (quoting *United States v. Weisz*, 718 F.2d 413, 433 (D.C. Cir. 1983))).

Although the law in certain circuits requires the government to demonstrate that the conspiracy serving as the basis for admission of a co-conspirator statement is "factually intertwined" with the offense being tried, *see, e.g.*, United *States v. Stratton*, 779 F.2d 820, 829 (2d Cir. 1985) (citing *United States v. Lyles*, 593 F.2d 182, 194 (2d Cir. 1979)), other circuits have rejected this additional requirement as redundant with the Court's general responsibility to ensure that all admitted evidence is relevant to the case at hand, *see United States v. Ellis*, 156 F.3d 493, 497 (3d Cir. 1998). Even under this heightened standard, however, because the statements at issue here allegedly advanced an uncharged conspiracy to engage in narcotics trafficking under circumstances substantially similar to the charged conspiracy, this evidence is sufficiently probative and intertwined with the charged conspiracy to be admissible under Rule 801(d)(2)(E).

Accordingly, in light of the government's representations during the September 11 hearing, as bolstered by the government's supplemental written proffer, the government's motion to admit out-of-court statements recorded in intercepted telephone communications is provisionally granted, subject to the government presenting sufficient evidence to demonstrate the admissibility of any introduced statements at trial.

### D.     The Government's Motion to Preclude Cross-Examination/Argument

Lastly, the government seeks seven pretrial orders broadly limiting the scope of cross-examination and argument the defendants may offer at trial.[22]  Gov't MIL Preclude Cross-Exam. or Arg., ECF No. 73.  These proposed orders fall into one of two categories.

---

[22]     The government initially sought an eighth order to preclude Chang-Rendon from raising the affirmative defense of duress at trial without first making a sufficient pretrial offer of proof entitling him to such a defense.

First, the government requests five separate orders precluding the defendants from engaging in any cross-examination of government witnesses, or otherwise presenting any evidence or argument, regarding five topics: (1) law enforcement witnesses' participation in ongoing and unrelated criminal investigations; (2) background and identifying information that could be used to locate witnesses and their families; (3) efforts to invoke sympathy for the defendants or invite jury nullification; (4) the government's charging decisions, including the decision to bring prosecution in the absence of evidence that the narcotics at issue were destined for the United States; and (5) the basis for United States jurisdiction over the *Mistby*. *Id*. at 2–12.

Second, the government seeks limitations on the use of law enforcement reports for impeachment purposes under the Jencks Act, 18 U.S.C. § 3500, asserting that these materials "are written after interviews are completed and reflect the thought process and interpretations of agents," and thus do not reflect a witness's own statements. *Id*. at 14–16. Additionally, the government asks the Court to require the defendants to refrain from inquiring as to the availability of material covered by the Jencks Act in the presence of the jury. *Id*. at 12–14.

At this stage, the government's various requests generally present abstract objections to potential lines of questioning and argument the defendants may or may not pursue at trial. Untethered as these requests are from the concrete circumstances of trial, when the parties have developed more fully their respective trial strategies, their scope, import and impact is difficult to assess at this time. Consequently, the government's motion is denied without prejudice, and the government is free to raise specific objections to particular lines of cross-examination and argument at trial.

---

Gov't MIL Preclude Cross-Exam. or Arg. at 17–21. In response, Chang-Rendon contends that he bears no obligation to make such a pretrial proffer, but also represents that he does not intend to raise such a defense at trial. Defs.' Supp. Opp'n Gov't Mot. Preclude Cross-Exam. or Arg. at 2. Accordingly, the government's request to preclude a duress defense is denied as moot.

**E.    The Defendants' Motion to Suppress Statements Given by Defendant Chang-Rendon to United States Law Enforcement**

Having addressed each of the government's outstanding evidentiary motions, the Court turns next to the defendants' motions to exclude certain categories of evidence the government intends to introduce at trial.

First, Defendant Chang-Rendon has moved to suppress any statements he gave to United States law enforcement officers while in Colombian custody on or about September 9, 2013.[23] Defs.' Am. Mot. Suppress Statements at 1, ECF No. 74.  Arguing that he did not voluntarily, knowingly, and intelligently waive his Fifth Amendment rights, Chang-Rendon contends that any such statements may not be admitted under *Miranda v. Arizona*, 384 U.S. 436 (1966).  *Id.* at 2–4.  Specifically, he asserts that the summary of his Fifth Amendment rights provided to him prior to his interrogation was unnecessarily confusing, preventing him from fully comprehending his right to counsel before forgoing this right and agreeing to proceed with the interrogation.  *Id.* at 6–8.  Likewise, emphasizing his fear and exhaustion following his arrest and transport while in Colombian custody, Chang-Rendon argues any purported waiver he gave while in custody was not voluntary because it "may have sprang from the coercive tactics employed by American law enforcement officials."  *Id.* at 5–6.

At the September 11 hearing, the Court heard testimony from two Special Agents of the DEA and the Navel Crime Investigative Service ("NCIS") who conducted the challenged

---

[23]     The Court allowed Moreno-Membache to adopt this motion, based on the representation that he would supplement his codefendant's motion "with particularized facts pertaining to him, if and when such facts become known."  Motion to Adopt Motions of Codefendants at 1, ECF No. 80; *see* Minute Order, dated Aug. 10, 2015.  Yet, he has not done so, and "'Fifth Amendment rights are, *a fortiori*, personal rights' in which [Moreno-Membache] cannot share."  *Straker*, 800 F.3d at 608 n.14 (quoting *Bryson v. United States*, 419 F.2d 695, 699 (D.C. Cir. 1969)).  Accordingly, Moreno-Membache may not join in Chang-Rendon's motion that relates specifically to Chang-Rendon's own interrogation, *id.*, and the motion is denied as to Moreno-Membache.  For the same reason, although the Court allowed Mosquera-Murillo "to adopt any . . . defense motions of co-defendants that can be conformed to [his] defense," *see* Minute Order, dated Aug. 10, 2015, the motion is denied as to Mosquera-Murillo.

interrogation.   In light of this testimony,  and the arguments  presented by the parties in their

written submissions  and during  the September 11 hearing,  the motion  to suppress is denied.

### 1.    Legal Standard

"The Fifth Amendment's self-incrimination  clause provides  that no 'person'  'shall be

compelled  in any criminal case to be a witness against himself.'  *Straker*, 800 F.3d at 613

(quoting  U.S. CONST. amend. V).  The Supreme Court in *Miranda v. Arizona* held that "the

prosecution  may not use statements, whether exculpatory  or inculpatory, stemming  from

custodial  interrogation  of the defendant unless it demonstrates the use of procedural  safeguards

effective to secure the privilege  against self-incrimination."  384 U.S. at 444.  "As a prophylactic

rule, *Miranda* safeguards the constitutional  privilege  against compelled  self-incrimination  by

deterring  negligent or willful  police  misconduct  that could impinge  upon the Fifth Amendment

right."  *Straker*, 800 F.3d at 614 (citing  authorities).

*Miranda* requires law enforcement  to warn a person subject to custodial  interrogation,

before any interrogation  has begun,  "that he has a right to remain silent, that any statement he

does make may be used as evidence against him, and that he has a right to the presence of an

attorney, either retained or appointed."  *Miranda*, 384 U.S. at 444.  "Unless a suspect

'voluntarily,  knowingly  and intelligently'  waives these rights, any incriminating  responses to

questioning  may not be introduced  into evidence in the prosecution's  case in chief in a

subsequent criminal  proceeding."  *Pennsylvania v. Muniz*, 496 U.S. 582, 589 (1990) (internal

citation  omitted).

The D.C. Circuit  has not definitively  decided whether "the Fifth Amendment  privilege

against self-incrimination  protects nonresident aliens facing criminal  trial in the United  States,

when, as here, the questioning  by federal authorities  took place abroad," nor, "[r]elatedly,"

whether "*Miranda* applies to statements obtained by U.S. authorities from suspects held in foreign custody abroad." *Straker*, 800 F.3d at 613 (assuming without deciding that *Miranda* applies in such situations). Here, however, the government concedes "the Fifth Amendment's protections against self-incrimination extend to non-U.S. citizens, such as Chang-Rendon, facing criminal prosecution in the United States when the questioning by U.S. authorities occurs outside the United States." Gov't Omnibus Opp'n at 13 (citing authorities).

Where, as here, the parties agree that the defendant was in custody when he was interrogated by authorities, *see id.* at 10 (stating that Defendant "Chang-Rendon remained in Colombian custody" during the interview with United States agents), it is the government's burden to prove, by a preponderance of the evidence, that the defendant validly waived his *Miranda* rights to overcome a motion to suppress any resulting statements, *see Colorado v. Connelly*, 479 U.S. 157, 168 (1986). As noted, in order to be valid, such a waiver must be both knowing and voluntary. *United States v. Yunis*, 859 F.2d 953, 961 (D.C. Cir. 1988). Thus, "'[f]irst, the relinquishment of the rights must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception[; and, s]econd, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* (internal alterations omitted) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

### 2.    Analysis

On the morning of September 9, 2013, Chang-Rendon was arrested by Colombian authorities while at work on the island of Malaga, Colombia. Defs.' Am. Mot. Suppress Statements at 1. Following his arrest, Chang-Rendon was interrogated initially by Colombian authorities, before being transported by helicopter and airplane to Bogota, Colombia. *Id.*

Approximately twelve hours after his arrest, Chang-Rendon was questioned by Special Agent Guillermo Fuentes from the DEA and Special Agent John Souchet of the NCIS. *Id.* at 2. A ten-year DEA veteran, Special Agent Fuentes has been assigned to the Bogota, Colombia DEA field office to assist with drug trafficking investigations since 2011. Tr. Mot. Hr'g (Sept. 11, 2015 PM) at 8:25–10:6, 11:8-16, ECF No. 146. Upon his assignment to the Bogota office, Special Agent Fuentes received additional training regarding interactions with overseas defendants who are subject to extradition to the United States, including instruction regarding the use of the Notification of Extraterritorial Rights to apprise foreign suspects of their rights. *Id.* at 10:7–11:7. Also a ten-year veteran, Special Agent Souchet has similarly received training in how to advise foreign suspects of their rights. *Id.* at 49:2-14.

According to the agents, after providing Chang-Rendon with a Notification of Extraterritorial Rights, as well as an accompanying Warning and Waiver of these rights, in both English and Spanish, which the agents read aloud before allowing Chang-Rendon to review the notification in writing, Chang-Rendon signed both the statement of his rights and a written waiver of these rights without objection. *Id.* at 16:22–18:11, 53:5–56:2; *see also* Am. Mot. Suppress Statements at 2, Ex. A (Notification of Extraterritorial Rights), ECF No. 74-2.[24] Thereafter, Chang-Rendon allegedly told the agents that he provided DTOs with reports and maps including the location and description of law enforcement assets to assist the DTOs in avoiding interdiction on the high seas. Gov't Omnibus Opp'n at 23. The government represents

---

[24] The parties dispute the correct translation of one phrase in the Spanish-language Notification of Extraterritorial Rights. *See* Tr. Mot. Hearing (Sept. 11, 2015 PM) at 20:11–27:12. The government contends that the Notification indicates that interrogators cannot assure the witness that a lawyer will be provided "before or during" the interrogation, *see id.*, Ex. 1A, and Special Agent Fuentes testified that this translation accurately conveys the meaning of the Notification, *id.* at 27:6–12. Chang-Rendon contends that this phrase is best interpreted to read "before or after" the interrogation. Am. Mot. Suppress Statements, Ex. A at 5. The Court relies on the testimony of the government agent at the September 11 hearing to find that his translation is the appropriate one to be used in resolving the pending motion.

that Chang-Rendon further explained how he transmitted these coordinates in coded text messages and used aliases and intermediaries to insulate himself from the DTOs. *Id.*

Seeking to suppress any statements he made following his execution of the written waiver of his Fifth Amendment rights, Defendant Chang-Rendon argues that his waiver was neither knowing nor intelligent. Defs.' Am. Mot. Suppress Statements at 4. Specifically, Chang-Rendon contends first that the Notification of Extraterritorial Rights he read and signed prior to his interrogation was ambiguous and confusing, and failed to provide effective notice of Chang-Rendon's right to refuse to submit to interrogation by United States law enforcement without access to counsel. *Id.* at 6–8. Beyond this initial confusion, Chang-Rendon contends that any subsequent waiver was obtain through coercion. *Id.* at 5–6. The government responds that the totality of the circumstances indicate that the defendant "was properly notified of his rights, and he voluntarily, knowingly, and intelligently waived those rights." Gov't Omnibus Opp'n at 2, 12–13. The government notes that courts have upheld international *Miranda* rights waiver forms, even if they varied from familiar *Miranda* warnings provided domestically. *Id.* at 13–14. Moreover, the government contends that "[t]here is no evidence of any coercive police activity" suggesting that Chang-Rendon's waiver of his rights was not voluntary. *Id.* at 15.

Following a review of the contents of the Notification of Extraterritorial Rights provided to Chang-Rendon, the Court will consider his contention that his decision to waive these rights was the product of government coercion. Based upon the testimony provided at the September 11 hearing from Special Agents Fuentes and Souchet, and a review of the forms challenged by Chang-Rendon, the Court finds that this defendant's waiver was valid.

####     a.     Chang-Rendon Was Adequately Advised of His Rights

Chang-Rendon argues that he did not knowingly waive his Fifth Amendment rights because the Notification of Extraterritorial Rights he reviewed and signed was "convoluted and vague," Defs.' Am. Mot. Suppress Statements at 6, and had "ambiguities and discrepancies," *id*. at 7. Chang-Rendon contends that, on the one hand, the Notification advised him he had the right to have a lawyer present for questioning and the right to consult a lawyer prior to any questioning, but at the same time, gave him the impression that (1) the United States government could not actually assure him access to a lawyer because he was not in the United States, but (2) that, if he were located in the United States, he would be appointed a public defender if he could not afford a lawyer. *Id*. at 6. Chang-Rendon further argues that the officers did not assure him they would provide him a lawyer familiar with United States law upon his request in Colombia, nor provide him with "any additional explanation of the charges, the indictment, or even the meaning of 'used against you in a court of law in the United States.'" *Id*. at 7. In light of these purported deficiencies, Chang-Rendon asserts that he was not adequately apprised of his Fifth Amendment rights, such that any subsequent waiver of these rights was not knowing. *Id*. at 8.

The D.C. Circuit has not considered the degree to which the Notification of Extraterritorial Rights provided to Chang-Rendon adequately apprises a detainee of his Fifth Amendment rights. Under similar circumstances, however, the Second Circuit has concluded that a substantially similar warning is sufficient to support a knowing waiver of these rights. In *In re Terrorist Bombings of U.S. Embassies in E. Africa*, the Second Circuit considered whether two defendants validly waived their Fifth Amendment rights while in Kenyan custody in connection with the bombings of the American embassies in Kenya and Tanzania. 552 F.3d 177, 180–186 (2d Cir. 2008). Prior to being interrogated, each defendant was provided with an

"Advice of Rights" by United States law enforcement officers, which included language substantially similar to the language at issue here. *Id*. at 181, 185–86.[25]

While observing that this summary of the detainee's rights "could have been made clearer," *id*. at 205, the court determined that the form "presented defendants with a factually accurate statement of their rights under the U.S. Constitution and how those rights might be limited by the governing non-U.S. criminal procedures," *id*. at 205–06. Thus, while declining to rule definitively on the matter, the court concluded that the form "substantially complied with whatever Miranda requirements were applicable" to the foreign detainees. *Id*. at 209 (holding that subsequent oral warnings obviated any remaining ambiguity presented by the written statement of rights).

Chang-Rendon suggests that unlike the oral clarification provided to the defendants in *In re Terrorist Bombings*, in this case, the agents provided no explanation of the forms, leaving the defendant with only the ambiguous written statement of rights, which is inadequate. Reply Supp. Defs.' Am. Mot. Suppress Statements at 3–4, ECF No. 104. According to Chang-Rendon, the agents' failure to clarify that his right to have any attorney provided to him prior to and during his interrogation depended on Colombian law left him unable to assess whether to waive his rights under American law. *Id*. at 6. As the government correctly notes, however, the Notification of Extraterritorial Rights in fact provides additional clarification as to the availability of counsel in a foreign jurisdiction that closely tracks the clarifying language

---

[25] The Second Circuit quoted the relevant language as follows: "'In the United States, you would have the right to talk to a lawyer to get advice before we ask you any questions and you could have a lawyer with you during questioning. In the United States, if you could not afford a lawyer, one would be appointed for you, if you wish, before any questioning. Because we are not in the United States, we cannot ensure that you will have a lawyer appointed for you before any questioning.'" *In re Terrorist Bombings*, 552 F.3d at 206 n.21 (quoting *United States v. Bin Laden*, 132 F. Supp. 2d 168, 173 (S.D.N.Y. 2001) and *United States v. Bin Laden*, 132 F. Supp. 2d 198, 203 (S.D.N.Y. 2001)).

suggested by the Second Circuit.[26]   Further, the Notification concludes by advising the detainee of his right to refuse to speak with American law enforcement without a lawyer present. Tr. Mot. Hearing (Sept. 11, 2015 PM), Ex. 1A.  Chang-Rendon does not dispute that the agents read this warning to him before allowing him to review the written warning himself.  *See generally* Defs.' Am. Mot. Suppress Statements.  Thus, notwithstanding any lingering ambiguity presented by the Notification of Extraterritorial Rights, the agents correctly apprised Chang-Rendon of his rights, and he then indicated in writing that he understood those rights before his interrogation began.  In these circumstances, the Court has no hesitation finding that Chang-Rendon understood his rights at the time he was so advised.

### b.  Chang-Rendon's Waiver was Voluntary

In addition to challenging the degree to which he understood his rights under the Fifth Amendment, Chang-Rendon suggests that his ostensible waiver of these rights was not voluntary and was obtained by the agents conducting his interrogation only through coercion. Defs.' Am. Mot. Suppress Statements at 5–6.  According to the defendant, the officers' coercive tactics included "captializ[ing] on his fatigue and fear" following his arrest, failing to be native Spanish speakers, and interrogating him late in the evening.  *Id.*

---

[26]      *Compare In re Terrorist Bombings*, 552 F.3d at 209 (suggesting the following addition to the Advice of Rights: "Whether you can retain a lawyer, or have a lawyer appointed for you, and whether you can consult with a lawyer and have a lawyer present during questioning are matters that depend on local law, and we cannot advise you on such matters.  If local authorities permit you to obtain counsel (retained or appointed) and to consult with a lawyer at this time, you may attempt to obtain and consult with an attorney before speaking with us.  Similarly, if local authorities permit you to have a lawyer present during questioning by local authorities, your lawyer may attend any questioning by us.") *with* Tr. Mot. Hearing (Sept. 11, 2015 PM), Ex. 1A ("Since you are not in our custody and we are not in the United States, we cannot in any way assure you that you will have access to a lawyer, or that you will be appointed a public defender, before or during our questioning.  If you want a lawyer, we will request the authorities here to allow you to have access to a lawyer or if you cannot pay for a lawyer, to have a public defender appointed to you.  If the authorities here agree, you may speak to a lawyer before we ask you any questions, and you may have a lawyer present during our questioning.")

As noted above, the government bears the burden of demonstrating that Chang-Rendon voluntarily waived his Fifth Amendment rights prior to his interrogation. *Connelly*, 479 U.S. at 168. At the September 11 hearing, the agents each testified that they were introduced to Chang-Rendon by officers of the Colombian National Police ("CNP") upon Chang-Rendon's arrival to the CNP headquarters in Bogota. Tr. Mot. Hr'g (Sept. 11, 2015 PM) at 13:3-11, 50:8–51:6. Each agent testified that Chang-Rendon immediately expressed interest in speaking with them. *Id.* at 13:12-22, 57:21–58:3. After offering Chang-Rendon something to eat and drink, the agents apprised Chang-Rendon of his rights while seated at a booth in the CNP cafeteria out of earshot from CNP officers escorting the group.[27] *Id.* at 15:4–16:1. The agents each testified that their interactions with Chang-Rendon were primarily in Spanish, that both Agent Fuentes and Agent Souchet are fluent in Spanish, and they are each native Spanish speakers. *Id.* at 16:2-21, 56:5-15. Upon being presented with the Notice of Extraterritorial Rights, Special Agent Fuentes testified that Chang-Rendon confirmed that he was willing to speak with the agents without further questions. *Id.* at 28:2-6. Likewise, the agents each averred that they made no representations to Chang-Rendon regarding the potential effect of speaking with authorities and did not threaten or otherwise coerce Chang-Rendon into waiving his right to refuse to speak with the agents. *Id.* at 28:7-20, 57:1-13. According to Special Agent Fuentes, Chang-Rendon was not

---

[27] The record is conflicting as to whether Chang-Rendon requested and was provided a meal prior to being advised of his rights. Special Agent Fuentes testified that the agents allowed Chang-Rendon to select food from the cafeteria prior to initiating their interrogation, Tr. Mot. Hearing (Sept. 11, 2015 PM) at 13:22–16:1, while Special Agent Souchet recalls that Chang-Rendon indicated that he was too nervous to eat, Not. Supp. Gov't Omnibus Opp'n Defs.' Mots. at 2, ECF No. 113. The record is likewise conflicting with regard to the location where Chang-Rendon read and signed the Notice of Extraterritorial Rights. *Compare* Tr. Mot. Hearing (Sept. 11, 2015 PM) at 15:4–16:1 (in the CNP cafeteria), *with* Not. Supp. Gov't Omnibus Opp'n Defs.' Mots. at 2 (in a conference room adjacent to the cafeteria). These conflicting recollections of details about immaterial aspects of the agents' interactions with Chang-Rendon almost three years ago are of no moment. No evidence suggests that Chang-Rendon was denied requested food or water or was otherwise subject to coercion by the agents prior to waiving his rights.

handcuffed during his interactions with the agents and the agents' weapons were not visible.  *Id.* at 31:1-3, 32:22–33:5.

Confronted with this uncontroverted testimony, Chang-Rendon emphasizes that his arrest was unexpected and then followed by a long, twelve-hour period of travel.  *Id.*  As a result, "he was exhausted, confused, and afraid" upon waiving his rights prior to his interrogation.  Defs.' Am. Mot. Suppress Statements at 5–6.  He also contends he was "terrified . . . of being placed in a Columbian jail with members of the Farc 30th Front, whom he had previously helped to incarcerate" and "expressly communicated his unease" to the officers.[28]  *Id.* at 5–6.  According to Chang-Rendon, this unease and exhaustion rendered any purported waiver of his Fifth Amendment rights involuntary.  *Id.*  This argument fails for at least three reasons.  First, Chang-Rendon no doubt felt anxious and fearful following his arrest, but his fear and anxiety—without more—is insufficient to refute the government's evidence that Chang-Rendon's waiver was voluntary.  "The sole concern of the Fifth Amendment, on which Miranda was based, is *governmental* coercion.  Indeed, the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Connelly*, 479 U.S. at 170 (emphasis added) (internal citations omitted) (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)).  Thus, although Chang-Rendon suggests that the agents "continued their questioning without adequately allaying [his] fears" of reprisal by members of the Farc 30th Front, he offers no support for his suggestion that this failure constituted government coercion sufficient to vitiate his waiver.  Further, Special Agent Fuentes's undisputed testimony indicates that neither he nor Special Agent Souchet threatened Chang-Rendon directly or otherwise suggested that his failure to speak with the agents would have any

---

[28]    The Farc 30th Front is a drug-trafficking paramilitary organization. Tr. Mot. Hearing (Sept. 11, 2015 PM) at 39:10–40:5.

effect on his safety while in Colombian custody. Absent evidence to the contrary, Chang-Rendon's suggestion that his waiver was nonetheless involuntary cannot prevail.

Second, Chang-Rendon provides no support for his contention that beginning his interrogation late in the evening, following a twelve-hour period of travel, is sufficiently coercive to render his waiver of his right to counsel involuntary. Special Agent Fuentes testified that the agents chose to proceed with the interrogation at the admittedly late hour both because their access to Chang-Rendon was limited while he was in Colombian custody *and* because Chang-Rendon immediately indicated a desire to speak with the agents. Tr. Mot. Hr'g (Sept. 11, 2015 PM) at 35:20–36:14. Chang-Rendon's expressed willingness to speak with the agents, despite his anxiety and exhaustion, belies his present suggestion that the agents sought to capitalize on his long day of travel to coerce an involuntary waiver of his right to refuse to provide a statement to the agents.

Finally, Chang-Rendon emphasizes his "confusion" with regard to his rights and the implications of the waiver thereof, but this argument is foreclosed by the Court's prior determination regarding the content of the Notification of Extraterritorial Rights. As the D.C. Circuit has emphasized, questions regarding a defendant's unfamiliarity with the American legal system and his rights under American law should be considered in determining whether a defendant knew and understood his rights. *Yunis*, 859 F.2d at 965. Yet, so long as a defendant was properly advised of his rights, "[t]he fact that a defendant's alien status may have prevented him from understanding the full, tactical significance of his decision to confess will not invalidate his waiver." *Id.* Consequently, because the Court has concluded that Chang-Rendon was adequately advised of, and understood, his rights under the Fifth Amendment, any lingering confusion cannot be said to render his subsequent waiver of these rights involuntary.

In sum, considering the totality of the circumstances, the government has carried its burden of demonstrating that Chang-Rendon's waiver of his Fifth Amendment rights "was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Connelly*, 479 U.S. at 168 (internal quotations omitted) (quoting *Moran*, 475 U.S. at 421).

### c.     Admission of Cheng-Rendon's Statement in Whole or Part

The government argues that, if it seeks to admit inculpatory portions of Chang-Rendon's post-arrest statement, the Court should "not permit Chang-Rendon to introduce omitted portions of the statement," Gov't Omnibus Opp'n at 21–24, particularly Chang-Rendon's claim that he provided fictitious coordinates to the DTOs, *id.* at 24. Federal Rule of Evidence 106 provides: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." FED. R. EVID. 106. The D.C. Circuit explained, in *United States v. Sutton*, 801 F.2d 1346, 1368 (D.C. Cir. 1986), that "Rule 106 can adequately fulfill its function only by permitting the admission of some otherwise inadmissible evidence when the court finds in fairness that the proffered evidence should be considered contemporaneously. A contrary construction raises the specter of distorted and misleading trials, and creates difficulties for both litigants and the trial court." In *Sutton*, the Court concluded that the trial court erred in excluding exculpatory portions of the criminal defendant's recorded statements that "would have supported an inference contrary to the government's contention that [the defendant] exhibited consciousness of guilt[,] . . . partially rebutted the government's use of the recordings, and were relevant to [the defendant's] defense." *Id.* at 1370.

This precedent notwithstanding, the government contends that Chang-Rendon's exculpatory statements during his interrogation should be excluded since these statements are

"clearly false" and "self-serving," and neither provide context for nor explanation of his post-arrest statement. Gov't Omnibus Opp'n at 23–24. Quite the opposite, however, contemporaneous post-arrest statements purporting to explain Chang-Rendon's intent in providing information to the DTOs certainly would be relevant to the jury's consideration of the meaning and import of Chang-Rendon's otherwise inculpatory admissions. *See Sutton*, 801 F.2d at 1369 (Rule 106's grounding in "'fairness' reasonably should be interpreted to incorporate the common-law requirements that the evidence be relevant, and be necessary to qualify or explain the already introduced evidence allegedly taken out of context." (citing authorities)).

As such, consistent with the procedure outlined by the D.C. Circuit in *Sutton*, should the government introduce evidence of Chang-Rendon's inculpatory post-arrest statements, the Court will consider whether and how these statements should be supplemented by Chang-Rendon's contemporaneous exculpatory statements in order to "remove [any] distortion that otherwise would accompany the prosecution's evidence." *Id.* Nonetheless, for the reasons outlined above, the defendant's motion to suppress Chang-Rendon's statements in their entirety is denied.

## F.    The Defendants' Motion to Suppress In-Court Identifications Made by Cooperating Witnesses

In addition to seeking to suppress Chang-Rendon's post-arrest statement to authorities, the defendants seek to suppress any in-court identifications of the defendants by three cooperating witnesses whom the government alleges participated in the charged conspiracy or other similar drug trafficking ventures with the defendants. Defs.' Am. Mot. Suppress Identifications at 1, ECF No. 75.[29] Each of these witnesses told investigators that they had

---

[29]     The defendants have requested identification by the government of all confidential informants who assisted in the investigation of the charged conspiracy, regardless of whether the informants will testify at trial. *See* Mot. Disclose Identities Conf. Informants at 1, ECF No. 79. At present, the government has identified each of the cooperating witnesses whose testimony the government intends to offer at trial, as well as all known co-conspirators who participated in or were discussed on intercepted communications with or about the defendants. *See supra* Part

known Moreno-Membache and Mosquera-Murillo for years prior to the charged conspiracy. Similarly, although one witness interacted with Chang-Rendon only briefly, two of the witnesses told investigators that they had prolonged interactions with Chang-Rendon prior to or during the planning of the launch of the *Mistby*. Despite this familiarity, the defendants argue that any in-court identifications by these witnesses would be tainted because their prior out-of-court identifications of the defendants were the product of impermissible suggestion. *Id*. [30]

During the September 11 hearing, the government presented testimony from Special Agent Robert Curtis of the Department of Homeland Security ("DHS") to demonstrate the reliability of the out-of-court identification procedures and anticipated in-court identifications. Tr. Mot. Hr'g (Sept. 11, 2015 PM) at 69:17–25. Special Agent Curtis has served as a DHS Special Agent for approximately fifteen years and, since 2012, has been assigned to an interagency taskforce investigating maritime drug trafficking. *Id*. at 70:10-24. In this role, Special Agent Curtis interviewed each of the cooperating witnesses at least once and led the interviews that resulted in the challenged identifications. As detailed below, each of the government's witnesses immediately identified Moreno-Membache and Mosquera-Murillo upon reviewing photo arrays that included their photographs. Similarly, although two witnesses were initially unable positively to identify Chang-Rendon upon reviewing arrays that included an

---

II.B.2. To the extent that non-testifying informants who assisted with the government's investigation remain unidentified, the defendants' mere speculation as to the potential "useful and relevant information" these individuals may offer is insufficient to meet their "'heavy burden . . . to establish that [this information] is necessary to [their] defense.'" *United States v. Gaston*, 357 F.3d 77, 84 (D.C. Cir. 2004) (quoting *United States v. Skeens*, 449 F.2d 1066 (D.C. Cir. 1971)); *see also United States v. Cooper*, 91 F. Supp. 2d 79, 86 (D.D.C. 2000) ("The mere speculation by the defense, barren of specific supportive information, that an informer's testimony might be of some benefit to the defense is insufficient to overcome the public interest in protecting informants." (citing authorities)). For this reason, and in light of the serious safety and security concerns identified by the government, *see generally* Gov't Omnibus Opp'n at 38–44, the defendants' request for further disclosure of the identities of non-testifying informants is denied.

[30]    The defendants also sought to suppress any in-court identification made by an individual referred to as MDFL-1. See Am. Mot. Suppress Identifications at 1. The government has represented, however, that this individual will not be called to testify at trial, Tr. Mot. Hearing (Sept. 11, 2015 AM) at 86:18-25, rendering moot any challenge to this individual's identification.

outdated photograph, each of the witnesses later made positive identifications from arrays that included a more recent photograph of that defendant.

*Witness #1 (identified as Hector Pozmino-Jezken)*: Special Agent Curtis testified that he interviewed Witness #1 on various occasions prior to the interdiction of the *Mistby* in connection with a separate narcotics trafficking investigation. *Id*. at 130:24–131:1-8. Generally, Witness #1 told investigators that: (1) he had known Moreno-Membache since they were young and observed him on numerous occasions over the course of many years, Gov't Omnibus Opp'n at 27; (2) he had also known Mosquera-Murillo for numerous years prior to the charged conspiracy and had often observed Mosquero-Murillo during that time, Gov't Opp'n Def. Mosquera-Murillo's Adopted Mot. Suppress Identifications ("Gov't Opp'n Mosquera-Murillo ID") at 2, ECF No. 100; and (3) he met Chang-Rendon more recently through Mosquera-Murillo and interacted with and observed Chang-Rendon on numerous occasions over multiple years, often with Mosquera-Murillo, Gov't Omnibus Opp'n at at 25. According to Special Agent Curtis, Witness #1 stated that he interacted with Chang-Rendon more than five times while acting as a taxi driver and transporting an alleged co-conspirator and delivering money to Chang-Rendon from this alleged co-conspirator. Tr. Mot. Hr'g (Sept. 11, 2015 PM) at 132:24–133:1-16.

Following the interdiction of the *Mistby*, on July 20, 2012, Witness #1 described Chang-Rendon, whom he knew only by an alias, to investigators as "a Black, Columbian male, approximately 37 to 40 years old, heavy build, dark curly hair, without facial hair, but when he does have facial hair it is sometimes styled as a goatee, and always well dressed." Gov't Omnibus Opp'n at 25. In addition to describing Chang-Rendon's place of residence and car, Witness #1 described where Chang-Rendon would park his car before departing on a boat for his work at a Navy base. *Id*. Witness #1 also provided a description of Mosquera-Murillo, whom

he knew by aliases and described as a "Black, Colombian male, approximately 47–50 years old, tall in stature, bald headed, and with a protruding stomach." Gov't Opp'n Mosquera-Murillo ID at 2. Witness #1 also described Mosquera-Murillo's usual attire, as well as the location and appearance of Mosquera-Murillo's home. *Id.*

On August 10, 2012, Special Agent Curtis again interviewed Witness #1 and presented him with a photo array, which the agent informed the witness included a photo of Chang-Rendon. Tr. Mot. Hr'g (Sept. 11, 2015 PM) at 136:12–138:5. Witness #1 identified the photograph of Chang-Rendon but estimated that he was only 30% confident in his selection. *Id.* at 138:12-22; Defs.' Am. Mot. Suppress Identifications at 2; Gov't Omnibus Opp'n at 25. Agents later learned that the photograph of Chang-Rendon included in this array was at least ten years old. Gov't Omnibus Opp'n at 25. Special Agent Curtis testified that Chang-Rendon's facial hair and hairstyle in this photograph may have been unfamiliar to the witnesses. Tr. Mot. Hr'g (Sept. 11, 2015 PM) at 74:7-12; 113:22-24.

Thereafter, on August 14, 2012, Special Agent Curtis again interviewed Witness #1 and presented him with a second array, which included a more recent photograph of Chang-Rendon but otherwise included photographs of five new individuals. *Id.* at 139:21–140:5, 142:3-6, 143:9-21. In this more current photograph, which was obtained from Chang-Rendon's *curriculum vitae*, Chang-Rendon appeared slimmer and had different facial hair than in the photograph included in the array presented on August 10, 2012. *Id.* at 83:9-16, 92:11-14. Special Agent Curtis testified that he told Witness #1 that this second array included a more recent photograph of Chang-Rendon. *Id.* at 145:5-8. Witness #1 identified Cheng-Rendon from this array by two aliases. Gov't Omnibus Opp'n at 26. Later, on October 24, 2012, agents showed Witness #1 two photo arrays, each consisting of six photographs of men, from which he

positively identified Mosquera-Murillo, Gov't Opp'n Mosquera-Murillo ID at 2–3, and Moreno-Membache, Gov't Omnibus Opp'n at 27.

*Witness #2 (identified as Ivan Rodolfo Campaz-Riascos)*: Like Witness #1, Witness #2 told investigators that he had also known Mosquera-Murillo for years prior to the charged conspiracy. Gov't Opp'n Mosquera-Murillo ID at 3. He began working with Mosquera-Murillo in drug trafficking in approximately 2008 or 2009, and worked with Mosquera-Murillo in a conspiracy that resulted in a seizure by Panamanian authorities during which he and Mosquera-Murillo fled on foot and hid in the mountains for fifteen days until their rescue. *Id.* Witness #2 also stated he had known Moreno-Membache for years prior to the charged conspiracy. Gov't Omnibus Opp'n at 27.

Special Agent Curtis interviewed Witness #2 twice, first on August 10, 2012, Tr. Mot. Hr'g (Sept. 11, 2015 PM) at 70:25–71:6, and again on October 2, 2012, *id.* at 77:16-18. On August 10, 2012, Witness #2 told Special Agent Curtis that he knew Chang-Rendon only by an alias but reported that he saw Chang-Rendon at the pier where the *Mistby* was moored prior to its departure. *Id.* at 72:1–73:11.[31]   When Special Agent Curtis asked Witness #2 whether he could identify Chang-Rendon, Witness #2 stated that he saw Chang-Rendon only briefly and could not be certain whether he would be able to identify him in a photograph. Gov't Omnibus Opp'n at 26. Special Agent Curtis then showed Witness #2 a black-and-white photo array that included the same photograph included in the array he showed to Witness #1, Tr. Mot. Hr'g (Sept. 11, 2015 PM) at 113:22-24, and informed Witness #2 that Chang-Rendon may or may not appear in the array. *Id.* at 73:14–74:5, 85:19–86:2. Upon reviewing this array, Witness #2 was unable to

---

[31]     Special Agent Curtis testified that a note included in his report of the interview incorrectly suggested that Witness #2 reported that he had never seen Chang-Rendon. Tr. Mot. Hearing (Sept. 11, 2015 PM) at 72:18–22. Upon further review of his notes, Special Agent Curtis testified that Witness #2 had in fact seen Chang-Rendon. *Id.* at 73:2-11.

identify Chang-Rendon. *Id.* at 75:20-23; Gov't Omnibus Opp'n at 26.[32]  During this same interview, Witness #2 described Mosquera-Murillo as "a Black, Colombian male, approximately 5 feet 9 inches, overweight and with a protruding stomach, with short, dark, and slightly receding hair but wears a ball cap, has a burn mark on his ear, and with no facial hair." Gov't Opp'n Mosquera-Murillo ID at 3. In addition, Witness #2 described the location and appearance of Mosquera-Murillo's home. *Id.*

On October 2, 2012, Special Agent Curtis re-interviewed Witness #2. Tr. Mot. Hr'g (Sept. 11, 2015 PM) at 77:16-18. During this second interview, Witness #2 reported that he saw Chang-Rendon at a planning meeting either one or three months prior to the launch of the *Mistby*, *id.* at 78:20–79:22, and again at a supermarket sometime after this meeting, *id.* at 81:15-23, 82:11-25, 83:1-7. Special Agent Curtis then presented Witness #2 with a second black-and-white array that included the more current photograph of Chang-Rendon obtained from his *curriculum vitae*, as well as five additional photographs used to generate the new array. *Id.* at 81:25–82:9, 83:9-22, 106:7-10. On this occasion, Special Agent Curtis told Witness #2 that a more recent photograph of Chang-Rendon was included in the array. *Id.* at 83:23–84:7. Upon reviewing the second array, Witness #2 immediately identified Chang-Rendon. *Id.* at 84:9-20. The same day, Witness #2 positively identified Moreno-Membache from a photo array. Gov't Omnibus Opp'n at 27. Thereafter, on October 12, 2012, Witness #2 identified Mosquera-Murillo from a photo array "immediately and without hesitation." Gov't Opp'n Mosquera-Murillo ID at 3.

*Witness #3 (identified as Luis Eduardo Paredes)*: Like the other witnesses, Witness #3 told investigators that he had known Mosquera-Murillo for multiple years prior to the charged

---

[32]     Special Agent Curtis testified that he returned this first array to the relevant case file but has since been unable to find it. *Id.* at 76:18-23, 88:16-23.

conspiracy.  Gov't Opp'n Mosquera-Murillo ID at 3.  He explained that he had been involved in drug trafficking with Mosquera-Murillo as early as 2008 and observed Mosquera-Murillo on multiple occasions, including in Mosquera-Murillo's home.  *Id*.  On July 6, 2012, he described Mosquera-Murillo "as 43 years old, 5 feet 9 inches tall, over 300 pounds, Black, with black hair, and from Juanchaco, Colombia."  *Id*.  Witness #3 stated that he had also known Moreno-Membache for multiple years prior to the charged conspiracy through prior work in drug trafficking and met with Moreno-Membache on multiple occasions, including at Moreno-Membache's home.  Gov't Omnibus Opp'n at 27.  Witness #3 told investigators that he met Chang-Rendon once during the course of the charged conspiracy in March or April 2012 at a planning meeting at Mosquero-Murillo's house.  *Id*. at 26.  He explained that he spoke with Chang-Rendon and Mosquero-Murillo at that meeting about the process by which Chang-Rendon would send coordinates of law enforcement patrols.  *Id*.

Special Agent Curtis interviewed Witness #3 on October 2, 2012.  Tr. Mot. Hr'g (Sept. 11, 2015 PM) at 91:1-6.  Witness #3 stated that he attended a planning meeting which appears to be the same meeting described by Witness #2, and observed and had a conversation with Chang-Rendon.  *Id*. at 91:17–92:6.  Special Agent Curtis testified that, after Witness #3 indicated that he would be able to identify Chang-Rendon based on their interaction at this meeting, *id*. 125:1-11, he presented Witness #3 with the same black-and-white array shown to Witness #2, including the more recent photograph from Chang-Rendon's *curriculum vitae*, and indicated that the array may contain a photograph of Chang-Rendon, *id*. at 92:9-20, 93:5-9.  Witness #3 identified Chang-Rendon immediately in this array.  *Id*. at 93:10-13.

Arguing both that the identification procedures utilized by Special Agent Curtis were "unduly suggestive" and that the identifications themselves are "unreliable," the defendants

move to suppress both out-of-court identifications made by each of these cooperating witnesses and any in-court identification planned by the government at trial. Defs.' Reply Supp. Mot. Suppress Identifications at 1, ECF No. 103. As discussed below, based on the evidence and arguments presented, the Court is not persuaded that the out-of-court identifications made by the cooperating witnesses were the product of unduly suggestive investigator conduct or are otherwise insufficiently reliable to merit exclusion at trial.

### 1. Legal Standard

The admissibility of identification evidence is governed by "fairness as required by the Due Process Clause." *United States v. Rattler*, 475 F.3d 408, 411 (D.C. Cir. 2007) (citing *Manson v. Brathwaite*, 432 U.S. 98, 113 (1977)); *see also Perry v. New Hampshire*, 132 S. Ct. 716, 724 (2012) ("[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." (citing authorities)). "If an out-of-court statement is held inadmissible, any subsequent in-court identification by the same witness will be barred, unless the prosecution can show an independent, untainted source of the in-court identification." *United States v. Lawson*, 410 F.3d 735, 739 n.3 (D.C. Cir. 2005) (citing *United States v. Wade*, 388 U.S. 218, 241 (1967)). Thus, a defendant challenging "'the corrupting effect of the suggestive identification' procedures . . . implicitly challenges in-court identification evidence." *Rattler*, 475 F.3d at 411 (internal quotation marks and citation omitted) (quoting *Manson*, 432 U.S. at 114).

In ruling on a motion to suppress an identification, a court must first determine "whether the identification procedure was impermissibly suggestive." *Rattler*, 475 F.3d at 411 (internal quotation marks omitted) (quoting *United States v. Washington*, 12 F.3d 1128, 1134 (D.C. Cir. 1994)). Even if the photo array is found to be improperly suggestive, however, an in-court

identification need not be excluded if, "under the totality of the circumstances, the identification was sufficiently reliable to preclude a very substantial likelihood of irreparable misidentification." *Id.* (internal quotation marks omitted) (quoting *Manson*, 432 U.S. at 116). The Supreme Court has made clear that "'[r]eliability of the eyewitness identification is the linchpin of that evaluation,'" and that identification evidence should not be suppressed unless "'the indicators of a witness' ability to make an accurate identification' are 'outweighed by the corrupting effect of law enforcement suggestion.'" *Perry*, 132 S. Ct. at 724–25 (alterations omitted) (quoting *Manson*, 432 U.S. at 114).

In light of this two-step inquiry, courts considering a motion to suppress identification evidence generally place the burden, first, on the defendant to demonstrate that the identification procedure was impermissibly suggestive.[33]  *See United States v. Jones*, 689 F.3d 12, 17 (1st Cir. 2012); *United States v. Washam*, 468 F. App'x 568, 576–77 (6th Cir. 2012); *United States v. Mendoza*, 401 F. App'x 739, 741 (4th Cir. 2010); 44 GEO. L.J. ANN. REV. CRIM. PROC. 205, 211–16 (2015).  If the defendant meets this burden, the government then bears the burden of demonstrating, under the totality of the circumstances, that a challenged identification is sufficiently reliable to permit an in-court identification.  *See id.*

To determine whether a photographic identification procedure was impermissibly suggestive, courts consider factors including  "'the size of the array, the manner of presentation by the officers, . . . the array's contents,'" *United States v. Cooper*, 85 F. Supp. 2d 1, 36 (D.D.C.

---

[33]    The Supreme Court has yet to provide clear guidance as to which party bears the burden in considering such a motion. *See Perry*, 132 S. Ct. 716, 733 (2012) (Sotomayor, J., dissenting) (indicating that the defendant bears the initial burden of "showing that the eyewitness identification was derived through 'impermissibly suggestive' means," after which courts consider "whether the identification was reliable under the totality of the circumstances" (citing *Simmons v. United States*, 390 U.S. 377, 384 (1968))).  Similarly, while the D.C. Circuit has held that the government must demonstrate the reliability of an in-court identification tainted by a flawed out-of-court identification procedure "by clear and convincing evidence," the Court's holding rested on the later-rejected premise that a witness's post-indictment review of a photo array implicates the defendant's Sixth Amendment right to counsel. *United States v. Ash*, 461 F.2d 92, 105 n.20 (D.C. Cir. 1972), *rev'd*, 413 U.S. 300 (1973).

2000) (quoting *United States v. Concepcion*, 983 F.2d 369, 377 (2d Cir.1992)), and whether there is evidence that the witnesses were told whom to select "or provided with information that would have [led] them to select a specific individual," *id*. To determine whether a witness's in-court identification is nonetheless reliable, the factors to be assessed in considering the totality of the circumstances are: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson*, 432 U.S. at 114.

### 2.    Analysis

Contending that the procedures used to compile and present these arrays to the witnesses were flawed, the defendants argue the witnesses' out-of-court identifications were impermissibly suggestive. Defs.' Am. Mot. Suppress Identifications at 5–6. The government responds that the out-of-court identification procedures were not unduly suggestive and, even if these procedures were flawed, the witnesses' "preexisting relationships with the Defendants and opportunities to view" them suggest that any in-court identifications would otherwise be reliable. *Id*. at Gov't Omnibus Opp'n at 2, 36.

Turning first to the identifications of Chang-Rendon, the three government witnesses were shown a total of four photo arrays, two that included a dated photograph of Chang-Rendon and two that included the current photograph taken from his *curriculum vitae*. These arrays are summarized as follows: (1) Array #1, shown to Witness #1 on August 10, 2012, which included a dated photograph; (2) Array #2, shown to Witness #2 on August 10, 2012, which also included a dated photograph; (3) Array #3, shown to Witness #1 on August 14, 2012, which included the

more recent photograph; and (4) Array #4, shown to Witness #2 and Witness #3 on October 2, 2012, which also included the more recent photograph.

The defendants assert two primary challenges. The defendants first point out that Witnesses #1 and #2 were unable to identify Chang-Rendon upon reviewing Arrays #1 and #2 and only subsequently identified him upon reviewing Arrays #3 and #4. Given that Chang-Rendon is the only individual whose photograph appeared in each of these arrays, and in light of the fact that Special Agent Curtis told the witnesses that Chang-Rendon appeared in the latter arrays, the defendants argue that the identification procedures employed by Special Agent Curtis were unduly suggestive. Defs.' Am. Mot. Suppress Identifications at 5–6. Second, the defendants assert that the photographs of Chang-Rendon included in the arrays that generated positive identifications were the only photographs that "closely matched" the physical descriptions provided by the witnesses prior to being presented with the arrays. *Id.* Specifically, the defendants asserts that the Chang-Rendon was the only man with little or no facial hair included Array #3, and that the photograph of Chang-Rendon included in Array #4, was higher quality than the other photographs included in the array and was one of only two photographs of men "who do not appear to be bald" *Id.*

The D.C. Circuit has recognized that the use of "consecutive identification procedures 'may be impermissibly suggestive where there is only one repeat player.'" *Rattler*, 475 F.3d at 413 (quoting *United States v. Washington*, 353 F.3d 42, 45 (D.C. Cir. 2004)). For example, the Circuit has observed that the risk of impermissible suggestion arises where a witness who, after failing to identify the defendant in a photo array, is presented with a lineup in which the defendant is the only individual appearing in both the array and the subsequent lineup. *Washington*, 353 F.3d at 44–45 (noting the risk of prohibited suggestion but ultimately

determining that any error resulting from the admission of the challenged identification was harmless). Here, by analogy, the use of two different photo arrays with Witness #1 and Witness #2 raises the possibility that the witnesses simply selected the photograph of the individual appearing in both arrays, regardless of whether the witnesses affirmatively recognized that individual as Chang-Rendon. This risk of impermissible suggestion was exacerbated by Special Agent Curtis's indication to both Witness #1 and Witness #2 that the second array included a more recent photograph of Chang-Rendon. Tr. Mot. Hr'g (Sept. 11, 2015 PM) at 83:23–84:7, 145:5-8.

While Special Agent Curtis's use of two different photo arrays, each of which contained photographs of Chang-Rendon, in succeeding interviews raises some risk of improper suggestion, any risk of unreliable identification is relatively minimal for at least two reasons. First, the arrays shown to Witnesses #1 and #2 included different photographs of Chang-Rendon that were taken nearly a decade apart with noticeable variation in Chang-Rendon's appearance. *Id.* at 83:9-16 (describing Chang-Rendon's differing appearance in the more recent photograph). Chang-Rendon's differing appearance in the first and second arrays significantly reduces the risk that the witnesses simply selected the individual they recognized from the first array upon being shown the second array. Second, the significant gap in time between the first and second interview of Witness #2 further reduces the potential risk presented by Special Agent Curtis's consecutive identification procedure. Coupled with Chang-Rendon's changed appearance, the Court is not persuaded that that Witness #2 recognized Chang-Rendon from the original array, which he reviewed only briefly, when he reviewed the second array nearly two months later.

The defendants' suggestion that the photographs of Chang-Rendon impermissibly stood out in these latter arrays is similarly unavailing. The D.C. Circuit has recognized that "an array

is impermissibly suggestive where only the defendant's distinctive [physical characteristics] correspond[] to the witness's descriptions." *Rattler*, 475 F.3d at 412–13 (citing authorities) (internal citations and quotations omitted). Even crediting the defendants' descriptions of the challenged arrays, however, the photographs of Chang-Rendon did not exhibit any distinctive features described by the witnesses. Indeed, of the three testifying witnesses, only Witness #1 provided a description of Chang-Rendon to United States authorities. *See* Gov't Omnibus Opp'n at 25. That witness described Chang-Rendon as "a Black, Columbian male, approximately 37 to 40 years old, heavy build, *dark curly hair, without facial hair, but when he does have facial hair it is sometimes styled as a goatee*, and always well dressed." *Id.* (emphasis added). On its face, this description includes no obvious distinctive physical characteristics and, in fact, indicates that certain key aspects of Chang-Rendon's appearance (*i.e.*, facial hair) varied over time.

With this in mind, the defendants' assertion that Chang-Rendon was the only man with little or no facial hair in Array #3 does little to suggest that his photograph impermissibly stood out from the rest. Quite the opposite, given the description of Chang-Rendon's facial hair provided to authorities, *all* of the photographs included in this array were consistent with Witness #1's recollection of Chang-Rendon's appearance. Similarly, although the defendants assert that Chang-Rendon was one of only two men "who do not appear to be bald," the defendants present no evidence that only the photographs of Chang-Rendon included in the challenged arrays exhibited any distinctive physical characteristic described by the witnesses themselves. Consequently, the defendants' argument that these arrays were impermissibly suggestive boils down to a contention that the photographs of Chang-Rendon were so unlike the others that the witnesses simply chose the photograph that was most *unlike* the rest. Defs.' Am. Mot. Suppress Identifications at 6 (noting the "increased danger of [mis]identification where

[investigators] show the witness several photographs but 'the photograph of a single . . . individual . . . is in some way emphasized) (quoting *Simmons v. United States*, 390 U.S. 377, 383 (1968)). Nonetheless, the defendants point to no authority for the proposition that the purported weaknesses in the arrays at issue here are sufficiently serious to undermine any subsequent identification. *See generally id*. Further, based on its own review of the challenged arrays, the Court disagrees that the photographs of Chang-Rendon were sufficiently "emphasized" to render the arrays unduly suggestive.

In any event, notwithstanding slight weaknesses in identification procedures employed by Special Agent Curtis, considering the various factors identified by the D.C. Circuit, the totality of the circumstances confirm that all three witnesses' identifications of Chang-Rendon were sufficiently reliable to preclude any substantial risk of misidentification. Both Witnesses #1 and #3 had sustained interactions with Chang-Rendon, with Witness #1 indicating that he observed Chang-Rendon and Mosquera-Murillo together on numerous occasions, and Witness #3 participating with Chang-Rendon in a planning meeting, at which he and Chang-Rendon discussed their respective roles in the charged conspiracy. *Supra* Part IV.F. As a result of these interactions, Witness #1 provided investigators with a description of Chang-Rendon, which the defendants do not dispute was both detailed and accurate, *see generally* Defs.' Am. Mot. Suppress Identifications, and Witness #3 was able to immediately identify Chang-Rendon upon reviewing a photo array, Gov't Omnibus Opp'n at 26–27. Moreover, although Witness #2 initially expressed doubt as to his ability to recognize Chang-Rendon following their brief encounter, the government presented evidence that he retained sufficient recollection of his brief interaction with Chang-Rendon to recall other details of this interaction. Gov't Omnibus Opp'n at 26, 32–33. Likewise, each of these witnesses positively identified Chang-Rendon within

months of interacting with him, further suggesting that these identifications are reliable and not merely the product of impermissible suggestion.

Further, even assuming Special Agent Curtis indicated that a photograph of Chang-Rendon was included in Arrays #3 and #4, the defendants have presented no evidence that Special Agent Curtis either directly or indirectly told the witnesses which photograph to select or provided information that would have led them to select Chang-Rendon's photograph. Likewise, Special Agent Curtis avers that he neither threatened the cooperating witness nor promised the witness any special treatment in exchange for a correct identification. Tr. Mot. Hr'g (Sept. 11, 2015 PM) at 76:3-17, 85:4-15, 93:14-23.[34]

Thus, the evidence demonstrates that each of the government's witnesses had an opportunity to observe Chang-Rendon on at least one occasion. Both Witness #1 and Witness #3 had ample opportunity to observe Chang-Rendon closely, while Witness #2's recollection of his brief interaction with Chang-Rendon was generally clear. Unsurprisingly, when presented an array that included a photograph of Chang-Rendon taken nearly a decade earlier, Witness #1 and Witness #2 initially had some difficulty positively identifying him. Gov't Omnibus Opp'n at 25–26. Upon reviewing a more recent photograph, in which Chang-Rendon appeared noticeably slimmer and had different facial hear, both of these witnesses were able to identify Chang-Rendon with relative ease. *Id.* at 32–36. Witness #3, who viewed only an array that included this more recent photograph, also positively identified Chang-Rendon without hesitation. *Id.* With this in mind, any procedural weaknesses identified by the defendants raise, at best, only a negligible risk that the witnesses' out-of-court identifications were the product of impermissible

---

[34]    Special Agent Curtis testified that he, in addition to various other agents, interviewed the witnesses at various points during the government's investigation of the charged conspiracy, but was unable to identify all of the agents who participated in these interviews. *See* Tr. Mot. Hr'g (Sept. 11, 2015 PM) at 97:7–98:5, 120:18–121:4, 130:24–132:6.

suggestion. Accordingly, considering the totality of the circumstances, the witnesses' identifications based on the most recent photograph of Chang-Rendon are sufficiently reliable "to preclude a substantial likelihood of irreparable misidentification" and therefore may be admitted by the government at trial. *Rattler*, 475 F.3d at 411 (internal quotations and citations omitted).

Finally, while Mosquera-Murillo and Moreno-Membache have each ostensibly adopted this motion to suppress identification evidence, *see* Minute Orders, dated Aug. 10, 2015, they have filed no written submission challenging their own identification by the witnesses. As the foregoing discussion illustrates, however, each of three co-conspirator witnesses told investigators that they had known Mosquera-Murillo and Moreno-Membache for years prior to the charged conspiracy, provided accurate descriptions of both men, and, easily and immediately identified both defendants from arrays that included their photographs. *See supra* Part IV.F. Absent any indication that these identifications were the product of impermissible suggestion, or were otherwise unreliable, the defendants have failed to demonstrate that the witnesses' out-of-court identification should be excluded. Even assuming that these out-of-court identifications were tainted by undue suggestion, however, the Court is persuaded that the longstanding relationships between the witnesses and these defendants provides an independent, untainted basis for these witnesses to identify these defendants at trial. *Lawson*, 410 F.3d at 739 n.3. As such, on the evidence currently before the Court, the defendants' motion is denied.[35]

---

[35]     Following the day-long September 11 hearing, the defendants requested a date for continuation of the hearing for the defendants to elicit testimony from the government's three cooperating witnesses. Defs.' Supp. Am. Mot. Suppress Identifications, ECF No. 141.  According to the defendants, the need for further testimony from the cooperating witnesses "is particularly acute in light of Agent Curtis's in-court admission that he showed two photo arrays to two of the witnesses, and that he advised those witnesses that Mr. Chang-Rendon's photograph was in the arrays that produced successful identifications." *Id.* at 2.  Given the Court's consideration of these very factors and findings on suggestiveness of the photo arrays and reliability of the identification evidence, the need for any further testimony is far from clear, since a showing of "incomplete or incorrect" testimony by Special Agent Curtis, *id.* at 2, may be relevant in assessing his credibility and the weighing the evidence, but these are evidentiary evaluations

117

### G.        The Defendants' Motion to Exclude Expert Witness Testimony

Finally, the defendants have moved to exclude the testimony of eight government expert witnesses under Federal Rule of Civil Procedure 702. Defs.' Mot. Excl. Expert Test., ECF No. 115. Following the September 11 hearing, the Court ordered the government to provide supplemental information regarding its proposed expert witnesses' professional experience and qualifications, as well as any accompanying expert reports, by September 25, 2015. *See* Minute Order, dated Sept. 11, 2015. The government has since provided all required materials to the defendants. Gov't Opp'n Defs.' Mot. Excl. Expert Test. at 2, ECF No. 156. Following this additional proffer, the defendants seek to suppress the testimony of all but one of the expert witnesses identified by the government. Defs.' Reply Supp. Mot. Excl. Expert Test. at 1, ECF No. 167.

### 1.        Legal Standard

Federal Rule of Evidence 702 provides that a qualified expert witness may testify in the form of opinion so long as "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702. As the Supreme Court has clarified, Rule 702 permits the

---

within the prerogative of the jury, *see Watkins v. Sowders*, 449 U.S. 341, 347–348 (1981) (noting that "Counsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification—including reference to both any suggestibility in the identification procedure and any countervailing testimony such as alibi." (internal quotations and citations omitted)). Indeed, even if cross-examination of the additional witnesses whom the defendants seek to call at another hearing helped the defendants meet their initial burden of demonstrating that the identification procedures employed by Special Agent Curtis were impermissibly suggestive, the government's evidence demonstrates that any in-court identifications by the witnesses are reliable. Nonetheless, the Court will permit, upon request at trial, a brief, limited *voir dire*, outside the presence of the jury, by Cheng-Rendon and Moreno-Membache, before any in-court identification by the three cooperating witnesses, regarding the reliability of the identification of the defendants.

court to allow expert testimony only where the proposed testimony is both reliable and relevant. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "[A]cting as gatekeeper, the court 'must determine first whether the expert's testimony is based on 'scientific knowledge;' and second, whether the testimony 'will assist the trier of fact to understand or determine a fact in issue.'" *United States v. Law*, 528 F.3d 888, 912 (D.C. Cir. 2008) (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996)).

Exclusion based on unfair prejudice is particularly important in the case of expert evidence, which "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595 (quoting JACK B. WEINSTEIN, RULE 702 OF THE FEDERAL RULES OF EVIDENCE IS SOUND; IT SHOULD NOT BE AMENDED, 138 F.R.D. 631, 632 (1991)). Nonetheless, courts have "have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Heller v. District of Columbia*, 801 F.3d 264, 271 (D.C. Cir. 2015) (internal quotations omitted) (quoting *Kumho Tire*, 526 U.S. at 152). Thus, in evaluating challenges brought under Rule 702, the court's inquiry "is a flexible one," *Law*, 528 F.3d at 912, and the "'district court has broad discretion regarding the admission or exclusion of expert testimony, and reversal of a decision on these matters is appropriate only when discretion has been abused.'" *United States v. Bostick*, 791 F.3d 127, 150 (D.C. Cir. 2015) (quoting *Clarke*, 24 F.3d at 268).

### 2.   Analysis

In addition to offering testimony from individuals who allegedly participated in the charged conspiracy, the government plans to call nine expert witnesses at trial.[36]  These expert

---

[36]     The government initially proposed calling a tenth expert witness, Colombian Naval Captain Javier Palomino Vargas, *see* Gov't Opp'n Defs.' Mot. Excl. Expert Test. at 1, whom the defendants opposed, Mot. Excl.

witnesses include: (1) two narcotics experts to testify about the operation of Colombian DTOs generally and about the use of coded communications in the charged conspiracy, respectively; (2) six government forensics chemists who were involved in testing the narcotics recovered from the *Mistby*; and (3) a government translator, who would testify to the accuracy of the English-language translations and transcriptions of the intercepted telephonic communications the government intends to introduce at trial. Gov't Opp'n Defs.' Mot. Excl. Expert Test. at 5. The defendants do not oppose the expert testimony of the government interpreter, but seek to suppress the testimony of the government's narcotics experts and forensic chemists. Defs.' Reply Supp. Mot. Excl. Expert Test. at 1. The defendants' objections to these witnesses share certain similarities but also present distinct challenges to each of the expert witnesses. Thus, the discussion below addresses each of the challenged experts *seriatim*.

### a.      DEA Special Agent Michael Wasser

The government proposes to call Special Agent Michael Wasser to testify at trial regarding the general operation of Colombian narcotics traffickers. The government proffers that Special Agent Wasser will testify to "techniques used by and *modus operandi* of Colombian drug trafficking organizations" that would not otherwise be readily known by a lay jury, as well as about law enforcement efforts to interdict vessels used by DTOs to ship narcotics. Gov't Opp'n Defs.' Mot. Excl. Expert Test. at 8–9. The defendants object to the admission of this testimony on two grounds. First, the defendants argue that the belated identification of Special Agent Wasser as an expert witness violates Federal Rule of Criminal Procedure 16, warranting exclusion of his testimony at trial. Defs.' Reply Supp. Mot. Excl. Expert Test. at 7–8. Second,

---

Expert Test. at 1. The government has since indicated that Captain Vargas will not be called as an expert witness, Gov't Opp'n Defs.' Mot. Excl. Expert Test. at 2 n.1, and, consequently, the discussion that follows does not address the defendants' objections to this witness.

the defendants contend that this testimony is irrelevant to any disputed issue and should therefore be excluded under Federal Rules of Evidence 702 and 403.  *Id.* at 8–13.

Regarding their procedural challenge, the defendants emphasize that the government failed to disclose its intention to call Special Agent Wasser either in previous notices to the defendants or in oral representations to the Court during the September 11 hearing.  *Id.* at 7–8. According to the defendants, this delayed disclosure violates the government's discovery obligations under Federal Rule of Criminal Procedure 16, such that the Court should exercise its discretion to exclude Special Agent Wasser's testimony at trial.  *Id.* at 8.[37]  In support, the defendants rely primarily on *United States v. Day*, 524 F.3d 1361 (D.C. Cir. 2008), *see* Defs.' Reply Supp. Mot. Excl. Expert Test. at 8, but this case is readily distinguishable.  In *Day*, the criminal defendant identified a proposed medical expert, along with a "vague" two-page report, one week after the district court had excluded the testimony of three other proposed defense experts and less than two weeks before trial, with the proposed expert's critical clinical diagnosis only disclosed less than one week before trial.  524 F.3d at 1371–72.  The D.C. Circuit upheld the district court's exclusion of the expert witness as a sanction for the defendant violating Rule 16 by providing an insufficient and tardy report that "failed to state what [the proposed expert] had concluded from any individual test result, interview, or expert report . . . [which], in combination with the absence of a clinical diagnosis in the report, made it virtually impossible for the Government to engage in meaningful cross-examination at the *Daubert* hearing," and had "the effect of putting the government in a box that was prejudicial and unfair and which had an

---

[37]    Rule 16 requires the government to provide, at the defendant's request, a "written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial."  FED. R. CRIM. P. 16(a)(1)(G).  Such a written summary must describe "the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."  *Id.*

impact [on] the integrity of the adversary process." *Id.* at 1372 (internal quotations and citations omitted).

Here, by contrast, the government identified Special Agent Wasser as an expert witness more than three months prior to trial, *see* Gov't Notice Expert Test. at 5, ECF No. 143, and the defendants do not contend that Special Agent Wasser's expert report is so vague as to prevent the defendants from discerning the conclusions to which he would testify, *see generally* Defs.' Reply Supp. Mot. Excl. Expert Test. at 7–13. Likewise, the defendants do not suggest that they were materially prejudiced by the timing of this disclosure. *See id.* Accordingly, the Court declines the defendants' request to exclude this testimony under Rule 16. *See United States v. Martinez*, 476 F.3d 961, 967–68 (D.C. Cir. 2007) (upholding the admission of expert testimony under Rule 16 where the government provided information as to the challenged testimony approximately six weeks before trial and in opposition to a motion to exclude the testimony).

Substantively, the defendants argue that Special Agent Wasser's testimony should be excluded as irrelevant under Rule 702 because the government has failed to demonstrate that this testimony is "'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" Defs.' Reply Supp. Mot. Excl. Expert Test. at 9 (quoting *Ambrosini*, 101 F.3d at 134). To the extent that this testimony is relevant, the defendants further contend that any probative value this testimony offers is "substantially outweighed by its prejudicial effect," such that the evidence must be excluded under Rule 403. *Id.* at 12–13. The Court disagrees.

The D.C. Circuit has broadly approved the use of expert testimony to inform the jury regarding methods employed by drug organizations. *See, e.g.*, *Martinez*, 476 F.3d at 967 (observing that such testimony is "common in drug cases," and upholding the admission of expert testimony from a DEA agent regarding the likely destination of drugs shipped from

Colombia through Central America); *United States v. Eiland*, 738 F.3d 338, 351–352 (D.C. Cir. 2013) ("The operations of narcotics dealers repeatedly have been found to be a suitable topic for expert testimony because they are not within the common knowledge of the average juror." (citing authorities)); *Mejia*, 448 F.3d at 448–49 (upholding admission of expert testimony about lexicon used by drug traffickers and "the modus operandi of drug trafficking organizations in Central and South America"); *United States v. Miller*, 395 F.3d 452, 454–455 (D.C. Cir. 2005) *cert. granted, judgment vacated on other grounds*, 545 U.S. 1101 (2005) (upholding admission of expert testimony "on *modus operandi* of drug dealers in the Washington, D.C. area"). The D.C. Circuit has emphasized that such testimony may be helpful in explaining "many aspects of drug operations falling outside the scope of lay knowledge." *United States v. Wilson*, 605 F.3d 985, 1025 (D.C. Cir. 2010); *United States v. Boney*, 977 F.2d 624, 628 (D.C. Cir. 1992) (noting that *modus operandi* testimony about the operations of narcotics dealers are appropriate for expert testimony because this is "not within the common knowledge of the average juror" (citing authorities)). More specifically, here, testimony regarding common DTO efforts to produce and transport cocaine, the types of vessels and routes used, the general desire to move cocaine northward to maximize profits from trafficking, and usual techniques used to avoid detection are all probative of the defendants' ability to obtain and transport narcotics from Colombia to Panama, as well as their intent to distribute the narcotics seized from the *Mistby*. *See Eiland*, 738 F.3d at 352 (explaining that testimony regarding investigative techniques "provide[s] useful background information[, and can aid] the jury in assessing the quality of the evidence").

Though acknowledging this well-settled precedent, the defendants suggest that the government has failed to establish that Special Agent Wasser's testimony is relevant to any issue likely to be disputed at trial. *See* Defs.' Reply Supp. Mot. Excl. Expert Test. at 10–12. In large

measure, the defendants' arguments regarding this testimony parallel their arguments regarding the admissibility of the government's proffered other crimes evidence outlined above, *supra* Part IV.B. Again, the defendants suggest that government evidence offered to prove elements of the charged offense that the defendants have not affirmatively disputed is wholly lacking in probative value and therefore irrelevant under Rule 702. As before, however, this argument ignores the D.C. Circuit's admonition that the government retains the burden of proving each element of a charged offense, regardless of a defendant's decision not to challenge any particular element. *See, e.g.*, *Douglas*, 482 F.3d at 596–97. Thus, the relevance of the government's proffered expert evidence is not dependent on the defendants' decision whether to dispute any particular element of the charged offense. Disputes regarding the *relative* probative value of this evidence, as compared to the risk of unfair prejudice or confusion, are more appropriately resolved under Rule 403.

The defendants' broad suggestion that the expert testimony of Special Agent Wasser "is likely to both confuse and mislead the jury" and be unfairly prejudicial is also unavailing. The D.C. Circuit has recognized the potential risk of unfair prejudice from *modus operandi* expert testimony when the proffered testimony describes narcotics trafficking by a particular racial or ethnic group associated the defendant, particularly when such testimony is far afield from the actual charge. *See, e.g.*, *United States v. Doe*, 903 F.2d 16, 19–23 (D.C. Cir. 1990) (finding error in allowing expert witness to testify about "monopolization of the local drug market by dealers tracing their ancestry to Jamaica, [which] strongly suggested that appellants were guilty because two of them are Jamaican," when defendants were charged only with possession with intent to distribute and "this charge does not associate them with importation"); *United States v. Layeni*, 90 F.3d 514, 520–21 (D.C. Cir. 1996) (holding that it is error, albeit harmless, to permit narcotics

expert to testify about Nigerian heroin trade when the defendant was charged only with possession and distribution of heroin in the United States). By contrast here, the proffered expert testimony about the operation of Colombian DTOs provides clearly probative and relevant background information for consideration by the jury of the charged narcotics conspiracy, which involved a vessel on the high seas and took place largely in Colombia, and this probative value substantially outweighs any risk of unfair prejudice. Indeed, the D.C. Circuit has upheld the admission of similar evidence regarding the "methods of drug organizations" for transporting Colombian cocaine through Central America in a prosecution involving Colombian nationals charged with drug trafficking offenses. *Martinez*, 476 F.3d at 967–968 (noting that expert testimony concerned "*general* trafficking routes" and did not refer to any defendant's "*particular* mental state" (emphasis in original)). The defendants do little to suggest that the risk of unfair prejudice is particularly pronounced in this case.

Accordingly, the defendants' objections to the admission of expert testimony from Special Agent Wasser are denied.

### b.     CNP Patrolman Rodrigo Alexander Supelano Vargas

The defendants next challenge the admission of testimony from CNP Patrolman Rodrigo Alexander Supelano Vargas, who will testify about the use of certain "practices, techniques, and terms used by drug traffickers" to conduct illicit business via cellular telephone. Gov't Opp'n Defs.' Mot. Excl. Expert Test. at 7–8. Based on his experience with drug trafficking investigations, Patrolman Vargas will testify that DTOs often use multiple cellular telephones, as well as coded communications, to "avoid detection and thwart apprehension by law enforcement." Gov't Notice Expert Test. at 3–4. Further, relying on his past exposure to intercepted communications, as well as his review of the wiretap evidence in this case, Patrolman

Supelano Vargas will "provide opinions on the meaning of ambiguous references from the wiretap recordings, to assist the jury in deciphering the jargon used by the Defendants and their co-conspirators over the telephone and in text messages." *Id.* at 4.

Suggesting that the topics on which Patrolman Supelano Vargas would testify are "not beyond the knowledge or understanding of the average juror," the defendants ask the Court to exclude it under Rule 702. Defs.' Reply Supp. Mot. Excl. Expert Test. at 15. In essence, the defendants contend that this testimony would not "help the trier of fact to understand the evidence or to determine a fact in issue," FED. R. EVID. 702, and would instead serve only to "bolster the Government witnesses' versions of the events to which they will testify" with "the imprimatur of an expert opinion." Defs.' Reply Supp. Mot. Excl. Expert Test. at 15–16 (citing *United States v. Cruz*, 981 F.2d 659, 663 (2d Cir. 1992)).[38]

As discussed above, the D.C. Circuit has broadly sanctioned the admission of expert testimony regarding common operations of narcotics conspiracies. *Eiland*, 738 F.3d at 351–52; *Wilson*, 605 F.3d at 1025. In particular, contrary to the defendant's objection to expert testimony regarding the use of cellular telephones to avoid detection, the Circuit has cited approvingly at least one case permitting testimony of exactly this sort. *Eiland*, 738 F.3d at 351 (citing *United States v. Perez*, 280 F.3d 318, 341–42 (3d Cir. 2002)). The defendants are surely correct that Patrolman Supelano Vargas's testimony likely will clarify, and perhaps corroborate, the lay testimony of cooperating co-conspirators. The Court finds no support, however, for the

---

[38] The defendants repeat their argument that Patrolman Supelano Vargas will testify only on matters that "are not (and may never be) in dispute." Defs.' Reply Supp. Mot. Excl. Expert Test. at 16. As explained above, the government's proffered expert evidence is not rendered irrelevant simply because the defendants have declined to dispute a particular element of the charged offense. *See supra* Part IV.G.2.a. Rule 702 specifically permits the admission of expert testimony where, as here, the expert will "assist the trier of fact to understand the evidence." FED. R. EVID. 702(a).

defendants' contention that this alone warrants the exclusion of otherwise reliable and relevant expert testimony under Rule 702.

The defendants likewise argue that the government has failed to demonstrate that Patrolman Supelano Vargas's opinions regarding the meaning of coded language employed in communications between the alleged co-conspirators is sufficiently reliable to be admitted as expert testimony under Rule 702. Defs.' Reply Supp. Mot. Excl. Expert Test. at 17–19. Thus, the defendants suggest that the government has failed to explain how Patrolman Supelano Vargas's extensive experience in analyzing intercepted communications between drug traffickers "inform his understanding of the specific terms he will be called upon to interpret at trial." *Id.* at 18. Presented with this very argument, however, the D.C. Circuit has held that a foreign investigator may be properly qualified as an expert witness under Rule 702 based "solely on his testimony that he had investigated drug trafficking and 'analyzed' drug trafficking for a long time." *Mejia*, 448 F.3d at 448. Observing that the Advisory Committee's notes to Rule 702 "contemplate that this kind of experience can qualify a witness as an expert on coded phrases used in drug trafficking," the court held that the admission of expert testimony from such a witness is permitted under Rule 702. *Id.*

Accordingly, the defendants' objections to the admission of expert testimony from Patrolman Supelano Vargas are also denied.

### c.    Government Forensic Chemists

Finally, the defendants ask the Court to exclude the expert testimony of the government forensic chemists who analyzed the physical evidence seized from the *Mistby* and prior shipments the government proposes to introduce as other crimes evidence under Rule 404(b). Defs.' Reply Supp. Mot. Excl. Expert Test. at 19–21. While they do not contest that such

testimony is generally admissible under Rule 702, the defendants argue that the government has

failed to provide the "bases and reasons for th[ese experts'] opinions" regarding this evidence.

*Id.* at 20.   Namely, the defendants contend that the government has failed to explain which tests

the witnesses performed to determine the nature of the seized substances, as well as the statistical

confidence-level of their resulting expert opinions.   *Id.*[39]

In support, the defendants do not identify binding precedent that the failure to provide

such information violates the government's disclosure obligations under Rule 16.   *See generally*

*id.* at 19–21.   Nonetheless, while the D.C. Circuit does not appear to have considered the issue, at

least two circuits have so concluded.   *See United States v. Davis*, 514 F.3d 596, 612–13 (6th Cir.

2008) (finding that materials provided by the government for expert chemist were inadequate

under Rule 16 where a chemist retained by the defendant would not have been able to analyze

the steps taken by the expert witness to reach her conclusions);   *United States v. Farmer*, No. 98-

2308, 2000 WL 639474, at *12 (10th Cir. May 18, 2000) (noting that the government conceded

that it failed to provide the basis for an expert witness's conclusion by failing to describe the test

used to conclude that a substance in evidence was cocaine).   The express language of Federal

---

[39]     Based upon review of the Periodic Discovery Status Reports submitted by the government, the Court is also aware that the defendants have made repeated requests for identification of "all cases in which the forensic chemist experts have testified." Oct. 16, 2015 DSR at 2, ECF No. 163; *see* Oct. 2, 2015 DSR at 2, ECF No. 154; Nov. 13, 2015 DSR at 2, ECF No. 170; Nov. 27, 2015 DSR at 2.  The most recent DSR indicates that neither the DEA, as the institution employing the chemists, "nor the chemists themselves maintain a list of the cases in which the chemists have testified," and therefore "the Government does not possess this information and cannot produce it to the defense." Nov. 27, 2015 DSR at 2.  The fact that forensic chemists employed by the government do not maintain a list of cases or courts where they have been qualified as an expert to testify is remarkable.  While Federal Rule of Criminal Procedure 16(a)(1)(G) requires the government to produce, at the defendant's request, the expert "witness's qualifications," the Rule is silent as to scope of this requirement.  By contrast, Federal Rule of Civil Procedure 26(a)(2)(B) specifies that an expert report "must contain: . . . (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition," since these items are relevant to evaluating the expert's qualifications. FED. R. CIV. P. 26(a)(2)(B)(iv), (v).  The defendants have not sought judicial intervention to obtain the proffered chemists' full qualifications, but this is a matter that may be raised at the pretrial conference, scheduled for December 18, 2015.  The government is cautioned that even though courts must apply the procedural rules based on the language used, where a rule is silent, courts may refer to parallel procedural rules to guide their analysis.  *Accord United States v. Redd*, 355 F.3d 866, 874 (5th Cir. 2003) ("[O]ur cases dealing with the parallel rule under the Federal Rules of Civil Procedure . . . may guide our analysis.").

Rule of Criminal Procedure 16(a)(1)(G) requires the government to produce, at the defendant's request, a written summary of any expert testimony that "describe[s] the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." FED. R. CRIM. P. 16(a)(1)(G). The Advisory Committee Notes clarifies that the "summary of bases relied upon by the expert . . . cover[s] not only written and oral reports, tests, reports, and investigations but any information that might be recognized as a legitimate basis for an opinion under Federal Rule of Evidence 703, including opinions of other experts." *Id.* advisory committee's note to 1993 amendment. In the Court's view, this includes, at a minimum, a summary of the tests performed by the expert chemists to reach opinions about the nature of the seized substances.

A recent Periodic Discovery Status Report indicates that, on November 20, 2015, the government produced to the defendants "a summary of testimony from the forensic chemist experts, supplementing the Government's prior notice of expert testimony and in response to requests for additional information from the chemists." Nov. 27, 2015 DSR at 1. No party has alerted the Court whether this supplemental production renders moot this aspect of the defendants' challenge to the forensic chemists' expert testimony. Nevertheless, to ensure the defendants are provided adequate notice and opportunity to challenge the forensic chemists' bases for their proffered opinion testimony, the government must supplement its existing proffer to include a description of the tests performed by these witnesses leading to the conclusion that the evidence in issue consists of narcotics, to the extent that such information has not already been produced.[40]

---

[40] The defendants requested a *Daubert* hearing to assess the reliability of all of the government's proposed expert witnesses. Mot. Excl. Expert Test. at 1. In replying to the government's opposition, however, the defendants appear to request a pretrial hearing only with respect to the government's forensic chemist witnesses. Defs.' Reply Supp. Mot. Excl. Expert Test. at 20. In general, "[d]istrict courts are not required to hold a *Daubert* hearing before ruling on the admissibility of scientific evidence." *United States v. Machado-Erazo*, 950 F. Supp. 2d 49, 52 (D.D.C. 2013) (citing authorities); *see also Kumho Tire*, 526 U.S. at 152 ("The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings

## V.      CONCLUSION

For the foregoing reasons, Chang-Rendon's Motion for Bill of Particulars, ECF No. 69,

Motion to Dismiss the Indictment, ECF No. 119, Amended Motion to Suppress Statements, ECF

No. 74, Amended Motion to Suppress Identifications, ECF No. 75, and Motion to Exclude

Expert Testimony, ECF No. 115, are each denied, as are Moreno-Membache's Motion to

Dismiss the Indictment, ECF No. 78, and Motion to Disclose Identities of Confidential

Informants Regardless of Whether They Will be Called at Trial, ECF No. 79. The government's

Motion *In Limine* to Preclude Cross-Examination or Argument by Defense Counsel, ECF No.

73, is denied without prejudice, while the government's Motion *In Limine* to Admit or Allow

admission of co-conspirator statement, ECF No. 72, is provisionally granted subject to

connection at trial, and the government's Motion *In Limine* to Introduce Other Crimes Evidence,

ECF No. 71, is granted.

Date: December 14, 2015

_____
BERYL A. HOWELL
United States District Judge

---

are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is
reliable."). In this regard, the D.C. Circuit has held that the use of standard laboratory protocols by experienced
technicians, including the use of generally accepted testing techniques for identifying narcotics residues, "is
sufficient to satisfy the limited *Daubert* inquiry." *Law*, 528 F.3d at 913 (internal quotations omitted) (citing
authorities). Accordingly, pending the government's compliance with the Court's direction to provide a
supplemental proffer regarding the testing procedures performed by the challenged forensic chemists, the
defendants' request for a pretrial *Daubert* hearing is denied.